UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------------

ALLIANCE GROUP SERVICES, INC.,

                 Plaintiff,

        -against-

GRASSI & CO., CERTIFIED PUBLIC
ACCOUNTANTS, P.C.,

                 Defendant.

------------------------------------------------------------

Civil Action No. 3:02CV02080 (WWE)


**MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

ROBERT K. CIULLA (ct-04262)
Rciulla@cd-llp.com
Ciulla & Donofrio, LLP
127 Washington Avenue
P.O. Box 219
North Haven, CT 06473
Tel:  (203) 239-9828
Fax:  (203) 234-0379

JOHN H. EICKEMEYER (ct-24317)
jeickemeyer@vedderprice.com
Vedder Price Kaufman & Kammholz, P.C.
805 Third Avenue
New York, New York  10022
Tel:  (212) 407-7700
Fax:  (212) 407-7799

*Attorneys for Defendant Grassi & Co.,
Certified Public Accountants, P.C.*

## PRELIMINARY STATEMENT

Defendant Grassi & Company, CPAs, P.C. ("Grassi"), submits this memorandum in support of its motion for summary judgment dismissing the complaint. Grassi provided accounting and tax services to plaintiff Alliance Group Services, Inc. ("Alliance"). Alliance claims that in the course of auditing Alliance's financial statements for the year ended June 30, 2000, Grassi failed to discover that a security deposit that Alliance had placed with a vendor from which it was purchasing long-distance capacity for resale to Alliance's customers had in fact been applied by that vendor to an outstanding invoice. There is no dispute that the amount against which the deposit was applied was an obligation Alliance validly owed to its vendor and that the application of the deposit did not result in any out-of-pocket damage to Alliance.

Rather, Alliance contends that after the discovery of the application of the deposit some two years after the fact, a dispute ensued with the vendor that allegedly led the vendor to enforce for the first time a minimum usage requirement and to refuse to negotiate more favorable rates with Alliance. Notwithstanding that Alliance chose to dispute the application of the deposit and also had a series of other disputes that caused it to withhold amounts the vendor claimed were due, Alliance now contends that the enforcement of the minimum usage provision and the refusal to negotiate discounts was caused by Grassi's alleged failure to discover the application of the deposit in the course of performing the audit.

However, as demonstrated in Point I, *infra*, the undisputed facts herein yield no basis, as a matter of law, for this Court to find that any conduct by Grassi proximately caused the enforcement of the minimum usage provision or the refusal to negotiate more favorable rates. Each of these developments was entirely independent of the non-discovery of the deposit, as Global consciously reduced its usage of the vendor's capacity and disputed a number of the vendor's charges for reasons unrelated to the deposit. Any dispute that may have poisoned the

relationship between the parties was a result, not of the non-discovery by Grassi of the application of the deposit, but of the vendor's actual application of the deposit. Moreover, the enforcement of the contractual minimum usage requirement and the refusal to grant better rates simply was not the kind of risk that could be foreseen from the audit failure alleged by Alliance. Accordingly, as a matter of law, the requisite element of causation is absent as to these two elements of claimed damage, and – even if some of Alliance's claims are allowed to proceed – Grassi is entitled to summary judgment dismissing any claim for recovery of these two elements, which comprise nearly 90 percent of Alliance's alleged damages.

In addition, Alliance's claims for negligence, negligent misrepresentation and breach of contract should be dismissed because, based on the unchallenged testimony of the Grassi auditor in charge of the engagement and Alliance's then-president, the invoice that would have revealed the application would not have been deemed to be an expense within the fiscal year under audit based on the accounting methods then being used by Alliance, and so would not have factored into the financial statements being audited by Grassi. Point II, *infra*. Finally, Alliance's other claims – for fraud, unjust enrichment, promissory estoppel, conversion and violation of the Connecticut Unfair Trade Practices Act – are all either legally infirm or must be dismissed because the undisputed record negates one or more requisite elements. Point III, *infra*. Accordingly, Grassi's motion for summary judgment should be granted in all respects.

## STATEMENT OF FACTS

Alliance is, in the words of its president, "a network service provider for AT&T and other first-tier telecommunications carriers to other telephone companies." (DiPasquale Dep. at 5)[1] In

---

[1]     Excerpts from the depositions taken in this action, together with other documents referred to in this Memorandum are annexed as exhibits to the accompanying Declaration of John H. Eickemeyer ("Eickemeyer Dec."). "DiPasquale Dep." refers to the deposition of Jess DiPasquale, excerpts of which are annexed as Exhibit C to the Eickemeyer Dec. "Mallon Dep." refers to the deposition of Michael Mallon, excerpts of which are annexed as

other words, Alliance provides access to long distance networks, occasionally with service enhancements, to other carriers, who in turn sell access to their customers. Alliance is a Delaware corporation with its principal place of business in Westport, Connecticut. (Complaint, ¶1) At some point in the period 1997-99, Alliance engaged the accounting firm of Tabb, Conigliaro & McGann ("TCM") to provide it with certain accounting and tax services. (McGann Dep. at 34) After preparing an initial tax return for Alliance, TCM began work on an audit of Alliance's financial statements for the fiscal year ended June 30, 1999. Alliance thereafter determined that this audit was not necessary and so it was not completed. (*Id*. at 35) Subsequently, TCM was engaged to audit Alliance's financial statements for the year ended June 30, 2000. (*Id*. at 39)

Originally, Alliance routed most of its business through the AT&T network, to which it provided access with enhancements arising from a "facility" loaded by Alliance on the AT&T network. (DiPasquale Dep. at 7-8) In April 2000, Alliance entered into an agreement with Global Crossing Bandwidth, Inc. ("Global") that enabled Alliance to provide service in areas not readily covered by AT&T. (Thomas Dep. at 9-10) The agreement with Global (referred to herein as the "Agreement" and annexed as Exhibit J to the Eickemeyer Dec.) required, *inter alia*, that Alliance initially place a security deposit of $250,000 with Global. (Agreement, ¶3.3) Alliance was to receive monthly invoices from Global, payment of which was required within 30 days. (*Id.*, ¶¶3.5, 3.6) Alliance made the deposit required by the Agreement on or about May 4, 2000. (Thomas Dep. at 11-12 and documents evidencing deposit (Eickemeyer Dec. Exh, K))

---

Exhibit D to the Eickemeyer Dec. "Thomas Dep." refers to the deposition of Mark Thomas, excerpts of which are annexed as Exhibit E to the Eickemeyer Dec. "Shannahan Dep." refers to the deposition of Carolyn Shannahan, excerpts of which are annexed as Exhibit F to the Eickemeyer Dec. "Holden Dep." refers to the deposition of Stuart Holden, annexed as Exhibit G to the Eickemeyer Dec. "McGann Dep." refers to the deposition of Kevin McGann, excerpts of which are annexed as Exhibit H to the Eickemeyer Dec. "Graham Dep." refers to the deposition of Stephen Graham, excerpts of which are annexed as Exhibit I to the Eickemeyer Dec.

However, unbeknownst to Alliance, Global did not hold the $250,000 deposit as required by the Agreement, but immediately applied it to an outstanding Alliance invoice. The effect was to reduce the amount then owed by Alliance to Global by $250,000. (See reproduction of Global invoice dated June 26, 2000, retrieved from Global's billing system, annexed as Exhibit L to the Eickemeyer Dec.) The application of the deposit and the reduction of Alliance's payable to Global went undiscovered by Alliance at the time because, for reasons that still are not clear, Global's invoice dated June 26, 2000, which would have revealed the application of the deposit, either was not received by Alliance or simply was not entered into its accounting system. As a result, Alliance's books reflected the continued existence of the deposit, though they also reflected the reduced amount due to Global, which was correctly stated on the subsequent Global invoice. At no time did Alliance provide a copy of the missing June 26, 2000 Global invoice to TCM, and Alliance to this day has been unable to find a copy of the invoice as sent to it by Global – if indeed the invoice was sent – in its files.[2] Alliance did not become aware of the application of the deposit and the corresponding reduction of its accounts payable until June 2002, when a copy of the invoice was provided by Global to invoice in the context of attempting to resolve certain billing issues. (DiPasquale Dep. at 49-51 and fax to DiPasquale by Steven Graham of Global, dated June 5, 2002 (Eickemeyer Dec. Exh. N))

---

[2]    While Alliance's current CFO speculated that the invoice was lost by TCM/Grassi personnel in the course of performing the audit, this is highly unlikely since the audit workpapers reflect that most of the audit field work was not performed until September and October 2000, long after the June 26, 2000 invoice would have been received in the normal course of business. Carolyn Shannahan, who functioned as Alliance's comptroller in the latter half of 2000, testified that invoices from vendors such as Global were generally entered into Alliance's system within one month of receipt. (Shannahan Dep. at 15) The records produced by Alliance do not reflect the entering of the June 26, 2000 Global invoice in Alliance's accounting system (Eickemeyer Dec., Exh. M), as would have been the case had the invoice been received and processed by Global. By the time TCM/Grassi personnel arrived to perform the audit, the Global invoice in question would have been processed and filed (Shannahan Dep. at 16-19) if it had been received by Alliance. Shannahan confirmed that she recalls having searched for Global invoices in the fall of 2000 but that there were some she could not find. (*Id.*)

Beginning in the fall of 2000, TCM undertook to audit Alliance's financial statement for the year ended June 30, 2000.  The audit took a long time to complete and the audited financial statement was not issued until the spring of 2001. (A copy of Alliance's audited financial statement for the year ended June 30, 2000, is annexed as Exhibit O to the Eickemeyer Dec.)  By the time the audit was completed, the accountants from TCM had joined the firm of Grassi & Co., CPAs, P.C. ("Grassi")[3], which issued the audit opinion on the financial statement.  The audited financial statement reflected the $250,000 as still being on deposit with Global.  The auditors were presented with documents showing that the deposit had been made (Eickemeyer Dec., Exh. K), but none showing the application of the deposit.

While examination of subsequent invoices might have revealed that the amounts due on the Global invoices from month to month did not match, thereby indicating a skip in the invoice sequence, it appears – based on the testimony of the persons involved in the audit – that this would not have made a difference in the amounts reported on Alliance's financial statement for the year ended June 30, 2000.  Kevin McGann, the Grassi partner who was in charge of the audit, explained at his deposition that Alliance generally billed its customers for usage in the month after an invoice was received from a supplier such as Global, and that the costs associated with the resulting revenue were matched, on a timing basis, with that revenue when billed. (McGann Dep. at 73-75)  Thus, the Global usage reflected in the invoice dated June 26, 2000, would have been billed to Alliance's customers in July 2000.  Since the proceeds of that billing would be classified as July 2000 revenue, the associated costs – in the form of the charges reflected in the Global invoices – would be classified as July 2000 costs and, as such, would not be reflected on the financial statements for the year ended June 30, 2000.

---

[3]     Hereafter, TCM, and the accountants associated with it, will be referred to as "Grassi" for the sake of clarity.

Mark Thomas, who was Alliance's president until June 30, 2001, has confirmed McGann's description of Alliance's practice at that time for timing revenues and expenses:

> "Q    So the usage that was reflected on the May 18 cycle invoice, which is part of Exhibit 5, would be billed to customers in June?
>
> A    Right, and a lot of that usage as the first eighteen days of that would be billed on the June plus fourteen days of usage and that would have appeared on the June billing cycle from Global Crossing..
>
> Q    So was it the case then that the $260,000 in usage which represented the billing from Global Crossing was being treated as a June expense by Alliance?
>
> A    That's possible, yes, because looking at the usage on the other one the information matches up to that invoice date, the May invoice date.
>
> Q    So it would have been the case that the usage reflected on the June 18 cycle invoice would have been treated as a July expense by Alliance?
>
> A    Yes.
>
> Q    That would have been consistent?
>
> A    Yes."

(Thomas Dep. at 37-38)  While as part of the audit, Grassi personnel did look at subsequent invoices from Global, this was part of a process to assure that all pre-June 30 expenses would have been properly recorded.  But since the usage reflected on Global's June 26, 2000 invoice would not have been considered a June 2000 expense under the Alliance accounting practice as described by McGann and Thomas, the presence or absence of the invoice would have had no effect on the June 30, 2000 financial statement and would not be reflected thereon.

Alliance was sold by its then-owners in or about August 2001.  McGann testified that he was unaware of any sale plans at the time his firm was engaged to perform the June 30, 2000

audit. (McGann Dep. at 39)    The new ownership replaced Grassi as Alliance's auditors, employing a firm – Hobe & Lucas – with which the new ownership had a relationship and with which the new ownership "felt comfortable." (DiPasquale Dep. at 105)

In the early part of 2002, Alliance reduced the volume of its business with Global due to concerns about Global's financial position following Global's bankruptcy filing. (Mallon Dep. at 33-34)   Alliance's new CFO testified that wherever possible in the first few months of 2002, Alliance transferred business away from Global to other carriers with a view to reducing its traffic on Global to the minimum amount possible. (*Id*. at 35)   In addition, in late 2001 and early 2002, Alliance – following an analysis by an outside company – concluded that it had "significant overbilling issues" with Global. (*Id*. at 38)   Alliance also had a dispute over actions by Global that had the effect of switching traffic of Lextel, an Alliance customer, to a vendor other than Alliance without Alliance's prior knowledge or consent.   This was particularly troubling to Alliance because Lextel was a slow-paying customer that owed Alliance about $280,000, and the transfer of Lextel's traffic away from Alliance deprived Alliance of the ability to take certain actions that would have facilitated collection. (*Id*. at 38-42)

The overbilling and Lextel issues led Alliance to withhold payment from Global on certain invoices with the result that by the spring of 2002, Alliance had a past due balance with Global of approximately $480,000. (Mallon Dep. at 55-56 and collection of Global-Alliance e-mails in May and June 2002 (Eickemeyer Dec., Exh. P))   In the course of trying to resolve this dispute, Alliance asked Global whether the $250,000 that it believed was still on deposit could be applied to some of the outstanding amounts.   After investigating the situation, on or about June 5, 2002, Steven Graham of Global replied to Jess DiPasquale, who was now Alliance's president, that the deposit had been applied to an outstanding invoice on May 4, 2000, and faxed

him copies of invoices generated by Global's accounting system that reflected the application of the deposit. (A copy of Graham's fax is annexed as Exhibit N to the Eickemeyer Dec.)  Global's only explanation for the application of the deposit was that it was probably done accidentally. (Mallon Dep. at 63-65)

Apparently, the application of the deposit became yet another area of dispute between Global and Alliance, which believes that the application was not justified under the Agreement. But since the deposit was applied by Global against an amount unquestionably due from Alliance, the only issue as between Alliance and Global is whether Global had a right to apply the deposit when it did. (Mallon Dep. at 100-01)  As a result, Alliance has not asked Global to return the $250,000 since that would only result in more money being owed to Global by Alliance. (DiPasquale Dep. at 88-89)

However, Alliance withheld payment on Global invoices as result of the controversy over the deposit.  At the moment, Alliance is still withholding $100,000 in amounts due under Global invoices because of its belief that the deposit should not have been applied by Global when it was (Mallon Dep. at 95-98) – notwithstanding that Alliance did not have any out-of-pocket loss as a result of the application of the deposit.[4]  Mallon and DiPasquale testified that Global forced Alliance to pay $150,000 of the amount Alliance was withholding by threatening to cut off service, though neither indicated that this amount was not validly owed to Global by Alliance. (DiPasquale Dep at 85-88; Mallon Dep. at 95-98)  Alliance's CFO testified that, in addition to

---

[4]    In short, Alliance owed the $250,000 to Global in any event and would have had to pay that amount out of its current cash flow had the deposit not been applied.  From a balance sheet perspective, the effect of the application of the deposit by Global was to reduce Alliance's cash assets by $250,000 while reducing its account payable liabilities by $250,000, resulting in a net change of zero on Alliance's balance sheet bottom line.

the deposit, other billing disputes with Global, including Lextel, persisted and new ones have arisen. (Mallon Dep. at 96-98)[5]

Alliance commenced this action against Grassi in November 2002, alleging, *inter alia*, that Grassi had negligently failed to detect the application of the Global deposit in the course of performing its audit of Alliance's financial statement for the year ended June 30, 2000.  Alliance asserted no less than eight separate causes of action in its complaint, a copy of which is annexed as Exhibit A to the Eickemeyer Dec.  In Count I of the Complaint, Alliance alleges that Grassi breached its contract with Alliance with respect to the performance of the services for which it was engaged, which Alliance alleges proximately caused at least $250,000 in damages.  Count II of the Complaint alleges that Grassi was negligent in the performance of its professional services.

Count III of the Complaint is for unjust enrichment, with Alliance claiming that Grassi was unjustly enriched in the amount of the $161,355.00 that Grassi (and presumably TCM before it) received in connection with their services to Alliance.[6]  Count IV is for negligent misrepresentation, which is apparently based on alleged misrepresentations contained in the audited June 30, 2000 financial statement.  In Count V, Alliance purports to assert a cause of action for fraud, alleging that Grassi falsely stated that it would perform its work in accordance with professional standards and that its invoices represented that its services had been so performed when in fact, Alliance alleges, they were not.

---

[5]    Mallon also testified at his deposition on November 5, 2003, that Alliance had recently reached some resolution of the Lextel issue but that Global had not yet credited the amount promised. (Mallon Dep. at 92-93)

[6]    These fees included not only the audit of the June 30, 2000 financial statements but other tax and review services as to which Alliance had not identified any errors or shortcomings in Grassi/TCM's performance.

Count VI of the Complaint purports to be a claim under the Connecticut Unfair Trade Practices Act ("CUTPA") alleging that Grassi committed unfair and deceptive acts by allegedly accepting payment for work that was not performed and/or that was not performed in accordance with professional standards, and by misrepresenting that it had performed its services in accordance with professional standards. In Count VII, Alliance asserts a claim of "promissory estoppel," in which it alleges that Grassi should be estopped from denying that it promised to perform its services in accordance with professional standards. Finally, in Count VIII of the Complaint, Alliance purports to assert a claim for conversion of the funds that Grassi/TCM received in payment of the invoices that they rendered to Alliance. Grassi has filed an answer, a copy of which is annexed as Exhibit B to the Eickemeyer Dec., denying the material allegations of the Complaint and asserting several affirmative defenses.

Although the Complaint makes repeated references to the $250,000 figure, it is clear that this is not the measure of any alleged damages suffered by Alliance since the deposit was applied to amounts that Alliance admittedly owed to Global. Faced with its inability to establish any damages based on the application of the deposit itself, Alliance has fallen back on the fees paid to Grassi – many of which were for other services as to which there is no dispute in this action. Alliance additionally alleges that it has been damaged by Global's refusal to negotiate more favorable rates for Alliance due to Alliance's open balance with Global. Finally, in or about April 2003 – long after the application of the deposit came to light and many months after this lawsuit was commenced – Global began enforcing section 3.9 of the Agreement, which requires that Alliance pay a minimum charge if its usage in any given month did not rise to a level specified in the Agreement. Based on documents provided by Alliance, this charge ceased to be

10

imposed in or about September 2003 and it appears that Alliance has not actually paid any of the minimum usage charges. (Copies of 2003 Global invoices to Alliance, Eickemeyer Dec., Exh. Q)

Alliance attempts to link these developments to Grassi's supposed failure to discover the application of the deposit. As demonstrated below, as a matter of law, Alliance cannot establish that any conduct by Grassi in the course of the audit of Alliance's financial statements for the year ended June 30, 2000 proximately caused these elements of alleged damage. For this reason, and others discussed herein, Grassi's motion for summary judgment should be granted.

## ARGUMENT

As demonstrated below, Grassi is entitled to summary judgment dismissing all of the claims asserted by Alliance. (Points II and III, *infra*) But even if some of those claims should survive to trial, Alliance will still be unable to establish the requisite element of proximate cause as to two of the principal elements of its alleged damages, namely, the more favorable rates that it alleges it would have obtained but for the dispute with Global over application of the deposit and the imposition, for a time, of the monthly minimum charge pursuant to the Agreement, which Alliance also attributes to the deposit dispute with Global. Thus, as demonstrated in Point I, *infra*, even if some of Alliance's claims survive this motion, these two elements of alleged damage are not causally connected to any conduct by Grassi and, based on the undisputed facts herein, may not be recovered as a matter of law.

## POINT I

### ALLIANCE MAY NOT RECOVER FROM GRASSI THE "LOST DISCOUNTS" AND MINIMUM USAGE CHARGES IMPOSED BY GLOBAL

Two of the elements of alleged damage that Alliance seeks to recover are (1) monthly minimum usage charges that Global began imposing in the spring of 2003 pursuant to a provision of the Agreement that had not been previously enforced, and (2) discounts or more

favorable rates that Alliance alleges it would have received from Global had the dispute over the deposit not arisen. As demonstrated below, as a matter of law, the undisputed record yields no basis from which it could be inferred that either of these elements of alleged damage was proximately caused by any conduct of Grassi. Partial summary judgment should therefore be granted dismissing Alliance's claims to the extent such damages are sought.

**A.     As A Matter of Law, Alliance Cannot Establish A Causal Link Between Global's Enforcement of the Minimum Usage Charge and Any Conduct By Grassi**

Even if it were assumed that Grassi should have detected, in the course of performing the June 30, 2000 audit, that the deposit had been applied by Global immediately upon receipt, Alliance cannot establish the requisite causal link between any conduct by Grassi and Global's decision, made sometime in the late winter or early spring of 2003, to begin enforcing the monthly minimum usage provision of the Agreement. Proximate cause is a requisite element of negligence and fraud claims under Connecticut law.[7] *Doe v. Manheimer*, 212 Conn. 748, 757, 563 A.2d 699, 703-04 (1989); *Coste v. Riverside Motors, Inc.*, 24 Conn.App. 109, 112, 585 A.2d 1263, 1265 (Conn. App. 1991); *Lane v. Reibel*, 1997 WL 403226 (Conn. Super. July 9, 1997).

Connecticut courts have established that to succeed on a negligence or fraud claim, a plaintiff must establish both causation in fact – that the injury would not have occurred but for the defendant's conduct – and "legal" or proximate cause. *Doe v. Manheimer, supra,* 212 Conn. at 757-58, 585 A.2d at 1265. Proximate cause "tempers the 'expansive view of causation [in fact]'" by requiring that the defendant's conduct be a "substantial factor" in producing the plaintiff's injury. (*Id.*) The Connecticut Supreme Court has further explained that the substantial factor test

---

[7]     For purposes of this motion, it is assumed that Connecticut law would be applied to this action.

> "reflects the inquiry fundamental to all proximate cause questions; that is, 'whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's negligence.' (citations omitted)"

(*Id.*)   While causation is generally thought of us a matter of fact (*Stewart v. Federated Department Stores, Inc.*, 234 Conn. 597, 611, 662 A.2d 753, 760 (1995)), it may be decided as a matter of law where "the mind of a fair and reasonable conclusion could reach only one conclusion." (*Id.*)   Courts have not hesitated to dismiss claims on motion where gaps in the causal chain require the court to engage in "conjecture" as to the existence of a proximate causal relationship between the defendant's conduct and the plaintiff's alleged harm.  *Coste v. Riverside Motors, Inc., supra,* 24 Conn. App. at 114-15, 585 A.2d at 1266.  *See also Abrahams v. Young and Rubicam, Inc.*, 240 Conn. 300, 307, 692 A.2d 709, 712 (1997)(CUTPA claim, which involves similar proximate cause analysis).

In this case, dismissal as a matter of law is entirely appropriate as the causal link proposed by Alliance between Grassi's alleged negligence and the enforcement of the monthly minimum usage charge is so "overly remote" as to be impermissibly "conjectural." *Coste v. Riverside Motors, Inc., supra.*  Indeed, as demonstrated below, Alliance's damage claim for the monthly minimum charge fails both the causation in fact and the proximate cause tests. Accordingly, summary judgment should be granted dismissing this element of Alliance's claim.

1. **Alliance Cannot Demonstrate Causation In Fact As To The Enforcement of the Monthly Minimum Usage Charges**

In order even to reach the issue of whether any conduct by Grassi was the proximate cause of Global's decision to begin enforcing the monthly minimum usage charges provided for in the Agreement, Alliance must first be able to demonstrate that the enforcement would not have occurred but for Grassi's conduct.  Based on the undisputed facts herein, Alliance cannot

do so.  The only wrongful conduct by Grassi alleged by Alliance is its supposed failure to discover, in the course of performing the June 30, 2000 audit, that the $250,000 deposit was applied by Global to an outstanding payable as soon as it was received.  The application of the deposit did not come to light until June 2002.

The Agreement contains a provision requiring that Global pay a minimum monthly charge of $250,000 or 75 percent of the previous month's usage, whichever was greater.  If Alliance's monthly charges fell below this minimum, it would be required to pay the shortfall. (Eickemeyer Dec., Exh. J, ¶3.9)  For most of the first two years of the relationship, Alliance's usage was generally greater than this minimum.  However, in or about early 2002, Alliance made a decision to reduce its usage of Global to the minimum amount possible due to Global's financial problems and, ultimately, bankruptcy. (Mallon Dep. at 33-35)  There is no dispute that, as a result, Global's monthly usage fell below the minimum amount. (*See* summary table of Global invoice amounts, provided by Alliance, Eickemeyer Dec., Exh. Q)

Despite this, for more than a year, Global did not enforce the minimum usage provision, notwithstanding that Alliance's usage was considerably below the monthly minimum, that the application of the deposit had been discovered and become a matter of contention, and that a host of other billing and overbilling disputes had arisen that led Alliance to withhold amounts that Global claimed it was owed.  (*See* discussion at pp. 7-9, *supra*)

Then, on a Global invoice dated April 26, 2003, reflecting usage between March 19, 2003 and April 18, 2003, Global first imposed a minimum shortfall charge of $116,667.43, reflecting that Alliance's usage in that month was below the contractually-specified minimum.  Shortfall charges in various amounts were imposed on invoices in subsequent months, through the invoice dated August 20, 2003.  The shortfall charges totaled $955,004.  Invoices in subsequent months

14

do not reflect any shortfall charge, even though the usage for those months was far below the minimum specified in the Agreement. Moreover, the growing balance due on the invoices, and handwritten notes on the copies produced by Alliance, indicate that none of the shortfall charges has actually been paid by Alliance.[8]

Alliance's attempt to recover the shortfall charges fails because it cannot satisfy the threshold causation in fact test. Alliance must show that the monthly minimum provision would not have been enforced but for Grassi's alleged failure to discover the application of the deposit. However, the undisputed facts herein preclude any such inference. First of all, the dispute with Global over the application of the deposit did not arise from the late discovery of the application, but from the application itself by Global in May 2000. Even if Global's arguably improper (or at best accidental) application of the deposit had been discovered in the fall of 2000, when the audit was being performed, it simply would have accelerated the timing of the dispute that ultimately broke out. The inescapable conclusion is that Grassi's non-discovery of the application did not cause the dispute between Global and Alliance; rather, the application of the deposit itself did. Thus, Alliance cannot contend that but for Grassi's alleged failure to discover that the deposit had been applied in May 2000, the shortfall charges would not have been imposed in 2003.

Second, Alliance was not meeting the minimum usage requirement for a full year before the minimum was enforced. This was a consequence of Alliance's decision to reduce its usage of Global capacity to the minimum level possible, notwithstanding the existence of the minimum

---

[8]    As an initial matter, the fact that Alliance has not paid the shortfall charges indicates that they are not properly an element of damages at this time. Given what are apparently ongoing discussions between Alliance and Global, it is entirely possible that these shortfall charges will be forgiven or compromised in some way should the Alliance-Global relationship proceed. Indeed, Graham testified that discussions between Alliance and Global are on-going and that one of the results might be that the shortfall balances are credited as part of an overall restructuring of the Global-Alliance relationship. (Graham Dep. at 58-59) At this point, any claim for damages based on the imposition of the monthly minimum charges is speculative and so may not be maintained. For this reason alone, dismissal of this portion of Alliance's claim is required.

usage provision in the Agreement.  Alliance's decision was the true "but for" cause of the imposition of the shortfall charge.  Even if the deposit application had been timely discovered – indeed, even if the deposit had never been applied – Alliance's decision to reduce its usage of Global's capacity would have rendered it susceptible of having the minimum usage provision enforced.[9]

Moreover, the record reveals a number of other disputes between Global and Alliance that remained unresolved as of March-April 2003.  As a result, Alliance was withholding amounts Global claimed to be owed and was pressing Global to grant credits against its outstanding balance. (Mallon Dep. at 95-98)  In view of these myriad disputes, Alliance cannot contend that "but for" the deposit application dispute, the minimum usage requirement would not have been enforced.  The fact that the shortfall charges have recently been discontinued while the deposit controversy with Global continues unresolved only serves to undercut further any contention that "but for" Grassi's non-discovery, the minimum usage provision would not have been enforced.

Finally, the deposition testimony of Global employee Steven Graham, who was responsible for Alliance's account with Global during the relevant period, establishes incontrovertibly that there is no causation in fact link between the imposition of the shortfall charges and the deposit "controversy."  Though Alliance was below the minimum usage level specified in the Agreement for many months before the shortfall charges were imposed, Graham testified that

---

[9]    Indeed, since Alliance had the technical capacity to readily transfer traffic back to Global's network (Holden Dep. at 22), it could have easily done so and averted the imposition of the shortfall charges.  Not only does this undercut any causation in fact link regarding Grassi's alleged non-discovery of the application of the deposit, it also requires dismissal of this aspect of the claim on the ground that Alliance has, as a matter of law, failed to take reasonable steps available to it that would have enabled it to mitigate or minimize its damages.

> "I would say it is always Global Crossing – I can't think of the word but I would say it is always Global Crossing's policy to put shortfalls onto someone's invoice when they are not meeting their minimums and that it is a manual process and that it does get overlooked."

(Graham Dep. at 46-47)  Graham testified that at some point he was informed by Global's billing department that the shortfall charges had not previously been imposed on Alliance but now would be (*id*. at 45-46), and went on to testify as follows:

> "Q.    Okay.  Did anyone ever tell you that the reason that Global Crossing was enforcing the minimum against Alliance was because of the ongoing issues relating to the deposit?
>
> "A.    I personally believe it was not related at all.  I believe it was just the billing audit that they did and compared it against their contract and realized that they were not meeting their minimum and thus, they started applying shortfalls.
>
> "Q.    Did anyone ever tell you that there was any relationship between Global Crossing's decision to start enforcing the minimum under the Agreement against Alliance and the existence of the deposit issue?
>
> "A.    No one told me that, no.
>
> "Q.    Do you have any reason to believe there is a relationship between the two?
>
> "A.    No."

(Graham Dep. at 47).

This testimony by the Global account executive responsible for the Alliance relationship removes any doubt that the imposition of the shortfall charges was unrelated to the issues over the deposit.  In response, Alliance can offer only its conjecture that there must have been some relationship between the deposit and the imposition of the shortfall.  But, as the Connecticut authorities cited above demonstrate, conjecture is inadequate to establish causation.  The undisputed record yields no facts from which it could be concluded that "but for" the non-

discovery of the deposit, the shortfall charges would not have been imposed. Accordingly, Alliance as a matter of law cannot meet the threshold causation in fact requirement for its claim to recover the imposed shortfall amounts (which it appears not even to have paid). Grassi is thus entitled to summary judgment dismissing this aspect of Alliance's damage claim.

> **2.     Alliance, As A Matter of Law, Cannot Establish That Any Conduct By Grassi Proximately Caused The Imposition Of The Minimum Usage Charges**

Even if Alliance could surmount the "but for" causation hurdle with respect to the minimum usage charges, it is still unable, as a matter of law, to establish the requisite element of proximate cause. The harm of which Alliance complains – imposition of the shortfall charges by Global pursuant to the Agreement – is simply not within the category of risks that were a foreseeable result of the kind of audit failure alleged by Alliance.

As discussed above, the doctrine of proximate, or legal, cause "tempers the 'expansive view of causation [in fact]'" and generally rejects "'remote or trivial [actual] causes'." *Doe v. Manheimer, supra,* 212 Conn. at 757-58, 563 A.2d at 704 (citations omitted). The proximate cause test is whether the alleged wrongful conduct was a "substantial factor" in the resulting harm. (*Id.*) The Connecticut Supreme Court explained in *Doe* that wrongful conduct is a "substantial factor" in bringing about the resulting harm where "the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's negligence." 212 Conn. at 758, 563 A.2d at 704.

The risks of an auditor's failure to perform its engagement in accordance with prevailing professional standards, in the context of an asset such as the $250,000 deposit, are straightforward. A failure by the auditor to ascertain whether or not the deposit exists would create a risk that it does not and that the company's net worth would be overstated on the balance sheet. It might also create a risk that further asset losses would occur, either due to a failure of

internal controls or a failure to detect wrongdoing such as an employee embezzlement. Such an audit failure might also create a risk that a third party would be deceived as to the audit client's true value, though the ability of non-clients to sue an accountant for negligence is often limited.[10] Essentially, the risk of an audit failure with respect to a particular asset is the loss of and/or inability to recover that asset, plus possible future similar asset losses.

However, no such harm is complained of here. Although the deposit was applied by Global when it arguably should not have been, there is no dispute that the $250,000 was applied against a valid obligation of Alliance to Global, a point which Alliance does not dispute. (Mallon Dep. at 100-01) From a balance sheet perspective, while the application of the deposit reduced Global's assets by $250,000, it also reduced its liabilities, in the form of accounts payable, by $250,000. The net bottom line effect was zero and Alliance does not – and cannot – claim that it suffered any direct loss as a result of the application or its non-discovery in 2000.

Alliance instead complains of a very different and far more attenuated type of "harm," namely, the imposition of the shortfall charge in 2003. But the risk that Global would, after Alliance had decided to reduce its usage, decide to enforce the minimum usage provision is simply a different kind of harm than that which could reasonably have been foreseen as a result of any audit failure by Grassi. At the time of the audit, foreseeing the imposition of the shortfall charge would have required foreseeing that Alliance would decide to minimize its use of the Global network (with which Alliance had just established a relationship) and that Global would, after a time, respond by imposing a shortfall charge. Alliance's decision to cut back on usage of the Global network was an entirely independent development, which was admittedly triggered by

---

[10]    *See, e.g., Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 483 N.E.2d 110, 493 N.Y.S.2d 435 (1985), (setting out restrictive three-part test for negligence actions against accountants by non-clients under New York law).

concerns over Global's financial stability, and was made months before the discovery, in June 2002, that the deposit had been applied two years earlier.

The imposition of the shortfall charge by Global in or about April 2003 thus was entirely independent of the non-discovery of the deposit application and was not a foreseeable consequence of any audit failure by Grassi. These undisputed facts show that Alliance's causation theory relies on conjecture that Global decided to enforce the minimum usage provision because of the ongoing dispute over the deposit. Not only is such conjecture insufficient, as a matter of law, to constitute the requisite proximate cause, it is contradicted by the testimony of Global's account executive, who testified that he had no reason to believe that there was a relationship between the deposit "issue" and the imposition of the shortfall charges. (Graham Dep. at 47)

Moreover, the deposit "issue" clearly is an outgrowth of the application of the deposit itself and Alliance's belief that it was improper, rather than any non-discovery by Grassi of the deposit application. Particularly instructive here is the Connecticut Supreme Court's decision in *Abrahams v. Young and Rubicam, supra*. (While *Abrahams* involved a CUTPA claim, the Supreme Court applied the same proximate cause analysis as for a tort claim.) The plaintiff in *Abrahams* alleged that his reputation was damaged by defendant's scheme to bribe certain government officials in Jamaica, where plaintiff was himself a government official. After the scheme came to light, defendant falsely implicated plaintiff in the scheme, after which he was indicted, with the result that his reputation was allegedly damaged and his consulting business destroyed. However, the Court found, the bribery scheme – which was actionable under CUTPA – was not the proximate cause of the harm to plaintiff. Rather, the court found, the disclosure of

20

the scheme and the wrongful implication of plaintiff was the cause of his alleged damage, not the scheme itself. The Court held that it could not be inferred that defendant

> "either intended or could have foreseen that, as a result of its attempt to bribe the plaintiff, he would be injured by an erroneous indictment for bribery or by publication of the incorrect accusations therein."

240 Conn. at 307, 692 A.2d at 712. Plaintiff's claim was therefore dismissed.

While *Abrahams* is in some ways the mirror image of this case, the same result is called for. The alleged failure by Grassi to discover the application of the deposit did not cause the dispute that Alliance alleges led to imposition of the shortfall charges. Rather, it was the application of the deposit itself by Global that led to the dispute. Alliance can present no facts from which it could be inferred that it was the timing of the discovery of the application, rather than Global's actual application of the deposit, that resulted in the dispute, much less that the dispute had anything to do with the imposition of the shortfall charges.

Since Alliance's proximate cause theory as to this element of damages rests entirely on its conjecture that the deposit dispute and the shortfall charges are somehow related, it falls within the category of cases in which courts have found, as a matter of law, that no reasonable fact-finder could find a proximate causal link. *See, e.g., Abrahams v. Young and Rubicam, supra; Coste v. Riverside Motors, Inc., supra* (negligence claim dismissed on motion where proposed proximate causal relationship was conjectural); *Fraser v. United States*, 1993 WL 667632 (D. Conn. July 16, 1993)(Eginton, J.)(negligence claim dismissed on summary judgment because violent conduct that harmed plaintiff was not foreseeable). Accordingly, the Court should grant summary judgment dismissing Alliance's claim insofar as it seeks damages based on the imposition of the shortfall charges.

**B.    As A Matter Of Law, Alliance Cannot Establish A Causal Link Between Global's Decision Not To Grant Alliance Discounts Or More Favorable Rates And Any Conduct By Grassi**

In addition to the shortfall charges, Alliance also seeks to recover discounts, or the equivalent of more favorable rates, that it contends it would have received from Global but for Grassi's alleged failure to discover Global's application of the $250,000 deposit when Grassi performed its audit work in the fall of 2000. However, Alliance fares no better here in establishing the requisite causation than it does with respect to the shortfall charges. Accordingly, summary judgment dismissing this element of damages should also be granted.

**1.    Alliance Cannot Demonstrate Causation In Fact With Respect To The "Lost Discounts" Or The Refusal To Renegotiate Rates**

Alliance alleges that if it had not been for the dispute with Global over the deposit application, Global would have been willing to negotiate more favorable rates. Global estimates that this refusal has cost it approximately $70,000. However, based on the undisputed facts herein, Alliance cannot establish that but for Grassi's alleged failure to discover that the deposit had been applied, it would have received lower rates from Global.

First of all, the dispute between Alliance and Global arises from Alliance's contention that Global applied the deposit to an outstanding Alliance payable when it had no right to do so under the Agreement. As a result, Alliance has withheld payment of certain amounts from Global, which in turn has led Global to consider Alliance not to be current in its payments.[11] As Global account executive Steven Graham testified at his deposition, Global generally is unwilling to renegotiate rates with a customer that is not current and the withholding of funds by Alliance has probably caused Alliance to consider Global as not current in its obligations.

---

[11]    At present, Alliance is withholding approximately $100,000 that Global contends it is owed for usage by Alliance. (Mallon Dep. at 95-96)

(Graham Dep. at 54-55)  Graham testified that Alliance's withholding of funds due to the deposit dispute may have affected Global's willingness to negotiate more favorable rates. (*Id.*)

However, as with the shortfall charges, the true cause of Alliance's decision to withhold funds is not Grassi's alleged failure to discover the application of the deposit in the course of performing the audit, but rather Global's application of the deposit itself.  At most, the non-discovery of the application of the deposit in the course of performing the audit merely affected the timing of the dispute.  Any contention to the contrary by Alliance would be so speculative as to be impermissible to sustain a chain of causation. *See, e.g., Parkins v. United States*, 834 F.Supp. 569, 575 (D.Conn. 1993)(Eginton, J.)("Causation must be removed from the realm of speculation and conjecture;" actions of doctor who performed 1985 surgery that left plaintiff paralyzed held to be "too far attenuated to be considered a proximate cause" of plaintiff's death four years later).

Causation in fact is also defeated by Alliance's decision to continue withholding amounts owed to Global because of its position that the deposit should not have been applied when it was. There is no dispute that the deposit was applied to amounts owed by Alliance to Global for usage of the Global network (Mallon Dep. at 100-01), and that Alliance suffered no out-of-pocket loss as a result of the application.  Alliance has withheld $100,000 from payments to Global even though that decision has, according to Alliance's own contention, caused it to pay $70,000 more to Global than it believes it would have otherwise.  If Alliance is correct that the withholding of the $100,000 has led Global not to renegotiate its rates, then Alliance could have easily avoided this situation by simply paying Global the amounts it owes and leaving the deposit issue for later resolution.  Under these circumstances, Alliance can hardly claim that but for Grassi's alleged failure to discover the application of the deposit, Global would have negotiated more favorable

rates of up to $70,000 since, if the more favorable rates were so important, Alliance could have simply removed the obstacle by clearing up its open balance with Global. Indeed, Graham himself testified that negotiations between Global and Alliance are ongoing notwithstanding the deposit dispute. (Graham Dep. at 58)

Causation in fact is also negated because it is apparent from Global's recent invoices that the $100,000 is not the only amount being withheld by Alliance. Alliance has also been withholding the shortfall charges imposed by Global that are discussed above. Moreover, it is obvious from the invoices rendered to Alliance by Global that Alliance has been withholding other amounts. For example, the Global invoice to Alliance dated April 25, 2003 (*See* Eickemeyer Dec. Exh. R), which is the first invoice on which the shortfall charge appears, shows an opening balance, after payments, of $542,166.64. This amount is far in excess of the Alliance's usage in each of the previous several months, which did not exceed $150,000. Plainly, Alliance was withholding amounts other than the $100,000 it has identified in connection with the deposit "issue." As discussed at pp. 7-9, *supra*, the record contains references to many other disputes, including Alliance's allegations of overbilling by Global and Alliance's contention that it should be compensated by Global for amounts owed to it by Lextel. Each of these disputes caused Alliance to withhold funds that Global claimed were owed to it; indeed, it appears that the Lextel matter was resolved only very recently. Since the withholdings arising from these disputes – which are indisputably unrelated to Grassi – also caused Alliance not to be current with Global, Alliance cannot establish that "but for" the non-discovery of the application of the deposit, it would have been able to obtain more favorable rates from Global.

These undisputed facts yield no evidence from which it could be inferred by a reasonable fact-finder that but for Grassi's alleged failure to detect, during the performance of the June 30,

2000 audit, that Global had applied Alliance's $250,000 deposit, Alliance would have been able to negotiate more favorable rates with Global and so would have avoided paying rates that Alliance estimates are $70,000 higher than they would have been otherwise. Each of the independent factors discussed above negates, as a matter of law, the essential element of causation in fact and requires that Grassi be granted summary judgment dismissing Global's claim for the $70,000 in discounts and reductions it claims it would have received but for Grassi's alleged conduct.

### 2.     Alliance, As A Matter of Law, Cannot Establish That Any Conduct By Grassi Proximately Caused Global Not To Negotiate More Favorable Rates

Even if Alliance could establish causation in fact, it can no more establish proximate cause with respect to its claim for "lost discount" or more favorable rate damages than it could with respect to the shortfall charges imposed by Global. As in *Parkins v. United States*, *supra*, any failure by Grassi to detect that the deposit had been applied by Global is "too attenuated" to be the proximate cause of Alliance's inability to obtain better rates from Global. While the factual situations are not precisely analogous, the court's analysis in *Parkins* is instructive. The decedent had entered a veterans' hospital for an operation in 1985, after which his legs were paralyzed. Four years later, he died of a staph infection that allegedly entered his body through bedsores which were alleged to be a result of his being bedridden. The decedent's wife sued the federal government, claiming that her husband's death was a result of the physician's negligence during the operation four years earlier. The Court found that any conduct by the physician, even if it might pass as "but for" causation, was "too attenuated" to be deemed a proximate cause of the death, and dismissed the action on motion. *See also Abrahams v. Young and Rubicam, supra.*

In this case, even if it is assumed *arguendo* that Grassi should have detected the application of the deposit by Global, any such audit failure is similarly too attenuated with respect to Alliance's inability, two or three years later, to obtain more favorable rates from Global to be considered a proximate cause of that "harm." As discussed above, the foreseeable risks from an audit failure that causes an asset to be listed on the balance sheet when it in fact does not exist are (1) an out-of-pocket loss to the company, (2) possible further losses if the asset is missing as a result of a pattern of illicit activity, or (3) a user of the financial statement receiving a misimpression about the company's financial condition. However, no such damage is sought to be recovered here.

Rather, Alliance claims that the non-discovery led to an inability to secure more favorable rates. But, as discussed above in connection with the shortfall charges, the risk that an audit failure regarding the existence of the deposit (as opposed to the application of the deposit itself) would result in a dispute between Alliance and Global in 2002-03 that would preclude the granting of more favorable rates by Global was simply not the type of risk that was foreseeable at the time of the June 30, 2000 audit. Even if "but for" causation could be established with respect to the more favorable rates "damages," these "damages" are too remote with respect to the alleged wrongful conduct for them to have been proximately caused by that conduct. Alliance's causation theory relies solely on conjecture that had this single dispute over the deposit not occurred when it did, Global would have negotiated more favorable rates. But since conjecture is an insufficient basis, as a matter of law, for the requisite element of proximate cause, Grassi is entitled to summary judgment dismissing Alliance's claim for "lost discount" or more favorable rate "damages."

## POINT II

## ALLIANCE'S CLAIMS BASED ON THE ALLEGEDLY NEGLIGENT FAILURE TO DISCOVER THE APPLICATION OF THE DEPOSIT MUST BE DISMISSED

Alliance asserts three causes of action – for breach of contract (Complaint, Count I), negligence (*Id.*, Count II), and negligent misrepresentation (*Id.*, Count IV) – that are based on Grassi's alleged failure to discover, in the course of performing its audit work, that Global had applied the $250,000 deposit to an amount owed to Global.  But the undisputed testimony of both Kevin McGann, the Grassi auditor in charge of the engagement, and Mark Thomas, who was the president of Alliance at the time of the June 30, 2000 audit, establishes that, under the accounting methods then used by Alliance, the missing invoice reflecting the deposit would not be considered an expense within the June 30, 2000 fiscal year and so would not have been reflected in the amounts contained in the financial statement audited by Grassi.  Accordingly, the undisputed record yields no basis on which Alliance can prevail on these negligence-based claims and they should be dismissed.

The application of the deposit by Global was reflected on a Global invoice dated June 26, 2000, which billed Alliance for usage during the period May 19-June 18, 2000.  As shown on the invoice (Eickemeyer Dec., Exh. L), the $250,000 deposit was essentially treated by Global as a payment when it was made on May 4, 2000, and reduced Alliance's then-outstanding balance. However, there is no dispute that this invoice was either never received by Alliance or, if it was received, was never entered into Global's accounting system. (Eickemeyer Dec., Exh. M)  To this day, Alliance is unable to locate a copy of the invoice as rendered by Global in June 2000; the only copy that has been produced in this litigation is a facsimile of the invoice reproduced by Global's accounting system in June 2002, when the application of the deposit was discovered.

27

If this invoice had been available to Alliance or to Grassi in the summer and fall in 2000, the application of the deposit and its effect on the outstanding balance might have been detected, though the effect of that would only have been to accelerate the dispute between Alliance and Global that later took place.  However, the invoice, for whatever reason, was not available to Grassi when it performed its audit, months after the invoice would have been received by Alliance – a period within which, according to Alliance's then-comptroller, the invoice would have been entered into Alliance's accounting system if it was on hand. (Shannahan Dep. at 16-19)

Moreover, Grassi would not have been concerned with this particular invoice in auditing Alliance's financial position as of June 30, 2000, because, under the accounting methodology then used by Alliance, the invoice would not have been accounted for as a June expense, but rather as a July expense, which would take it out of the fiscal year under audit.  As McGann testified at his deposition, Alliance generally billed the expense reflected in an invoice issued at the end of the month – as Global's were – to its customers in the following month.  Thus, the usage expense reflected in the June 26, 2000 invoice would have been billed to Alliance's customers in July 2000, and would have been accrued as July revenue.  In order to assure a consistent matching of revenues and expenses, the associated expense would be accounted for as a July 2000 expense, thus placing it outside the fiscal year under audit.  (McGann Dep. at 73-75)

This description of how the invoice would have been treated under Alliance's accounting methodology was confirmed by Mark Thomas, who was Alliance's president at the time, in his deposition testimony.  Thomas testified that, based on the contemporaneous workpapers, the usage reflected on Global's May 26, 2000 invoice appeared to have been treated as a June 2000 expense by Alliance.  If this methodology was applied consistently, he continued, the usage

28

through June 18, 2000 that was reflected on the June 26, 2000 invoice would have been treated as a July 2000 expense because that is when it would have been billed to Alliance's customers. (*See* Thomas Dep. at 37-38, quoted at p. 6, *supra*)

The workpapers from Grassi's audit fully accord with this uncontradicted testimony. A four-page workpaper from Grassi's files (annexed as Exh. S to the Eickemeyer Dec.), which was generated during the performance of the audit and derived from Alliance's accounting records, shows that the usage from Global's invoice dated May 26, 2000 (Exh. T to the Eickemeyer Dec.) was treated as June billing by Alliance. Thus, the balance outstanding on that invoice would be treated as the year-end balance owed to Global under the accounting methodology employed by Alliance at the time. Accordingly, the June 26, 2000 invoice would have been classified as July billing under this methodology, thus taking it outside the scope of the audit.

Since the uncontradicted testimony compiled during discovery demonstrates that the invoice would not have fallen within the period under audit, there is, as a matter of law, no basis to find that Grassi violated any standard of professional care in connection with the existence or non-existence of the deposit. The invoice reflecting the application of the deposit would, under consistent application of the accounting methodology testified to by McGann and Thomas, have been classified outside the period covered by the financial statements for the year ended June 30, 2000, because the expense it represented would, consistent with treatment of the associated income, have been considered to be a July 2000 expense. The invoice thus was not needed for completion of the audit.

Since Alliance's accounting methodology treated the expense associated with the June 26, 2000 invoice as a July 2000 expense, there is no basis on which plaintiffs can contend that the financial statements for the year ended June 30, 2000, misstated Alliance's financial

condition as of that date.  Nor is there any basis for Alliance to contend that Grassi's alleged failure to detect the application of the deposit was a deviation from professional standards since the only document on which it could have been reflected was one that was unnecessary for completion of the audit.  The uncontroverted testimony of McGann and Thomas establishes that, under the accounting methodology then being used by Alliance, the expense associated with the June 26, 2000 Global invoice would not have fallen within the fiscal year under audit.  As a result, there is no basis in the record on which the three causes of action asserted by Alliance that are founded on Grassi's allegedly negligent conduct of the audit can possibly be sustained. Grassi is therefore entitled to summary judgment dismissing all three of those claims.

### POINT III

### ALLIANCE CANNOT MAINTAIN ITS CLAIMS FOR UNJUST ENRICHMENT, FRAUD, PROMISSORY ESTOPPEL, CONVERSION AND VIOLATION OF CUTPA

In addition to its claims for breach of contract, negligence and negligent misrepresentation, Alliance also purports to assert claims for unjust enrichment, fraud, violation of the Connecticut Unfair Trade Practices Act (CUTPA), promissory estoppel and conversion. As demonstrated below, each of these claims is either insufficient as a matter of law or is precluded because the undisputed facts negate one or more of the essential elements of the claim. Accordingly, Grassi is entitled to summary judgment dismissing each of these claims.

**A.    Alliance May Not Maintain Its Unjust Enrichment Claim Due To The Existence Of A Contract Between The Parties**

In Count Three of the Complaint, Alliance purports to assert a claim for unjust enrichment.  Alliance alleges that it was billed a total of $161,355 by Grassi (or TCM) and that the invoices were "false" because Grassi either never performed the work represented by those

invoices or performed it in a substandard manner. (Complaint, ¶¶32-33).[12]  Alliance alleges that Grassi would be unjustly enriched it if it were not required to return the alleged "overpayments."

The basic requirements of the unjust enrichment doctrine under Connecticut law are that (1) the defendant was benefited, (2) the defendant unjustly refused to pay the plaintiff for the benefits, and (3) the failure of payment was to the plaintiff's detriment.  *Gagne v. Vaccaro*, 255 Conn. 390, 409, 766 A.2d 416, 428 (2001).  In this case, the precise opposite is the situation, that is, Grassi has provided services to Alliance for which Grassi has in fact been paid.  Thus, this case does not present the classic situation for which the unjust enrichment doctrine was designed.  However, even if it is assumed that the unjust enrichment doctrine is applicable in these circumstances, Alliance's claim must be dismissed for an even more fundamental reason.  An unjust enrichment remedy is available only when "no remedy is available by an action on the contract." *Id.*, 255 Conn. at 401, 766 A.2d at 424.  Accordingly, "lack of remedy under the contract is a precondition for recovery based on unjust enrichment." *Id.   See also Ayoette Brothers Construction Co. v. Finney*, 42 Conn. App. 578, 580-81, 680 A.2d 330, 332 (Conn. App. 1996)(unjust enrichment claim appropriate because parties did not have a contract).

In this case, there is no dispute that a contractual engagement existed between Grassi and Alliance for the performance of the auditing, tax and other services that Grassi provided.  Alliance has a contractual remedy available for any overpayments that it believes it may have made to Grassi – indeed it has resorted to such a remedy in Count I of the Complaint, which purports to be a breach of contract claim.  Since the principal prerequisite for an unjust

---

[12]    In fact, only a portion of the amounts billed to Alliance by Grassi reflected services performed in connection with the audit of Alliance's financial statements for the year ended June 30, 2000.  The remainder was billed in connection with tax return preparation, a review of Alliance's financial statements for the nine months ended March 31, 2001, and other services.   There is no evidence in the record of shortcomings in any of these other services or that Alliance sustained any damage by virtue of those services, and so the fees paid for these services cannot properly be a subject of Alliance's claim.

31

enrichment claim – the  lack of a contractual remedy – is indisputably absent here, Alliance's unjust enrichment claim, contained in Count III of the Complaint, must be dismissed.

**B.    Alliance's Fraud Claim Against Grassi Must Be Dismissed
       <u>Because The Requisite Element of Scienter Is Lacking</u>**

In Count V of the Complaint, Alliance purports to assert a claim for fraud against Grassi. Alliance alleges that Grassi falsely represented that its work would be performed accurately and in accordance with professional standards, and that its invoices would reflect work actually performed. (Complaint, ¶50)  Alliance further alleges that Grassi knew or should have known that its services were not performed in accordance with professional standards and that it knew or should have known that the invoices it was sending were false. (*Id*., ¶51)  Based on these allegations, Alliance seeks to hold Grassi liable for the damages it claims to have suffered.

The elements of a fraud claim under Connecticut law are a material misrepresentation made with knowledge of its falsity on which plaintiff relies to its detriment. *Kilduff v. Adams, Inc.,* 219 Conn. 314, 327-29, 593 A.2d 478, 486-87 (1991)  In this case, the requisite element of scienter, that is, an intent on Grassi's part to deceive Alliance, is indisputably lacking.  There is simply no evidence in the record from which it could be inferred that Grassi knew that Alliance's financial statements for the year ended June 30, 2000, on which it opined, contained incorrect information or that Grassi intentionally sent Alliance false invoices.  Even if were assumed that the financial statements were negligently audited, the record contains no evidence from which it could be inferred that Grassi made an intentional or reckless misrepresentation in issuing its audit opinion.  On the contrary, as discussed above, McGann's testimony indicates that he believed the invoice that would have revealed the application of the $250,000 deposit by Global would, under Alliance's accounting methods, have been classified as outside the fiscal year ended June 30, 2000.  The revenue associated with that invoice would have been counted as July 2000 revenue

based on when it was billed to Alliance's customers and the expense incurred to generate the revenue, namely, the Global billing on that invoice, would have been deemed a July 2000 expense. (McGann Dep. at 73-75)  Alliance's then-president, Mark Thomas, confirmed that this would have been Alliance's accounting treatment. (Thomas Dep at 37-38).

Thus, if the application of the deposit was not detected and reflected in the financial statements when it should have been, it was solely due to a good faith error and not an intentional omission.  The record is simply devoid of any evidence that Grassi knew it was opining on an erroneous financial statement or that it knew there was an error when it billed Alliance for the audit work performed.  Since there is no evidence that Grassi intended to mislead Alliance or acted intentionally with respect to the issuance of the financial statements or its invoices, the requisite element of scienter is indisputably lacking and Alliance's fraud claim must be dismissed.  In addition, to the extent that Alliance is seeking to recover, via the purported fraud claim, not just amounts that it paid Grassi in connection with the audit but the "lost discounts" and minimum usage "damages" discussed above, that portion of its claim must be dismissed for the independent reason that, as demonstrated above, the requisite element of proximate cause is lacking.

**C.    Alliance May Not Maintain A Claim For Violation Of The Connecticut Unfair Trade Practices Act**

In Count VI of the Complaint, Alliance purports to assert a claim for violation of the Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. §42-110g(a) *et seq.* Specifically, Alliance alleges that Grassi violated CUTPA by demanding payment for work that was not performed or was performed improperly and for misrepresenting that its work was performed in accordance with professional standards. (Complaint, ¶59)  However, Connecticut courts have made it clear that CUTPA may not be used to maintain disguised claims for

professional negligence, such as that asserted by Alliance. The purported CUTPA claim must therefore be dismissed.

It is well-established that "professional negligence – that is, malpractice – does not fall under CUTPA." *Haynes v. Yale-New Haven Hospital*, 243 Conn. 17, 34, 699 A.2d 964, 972 (1997). Only the entrepreneurial or commercial aspects of professional practice are covered by CUTPA. *Id*. *See also Suffield Development Associates Limited Partnership v. National Loan Investors, L.P.*, 260 Conn. 766, 782, 802 A.2d 44, 53 (2002)("entrepreneurial" exception to CUTPA covers well-defined set of activities, such as advertising and bill collection). Courts look to the underlying nature of the claim to determine whether the action is one truly based on the deceptive trade practices that CUTPA is aimed at or is merely a malpractice claim recast in the guise of CUTPA. *Haynes v. Yale-New Haven Hospital*, *supra*, 243 Conn. at 38-39, 699 A.2d at 974-75. In the latter case, dismissal is required. The non-applicability of CUTPA to professional negligence has been upheld repeatedly in the context of accounting services. *See, e.g., Shareamerica, Inc. v. Ernst & Young*, 1999 WL 545417 (Conn. Super. July 2, 1999); *Advest Group v. Andersen, LLP*, 1998 WL 457697 (Conn. Super. July 28, 1998).

Since Alliance's principal complaint against Grassi is that its audit of Alliance's June 30, 2000 financial statements was performed negligently, such that the application of the $250,000 deposit by Global was not discovered, it is apparent that this action does not fall within the "entrepreneurial" exception that would permit a CUTPA claim. Even though Alliance alleges that Grassi deceptively represented that its services would be, and were, performed in accordance with professional standards, "deviations from the standard of care applicable to accountants are not the type of actions the consumer protection provisions of CUTPA were designed to prevent." *Advest Group, Inc. v. Andersen, supra,* 1998 WL 457697 at *7. Just as in *Advest Group* and

*Shareamerica*, Alliance's alleged entitlement to damages is predicated entirely on Grassi's alleged professional negligence.  Accordingly, its CUTPA claim must be dismissed as a matter of law. *See also Suffield Development Associates Limited Partnership v. National Loan Investors, L.P.*, *supra,* 260 Conn. at 782-83, 802 A.2d at 53-54 (mere fact that attorney's personal profit might be involved is insufficient to allow CUTPA claim based on negligent performance of professional services; to hold that professional's financial considerations make claim entrepreneurial would dissolve distinction between professional and entrepreneurial actions since such considerations are present in every case).[13]

**D.    Alliance May Not Maintain A "Promissory Estoppel" Claim**

In Count VII of the Complaint, Alliance purports to assert a claim denominated as "promissory estoppel," contending that Grassi should be equitably estopped from denying that it promised to perform its services in accordance with applicable professional standards.  However, promissory estoppel is "not a separate cause of action available to the plaintiffs, but rather serves to allow enforcement of an otherwise validly formed contractual commitment that lacks traditional consideration." *Pavliscak v. Bridgeport Hospital*, 48 Conn.App. 580, 592 n.5, 711 A.2d 747, 753 n.5 (Conn.App. 1998). Since promissory estoppel cannot serve as an independent cause of action, Count VII should be dismissed.  In addition, since there is no issue of an absence of consideration here, the predicate for application of the doctrine of promissory estoppel is absent, rendering Count VII entirely superfluous.  Summary judgment dismissing Count VII should therefore be granted.

---

[13]    Insofar as Alliance may be seeking to recover the minimum usage charges and the "lost discounts" by way of the CUTPA claim, the requisite element of proximate clause is lacking (*see* Point II*, supra*), and dismissal is also required on that basis for those elements of alleged damage.

**E.     Alliance's Conversion Claim Must**
**Be Dismissed As A Matter of Law**

Count VIII of the Complaint purports to assert a claim for conversion, alleging that Grassi "asserted control or exercised dominion of monies belonging to [Alliance] by issuing invoices and accepting payment for work it never performed." (Complaint, ¶73)  In the course of this action, Alliance has not identified any services for which it paid that were not actually performed; presumably, Alliance's actual complaint is that Grassi supposedly did not perform the services in accord with professional standards.  Even so, Alliance may not maintain its purported conversion claim.

In order to prevail on a conversion claim, plaintiff must establish that defendant (1) took possession of property belonging to the plaintiff, (2) deprived plaintiff of the use of the property, (3) was not authorized to do so, and (4) caused harm to the plaintiff.  *Miller v. Guimaraes*, 78 Conn. App. 760, 778, 829 A.2d 422, 436 (Conn. App. 2003) Alliance presumably contends that Grassi collected the fees for its services without authorization and that Alliance was harmed as a result.  However, Alliance's effort to force-fit its negligence claim into the conversion context falls short.  Alliance made payments to Grassi after receiving invoices reflecting the charges for Grassi's services.  Grassi was certainly authorized at the outset to receive these amounts, which were remitted by Alliance.  Nor is there any evidence in the record that Alliance ever informed Grassi that its retention of these professional fees was unauthorized.  Quite simply, on the undisputed facts here, Alliance cannot make out a conversion claim.

In essence, this is an action in which Alliance contends that Grassi's services were not provided in accordance with professional standards.  As such, its remedy, even if it seeks return of fees, is the assertion of claims for negligence and breach of contract, which it has done.  While research has not uncovered an analogous Connecticut case, the United States District Court for

the Southern District of New York rejected a similar attempt to transform a breach of contract claim into a conversion claim in *Anglo-Iberia Underwriters Management Co. v. Lodderhose*, 224 F.2d 679, 689 (S.D.N.Y. 2002).  Plaintiff contended that the defendant "converted plaintiffs' payments by not performing as agreed and by not  returning the funds." (*Id*.)  The Court held that "'not performing as agreed' . . . is not a proper basis for a conversion claim," and that "payment for services inadequately rendered sounds in breach of contract." (*Id*.)  This principle is fully applicable here, and this Court should accordingly grant summary judgment dismissing Alliance's purported conversion claim.

## **CONCLUSION**

For all the foregoing reasons, Grassi's motion for summary judgment should be granted in all respects.

Dated: February 6, 2004                    Respectfully submitted,

                                           THE DEFENDANT-
                                           GRASSI & CO.,
                                           CERTIFIED PUBLIC ACCOUNTANTS, P.C.


                                           By_____
                                               ROBERT K. CIULLA (ct-04262)
                                               Rciulla@cd-llp.com
                                               Ciulla & Donofrio, LLP
                                               127 Washington Avenue
                                               P.O. Box 219
                                               North Haven, Connecticut  06473
                                               Tel:  (203) 239-9828
                                               Fax:  (203) 234-0379


                                           By_____
                                               JOHN H. EICKEMEYER (ct-24317)
                                               jeickemeyer@vedderprice.com
                                               Vedder Price Kaufman & Kammholz, P.C.
                                               805 Third Avenue
                                               New York, New York  10022
                                               Tel:  (212) 407-7700
                                               Fax:  (212) 407-7799

## TABLE OF AUTHORITIES

Page

**CASES**

*Abrahams v. Young and Rubicam, Inc.*, 240 Conn. 300, 692 A.2d 709 (1997).......... 13, 20, 21, 25

*Advest Group v. Andersen, LLP*, 1998 WL 457697 (Conn. Super. July 28, 1998) ...................... 34

*Anglo-Iberia Underwriters Management Co. v. Lodderhose*, 224 F.2d 679 (S.D.N.Y. 2002) .... 37

*Ayoette Brothers Construction Co. v. Finney*, 42 Conn. App. 578, 680 A.2d 330
    (Conn. App. 1996) ..................................................................................................... 31

*Coste v. Riverside Motors, Inc.*, 24 Conn.App. 109, 585 A.2d 1263
    (Conn. App. 1991) ........................................................................................... 12, 13, 21

*Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 483 N.E.2d 110,
    493 N.Y.S.2d 435 (1985)............................................................................................ 19

*Doe v. Manheimer*, 212 Conn. 748, 563 A.2d 699 (1989) .................................................... 12, 18

*Fraser v. United States*, 1993 WL 667632 (D. Conn. July 16, 1993) ......................................... 21

*Gagne v. Vaccaro*, 255 Conn. 390, 766 A.2d 416 (2001) ............................................................ 31

*Haynes v. Yale-New Haven Hospital*, 243 Conn. 17, 699 A.2d 964 (1997)................................ 34

*Kilduff v. Adams, Inc.,* 219 Conn. 314, 593 A.2d 478 (1991) .................................................... 32

*Lane v. Reibel*, 1997 WL 403226 (Conn. Super. July 9, 1997).................................................... 12

*Miller v. Guimaraes*, 78 Conn. App. 760, 829 A.2d 422 (Conn. App. 2003) ............................ 36

*Parkins v. United States*, 834 F.Supp. 569 (D.Conn. 1993) ................................................ 23, 25

*Pavliscak v. Bridgeport Hospital*, 48 Conn.App. 580, 711 A.2d 747 (Conn.App. 1998) ........... 35

*Shareamerica, Inc. v. Ernst & Young*, 1999 WL 545417 (Conn. Super. July 2, 1999)............... 34

*Stewart v. Federated Department Stores, Inc.*, 234 Conn. 597, 662 A.2d 753 (1995)................ 13

*Suffield Development Associates Limited Partnership v. National Loan Investors, L.P.*,
    260 Conn. 766, 802 A.2d 44 (2002) .................................................................... 34, 35

**STATUTES**

Conn. Gen. Stat. §42-110g(a) ..................................................................................................... 33

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ...................................................................................... 2

ARGUMENT ......................................................................................................... 11

POINT I     ALLIANCE MAY NOT RECOVER FROM GRASSI THE "LOST
            DISCOUNTS" AND MINIMUM USAGE CHARGES IMPOSED BY
            GLOBAL ............................................................................................ 11

       A.   As A Matter of Law, Alliance Cannot Establish A Causal Link Between
            Global's Enforcement of the Minimum Usage Charge and Any Conduct
            By Grassi................................................................................................ 12

            1.   Alliance Cannot Demonstrate Causation In Fact As To The
                 Enforcement of the Monthly Minimum Usage Charges ......................... 13

            2.   Alliance, As A Matter of Law, Cannot Establish That Any Conduct
                 By Grassi Proximately Caused The Imposition Of The Minimum
                 Usage Charges ............................................................................. 18

       B.   As A Matter Of Law, Alliance Cannot Establish A Causal Link Between
            Global's Decision Not To Grant Alliance Discounts Or More Favorable
            Rates And Any Conduct By Grassi ...................................................... 22

            1.   Alliance Cannot Demonstrate Causation In Fact With Respect To
                 The "Lost Discounts" Or The Refusal To Renegotiate Rates.................. 22

            2.   Alliance, As A Matter of Law, Cannot Establish That Any Conduct
                 By Grassi Proximately Caused Global Not To Negotiate More
                 Favorable Rates.......................................................................... 25

POINT II    ALLIANCE'S CLAIMS BASED ON THE ALLEGEDLY NEGLIGENT
            FAILURE TO DISCOVER THE APPLICATION OF THE DEPOSIT
            MUST BE DISMISSED .................................................................... 27

POINT III   ALLIANCE CANNOT MAINTAIN ITS CLAIMS FOR UNJUST
            ENRICHMENT, FRAUD, PROMISSORY ESTOPPEL, CONVERSION
            AND VIOLATION OF CUTPA........................................................... 30

       A.   Alliance May Not Maintain Its Unjust Enrichment Claim Due To The
            Existence Of A Contract Between The Parties ................................... 30

i

## TABLE OF CONTENTS
(continued)

**Page**

B.    Alliance's Fraud Claim Against Grassi Must Be Dismissed Because The Requisite Element of Scienter Is Lacking..............................................................32

C.    Alliance May Not Maintain A Claim For Violation Of The Connecticut Unfair Trade Practices Act..................................................................................33

D.    Alliance May Not Maintain A "Promissory Estoppel" Claim............................35

E.    Alliance's Conversion Claim Must Be Dismissed As A Matter of Law .............36

CONCLUSION......................................................................................................................38