UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---

ALLIANCE GROUP SERVICES, INC.

                 Plaintiff,

-against-

GRASSI & CO., CERTIFIED PUBLIC
ACCOUNTANTS, P.C.,

                 Defendant.

Civil Action No. 3:02CV02080 (WWE)

February 6, 2004

---

**LOCAL RULE 56(A)1 STATEMENT OF**
**DEFENDANT GRASSI & CO., CPA'S, P.C.**

Defendant Grassi & Co., CPAs, P.C., submits this statement of undisputed material facts pursuant to Local Rule 56(a)1. There is no genuine factual dispute as to the following:

1. Plaintiff Alliance Group Services, Inc. ("Alliance") is "a network service provider for AT&T and other first-tier telecommunications carriers to other telephone companies." (DiPasquale Dep. at 5, Exhibit C to the Eickemeyer Dec.)

2. Alliance is a Delaware corporation with its principal place of business in Westport, Connecticut. (Complaint, ¶1, Exhibit A to the Eickemeyer Dec.)

3. At some point in the period 1997-99, Alliance engaged the accounting firm of Tabb, Conigliaro & McGann ("TCM") to provide it with certain accounting and tax services. (McGann Dep. at 34, Exhibit H to the Eickemeyer Dec.)

4. TCM was engaged to audit Alliance's financial statement for the year ended June 30, 2000. (*Id*. at 39)

5. In April 2000, Alliance entered into an agreement with Global Crossing Bandwidth, Inc. ("Global") that enabled Alliance to provide service in areas not readily covered by its principal vendor, AT&T. (Thomas Dep. at 9-10, Exhibit E to the Eickemeyer Dec.)

6. The agreement with Global (referred to herein as the "Agreement" and annexed as Exhibit J to the Eickemeyer Dec.) required, *inter alia*, that Alliance initially place a security deposit of $250,000 with Global. (Agreement, ¶3.3)

7. Alliance made the deposit required by the Agreement on or about May 4, 2000. (Thomas Dep. at 11-12, and documents evidencing deposit, Exhibit K to the Eickemeyer Dec.)

8. Global did not hold the $250,000 deposit as required by the Agreement, but immediately applied it to an outstanding amount owed by Alliance. The effect was to reduce the amount then owed by Alliance to Global by $250,000. (Reproduction of Global invoice dated June 26, 2000, retrieved from Global's billing system, Exhibit L to the Eickemeyer Dec.)

9. The $250,000 deposit was applied by Global against a valid obligation of Alliance to Global. (Mallon Dep. at 100-01, Exhibit D to the Eickemeyer Dec.)

10. Global's invoice dated June 26, 2000, which would have revealed the application of the deposit, was not entered into Alliance's accounting system. (Alliance's Balance Sheet Detail as of June 30, 2000, Exhibit M to the Eickemeyer Dec.)

11. Alliance did not become aware of the application of the deposit and the corresponding reduction of its accounts payable until June 2002, when a copy of the invoice was provided by Global in the context of attempting to resolve certain billing issues. (DiPasquale

Dep. at 49-51, and fax to DiPasquale by Steven Graham of Global, dated June 5, 2002, Exhibit N to the Eickemeyer Dec.)

12. Beginning in the fall of 2000, TCM undertook to audit Alliance's financial statement for the year ended June 30, 2000. The audited financial statement was issued in the spring of 2001. By the time the audit was completed, the accountants from TCM had joined the firm of Grassi & Co., CPAs, P.C. ("Grassi")[1], which issued the audit opinion on the financial statement. The audited financial statement reflected the $250,000 as still being on deposit with Global. (Alliance audited financial statement for the year ended June 30, 2000, Exhibit O to the Eickemeyer Dec.)

13. In or about June and July 2000, Alliance generally billed its customers for usage in the month after an invoice was received from a supplier such as Global, and the costs associated with the resulting revenue were matched, on a timing basis, with that revenue when billed. (McGann Dep. at 73-75; Thomas Dep. at 37-38)

14. The usage of Global's network reflected on Global's invoice to Alliance dated May 26, 2000, was treated as June billing by Alliance. (Excerpt from Grassi's audit workpapers, Exhibit S to the Eickemeyer Dec.; May 26, 2000 Global invoice to Alliance, Exhibit T to the Eickemeyer Dec.)

15. Alliance was sold by its then-owners in or about August 2001. The new ownership replaced Grassi as Alliance's auditors, employing a firm – Hobe & Lucas – with

---

[1] Hereafter, TCM, and the accountants associated with it, will be referred to as "Grassi" for the sake of clarity.

which the new ownership had a relationship and with which the new ownership "felt comfortable." (DiPasquale Dep. at 105)

16. In the early part of 2002, Alliance reduced the volume of its business with Global due to concerns about Global's financial position, including Global's bankruptcy filing. (Mallon Dep. at 33-34) Alliance transferred business away from Global to other carriers with a view to reducing its traffic on Global to the minimum amount possible. (*Id*. at 35)

17. In late 2001 and early 2002, Alliance – following an analysis by an outside company – concluded that it had "significant overbilling issues" with Global. (*Id*. at 38)

18. Alliance also had a dispute with Global over actions by Global that had the effect of switching traffic of Lextel, an Alliance customer, to a vendor other than Alliance without Alliance's prior knowledge or consent. The transfer of Lextel's traffic away from Alliance deprived Alliance of the ability to take certain actions that would have facilitated collection of amounts that Lextel owed to Alliance. (*Id*. at 38-42)

19. The "overbilling" and Lextel issues led Alliance to withhold payment from Global on certain invoices, with the result that by the spring of 2002, Alliance had a past due balance with Global of approximately $480,000. (Mallon Dep. at 55-56, and collection of Global-Alliance e-mails in May and June 2002, Exhibit P to the Eickemeyer Dec.)

20. On or about June 5, 2002, Steven Graham of Global reported to Jess DiPasquale, Alliance's president, that the $250,000 deposit had been applied by Global to an outstanding invoice on May 4, 2000, and faxed him copies of invoices generated by Global's accounting

system that reflected the application of the deposit. (Graham fax to DiPasquale, Exhibit N to the Eickemeyer Dec.)

21.    Alliance has not asked Global to return the $250,000 since that would only result in more money being owed to Global by Alliance. (DiPasquale Dep. at 88-89)

22.    Alliance is withholding $100,000 in amounts due under Global invoices because of its belief that the deposit should not have been applied by Global in May 2000. (Mallon Dep. at 95-98)

23.    The Agreement between Global and Alliance contains a provision requiring that Global pay a minimum monthly charge of $250,000 or 75 percent of the previous month's usage, whichever was greater.  If Alliance's monthly charges fell below this minimum, it would be required to pay the shortfall. (Agreement, ¶3.9)

24.    For most of the first two years of the Global-Alliance relationship, Alliance's monthly usage was generally greater than the minimum specified in the Agreement.  However, in or about early 2002, Alliance made a decision to reduce its usage of Global to the minimum amount possible due to Global's financial problems and, ultimately, bankruptcy. (Mallon Dep. at 33-35)  Shortly thereafter, Global's monthly usage fell below the minimum specified in the Agreement. (See summary table of Global invoice amounts, provided by Alliance, Exhibit Q to the Eickemeyer Dec.)

25.    On a Global invoice dated April 26, 2003, reflecting usage between March 19, 2003 and April 18, 2003, Global for the first time imposed a minimum shortfall charge of $116,667.43.  Shortfall charges in various amounts were imposed on invoices in subsequent

months, through the invoice dated August 20, 2003. These shortfall charges totaled $955,004. (Global's invoices to Alliance, contained in Exhibit Q to the Eickemeyer Dec.)

26. At the time that Global began imposing shortfall charges on Alliance, there were other unresolved billing disputes between Global and Alliance besides the "dispute" over the application of the $250,000 deposit. (Mallon Dep. at 96-98)

27. Global has not imposed any shortfall charges on invoices issued to Alliance after the invoice dated August 20, 2003, even though the "dispute" between Global and Alliance remains unresolved. (Eickemeyer Dec., Exhibit Q)

28. None of the shortfall charges imposed by Global has actually been paid by Alliance. (*Id.*)

29. Alliance had the technical capacity to readily transfer traffic being routed to other carriers back to Global's network if it so desired. (Holden Dep. at 22, Exhibit G to the Eickemeyer Dec.)

30. Global's invoice to Alliance dated April 25, 2003 (Exhibit R to the Eickemeyer Dec.) had an opening balance, after payments, of $542,166.64, which is far more than Alliance's monthly usage in each of the previous several months, as reflected by Global's invoices to Alliance for those months (contained in Exhibit Q to the Eickemeyer Dec.).

31. It is Global's policy to place shortfall charges on the invoices of customers such as Alliance when they are not meeting their monthly minimums, though placing such charges is a manual process that is sometimes overlooked. (Graham Dep. at 46-47, Exhibit I to the Eickemeyer Dec.)

32. The account executive at Global who is responsible for the Global – Alliance relationship believes there is no relationship between the deposit dispute and the imposition of the shortfall charges by Global. (Graham Dep. at 47)

Dated: February 6, 2004　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　THE DEFENDANT-
　　　　　　　　　　　　　　　　　　GRASSI & CO.,
　　　　　　　　　　　　　　　　　　CERTIFIED PUBLIC ACCOUNTANTS, P.C.


　　　　　　　　　　　　　　　　　　By_____
　　　　　　　　　　　　　　　　　　　ROBERT K. CIULLA (ct04262)
　　　　　　　　　　　　　　　　　　　Rciulla@cd-llp.com
　　　　　　　　　　　　　　　　　　　Ciulla & Donofrio, LLP
　　　　　　　　　　　　　　　　　　　127 Washington Avenue
　　　　　　　　　　　　　　　　　　　P.O. Box 219
　　　　　　　　　　　　　　　　　　　North Haven, CT 06473
　　　　　　　　　　　　　　　　　　　Tel:  (203) 239-9828
　　　　　　　　　　　　　　　　　　　Fax: (203) 234-0379



　　　　　　　　　　　　　　　　　　By_____
　　　　　　　　　　　　　　　　　　　JOHN H. EICKEMEYER (ct-24317)
　　　　　　　　　　　　　　　　　　　jeickemeyer@vedderprice.com
　　　　　　　　　　　　　　　　　　　Vedder, Price, Kaufman & Kammholz, P.C.
　　　　　　　　　　　　　　　　　　　805 Third Avenue
　　　　　　　　　　　　　　　　　　　New York, New York  10022
　　　　　　　　　　　　　　　　　　　Tel: (212) 407-7700
　　　　　　　　　　　　　　　　　　　Fax: (212) 407-7799