# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| ALLIANCE GROUP SERVICES, INC., | Case No. 3:02CV02080(WWE) |
| Plaintiff | |
| v. | |
| | March 26, 2004 |
| GRASSI & CO., CERTIFIED PUBLIC ACCOUNTANTS, P.C. | |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Now comes the Plaintiff, Alliance Group Services, Inc. ("AGSi" or "Plaintiff"), by and through its undersigned counsel, and respectfully submits its Brief in Opposition to Defendant's Motion for Summary Judgment. Genuine issues of material fact remain, and reasonable minds can come to differing conclusions, therefore Summary Judgment is inappropriate in this case. A Brief in Opposition to Defendant's Motion for Summary Judgment is incorporated herein and attached hereto.

Respectfully submitted,

**MINTZ, LEVIN, COHN, GLOVSKY AND POPEO, P.C.**

By: _/s/Pamela Cambers_____

    **Pamela Chambers, Esq. (21105)**
    Mintz, Levin, Cohn, Ferris,
     Glovsky and Popeo, P.C.
    Connecticut Financial Center
    157 Church Street
    New Haven, Connecticut 06510
    (203) 777-8200 phone
    (203) 777-7111 fax

**Of Counsel:**

**RITZLER, COUGHLIN**
  **& SWANSINGER, LTD.**

John Swansinger, Esq.
Drue Marie Skaryd, Esq.
1001 lakeside Avenue
1550 North Point Tower
Cleveland, Ohio 44114
(216) 241-8333 phone
(216) 241-5890 fax

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................ 1

FACTS ............................................................................................................... 3

SUMMARY JUDGMENT STANDARD ........................................................ 13

LAW AND ARGUMENT .................................................................................. 15

    A.   GENUINE ISSUES OF FACT EXIST AS TO AGSI'S BREACH OF
          CONTRACT CLAIM ................................................................................ 15

    B.   A MATERIAL QUESTION OF FACTS EXISTS AS TO
          WHETHER OR NOT THE JUNE 2000 INVOICE TO AGSI
          SHOULD HAVE BEEN REVIEWED AS PART OF THE JUNE 30,
          2000 AUDIT AND FINANCIAL STATEMENTS AND/OR
          MARCH 31, 2000 REVIEW ...................................................................... 18

    C.   GENERAL MATERIAL ISSUES OF FACT REMAIN AS TO
          NEGLIGENCE CLAIM .............................................................................. 21

    D.   QUESTIONS OF FACT REMAIN REGARDING AGSI'S CLAIM
          FOR NEGLIGENT MISREPRESENTATION ........................................... 22

    E.   MATERIAL QUESTIONS OF FACT REMAIN AS TO AGSI'S
          FRAUD CLAIM ......................................................................................... 25

    F.   QUESTIONS OF FACT REMAIN AS TO AGSI'S CLAIM FOR
          VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE
          PRACTICES ACT ...................................................................................... 27

    G.   SIGNIFICANT FACTUAL ISSUES EXIST REGARDING THE
          PROMISSORY ESTOPPEL CLAIM .......................................................... 30

    H.   MATERIAL QUESTIONS OF FACT REMAIN AS TO THE
          CONVERSION CLAIM .............................................................................. 32

    I.   SIGNIFICANT FACTUAL QUESTIONS REMAIN AS TO AGSI'S
          UNJUST ENRICHMENT CLAIM .............................................................. 33

# TABLE OF CONTENTS
(continued)

Page

J.   GENUINE ISSUES OF MATERIAL FACT REMAIN AS TO
WHETHER AGSI WAS DAMAGED DUE TO GRASSI'S
NEGLIGENCE AND REPRESENTATIONS ............................................... 35

K.   THE AFOREMENTIONED DAMAGES WERE PROXIMATELY
CAUSED BY GRASSI'S NEGLIGENCE AND
MISREPRESENTATIONS NOTED HEREIN ........................................... 38

CONCLUSION ........................................................................................................ 40

# **TABLE OF AUTHORITIES**

**CASES**                                                                                           **Page**

*Abrahams v. Young and Rebicam, Inc.* (1997), 240 Conn.300, 306, 692 A.2d 709,
709, 712 ...................................................................................................................27

*Advest Group v. Arthur Anderson LLP* (July 28, 1998), *unreported*, Connecticut
Superior Court Case No. CV970571417, 1998 WL 457697 (Conn. Super.) ........28

*Anglo-Iberia Underwriting Mgmt. Co. v. Lodderhose* (2002), 224 F.Supp.2d 679 ..........33

*Ayotte Bros. Constr. Co. v. Finney* (1996), 42 Conn.App. 578, 680 A.2d 330 ................34

*Barbara Weisman, Trustee v. Kaspar* (1995), 233 Conn. 531, 539-540, 661 A.2d
530 .........................................................................................................................25

*Bernardo v. Hoffman* (1929), 109 Conn. 158, 159, 145 A. 884 ........................................14

*Billington v. Billington* (1991), 220 Conn. 212, 217, 595 A.2d 1377 ...............................25

*Bobbin v. Sail the Sounds, LLC* (September 12, 2003), *unreported*, Connecticut
Superior Court Case No. CV020563884S, 2003 WL 22206799 ...........................25

*Bolmer v. Kocet*, 6 Conn.App. 595, 612-13, 507 A.2d 129 (1986) ...................................34

*Bouchard v. Sundberg* (2003), 8 Conn. App. 180, 189, 834 A.2d 744 ............................15

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d
265 (1986) .........................................................................................................13, 14

*Chotkowski v. State*, 240 Conn. 246, 268, 690 A.2d 368 (1997) .....................................31

*Coste v. Riverside Motors, Inc.* (1991), 24 Conn.App.109, 112, 585 A.2d 1263,
1265 .................................................................................................................21, 38

*D'Ulisse-Cupo v. Board of Directors of Notre Dame High School* (1987), 202
Conn. 206, 217, 520 A.2d 217 .............................................................................24

*Dudrow v. Ernst & Young* (September 14, 1999), *unreported,* Connecticut
Superior Court Case No. X01CV980144211, 1999 WL 786343 (Conn.
Super.) ..............................................................................................................28,29

*Epstein v. Automatic Enterprises* (1986), 6 Conn.App. 484, 488, 506 A.2d 158 ............32

## TABLE OF AUTHORITIES
(continued)

**CASES**                                                                      **Page**

*Facchini v. Miller* (January 31, 2000), *unreported*, Connecticut Superior Court
Case No. CV990587686S, 2000 WL 175580 (Conn. Super.)..............................29

*Falker v. Samperi* (1983), 190 Conn. 412, 461 A.2d 681 ................................................32

*Gagne v. Vaccaro* (2001), 255 Conn. 390, 401, 766 A.2d 416..................................33, 34

*Habetz v. Condon* (1992), 224 Conn.231, 238, 618 A.2d 501 .........................................15

*Janusauskas v. Fichman* (2003), 264 Conn. 796, 808, 826 A.2d 1066......................27, 28

*Jester v. Fischer* (2001), 65 Conn. App. 349, 358, 783 A.2d 28; *Thompson* at 3.............25

*Kiduff v. Adams, Inc.* (1991), 219 Conn. 314, 329, 593 A.2d 478 ..................................25

*L.G. Defelice, Inc. v. Fireman's Insurance Co*. (1998), 41 F. Supp.2d 153, 166 ............30

*Lawson v. Aetna Life Ins. Co.* (Conn.Super. Dec. 30, 1998), *unreported*, No. CV
940464989S, 1998 WL 929645..................................................................................31

*Luciani v. Stop & Shop Co., Inc.* (1988), 15 Conn.App. 407, 544 A.2d 1238 .................32

*Maloney v. Connecticut Orthopedics, P.C.* (1999), 47 F. Supp.2d 244, 249 ...................15

*Maturo v. Gerard* (1985), 196 Conn. 584, 587, 494 A.2d 1199 ......................................25

*Miller v. Guimaraes* (2003), 78 Conn.App. 760, 829 A.2d 422 ......................................32

*Normand Josef Enterprises, Inc. v. Connecticut National Bank* (1994), 230 Conn.
486, 523, 646 A.2d 1289 .....................................................................................30

*Pavliscak v. Bridgeport Hosp.* (1998), 48 Conn.App. 580, 711 A.2d 747.......................31

*Richard v. A. Waldman & Sons, Inc*. (1967), 155 Conn. 343, 346, 232 A.2d 307...........24

*ShareAmerica, Inc. v. Ernst & Young* (July 2, 1999), *unreported,* Connecticut
Superior Court Case No. X02CV930150132S, 1999 WL 545417 (Conn.
Super.) ................................................................................................................28

*Suarez v. Dickmont Plastics Corp*. (1994), 229 Conn. 99, 105, 639 A.2d 507................14

## <u>TABLE OF AUTHORITIES</u>
(continued)

**CASES**                                                                                                    **Page**

*Thompson v. Bridgeport Hospital* (2003), unreported, Conn. Super. No.
    CV980352686S, 2003 WL 294465 (Conn. Super.) .......................................22, 25

*United Oil Co. v. Urban Redevelopment Commission* (1969), 158 Conn. 364, 380,
    260 A.2d 596 ............................................................................................................15

*Williams Ford, Inc. v. The Hartford Courant Company* (1995), 232 Conn. 559,
    579, 657 A.2d 212 ..................................................................................................26

**BRIEF IN OPPOSITION**

## I.    Introduction

Genuine issues of material fact remain in this case as to a myriad of matters all involving Defendant Grassi & Company's ("Grassi") grossly negligent provision of accounting services for plaintiff, Alliance Group Services, Inc. ("AGSi").  Indeed, the expert reports demonstrate the vast difference in opinion as to whether Grassi performed in accordance with acceptable audit standards.  A copy of the Plaintiff's expert reports by Jim Gero ("Gero") of Hobe and Lucas, Defendant's expert report by Conrad Kappel of Blum Shapiro Litigation Consulting Group, LLC and Gero's Reply to Mr. Kappel's Report ("Gero Reply") are incorporated herein and attached as **Exhibits A, B** and **C,** respectively.[1]

Grassi's negligence was uncovered when AGSi discovered that it no longer had a cash deposit of $250,000.00 to its credit with one of its major suppliers, Global Crossing. This was of great concern as Grassi had recently concluded an audit of AGSi's financial statements *which showed* the $250,000.00 deposit with Global Crossing as an asset to AGSi.

---

[1] All of the documents and deposition transcripts noted herein are annexed as the noted exhibits to the accompanying Declaration of John Swansinger ("Swansinger"), and all such documents and deposition transcripts are hereby incorporated herein by reference.  A copy of such declaration is incorporated herein and attached as **Exhibit 1**.  All of the depositions are referenced herein by the last name of the deponent.  "Shannahan" refers to the deposition of Carol Shannahan and is attached as **Exhibit D**; "McGann" refers to the deposition of "Kevin McGann" and is attached as **Exhibit E**; DiPasquale refers to the deposition of "Jess DiPasquale" and is attached as **Exhibit F**; "Manhaupt" refers to the deposition of "Steven Manhaupt" and is attached as **Exhibit G**; "Colbert" refers to the deposition of "Monte Colbert" and is attached as **Exhibit H**; "Linda" refers to the deposition of "Hongling Zhang a.k.a. "Linda"" and is attached as **Exhibit I**; "Mallon" refers to the deposition of "Michael Mallon" and is attached as **Exhibit J**; "Conigliaro" refers to the deposition of "Ronnie Conigliaro" and is attached as **Exhibit K**; Graham" refers to the deposition of "Steven Graham" and is attached as **Exhibit L**; "Thomas" refers to the deposition of "Mark Thomas" and is attached as **Exhibit M** and "Holden" refers to the deposition of "Mark Thomas" and is attached as **Exhibit N.**

Grassi, among numerous other negligent acts, failed to follow up on unanswered requests to Global Crossing to verify the existence of the deposit. However, Grassi itself established the materiality definition as $102,284.00, (i.e. amounts greater than $102,284.00 were material and requested greater scrutiny under the applicable accounting guidelines).

Notwithstanding clever arguments to the contrary, one fact remains undisputed: Grassi failed to discover that the Global Crossing deposit was no longer an AGSi asset during the audit. Grassi claimed to have done the work which would have determined that fact and just as smugly, charged AGSi for the work it didn't do and which was necessary for a reliable audit. Instead, AGSi paid for an audit that was useless and severely damaged its relationship with its major supplier. Numerous issues of material fact remain, including, but not limited to:

- Whether or not the June 2000 invoice (which reflected the application of the deposit) should have been examined as a June expense;

- Whether Grassi properly performed the alternative procedures required under GAAS/GAAP to independently verify that the deposit existed with Global Crossing;

- Whether Grassi properly followed GAAS/GAAP and/or their own internal procedures to train/supervise their staff and to perform/review their work on at AGSi;

- Whether or not the misstatements on the financial statements are material;

- Whether AGSi was improperly charged for work that was not performed, performed in duplicate or performed so inadequately as to not be in accordance with the terms as agreed by the parties;

- Whether or not Grassi's collective negligence resulted in a breach of the contract;

- Whether or not Grassi failed to provide a timely audit;

- Whether or not Grassi's tax returns are misstated and need to be corrected;

2

- Whether Grassi had a duty to correct AGSi's June 30, 2000 audited financial statements and/or June 30, 2000 tax return when it knew or should have known that these documents had been misstated;

- Whether Grassi was aware of the sale of AGSi; and

- Whether Grassi sought to profit from such sale by knowingly or recklessly inflating AGSi's audited financial statements.

Even the experts in this matter cannot agree as to whether this audit was performed properly and/or whether such misstatements are material. <u>See</u>: **Exhibits A, B,** and **C.** Clearly material issues of fact remain in this matter. As such, Grassi's motion for summary judgment must be denied and such issues must be determined by the jury.

## II.    <u>FACTS</u>

This case relates to damages ascertained by AGSi when Grassi failed to exercise proper accounting and auditing procedures in performing services for AGSi. Numerous deviations from the applicable professional standards and Grassi's own internal standards resulted in Grassi failing to discover a clear material accounting discrepancy thereby damaging AGSi. Moreover, Grassi, through its mismanagement of the services, was paid for work it did not perform or performed inadequately by its failure to follow the applicable standards as had been contracted.

In early to mid-2000, AGSi hired Tabb, Conigliaro & McGann ("Tabb") to perform an audit for the year end June 30, 2000, prepare the June 30, 2000 year end tax return, to close the accounting books on a monthly basis from June 30, 2000 until the audit concluded, and to perform a review of the period ending March 30, 2001. Shannahan at 42, L. 1-14. The auditors agreed to perform these services in accordance with the applicable accounting principals that were applicable to the particular services being performed. Grassi's response

to Request for Admission No. 14.  Tabb began the audit and charged AGSI on an hourly basis for the work that was allegedly performed.

On or about January 1, 2001, during the audit of AGSi, Tabb merged with Grassi. McGann at P. 8, L. 23-24.  After the merger, the same personnel, formerly from Tabb, were present to continue the audit.  Linda at P. 24, L. 1-6.  After the merger, without explanation, Grassi proceeded to redo the work that had been done by Tabb, even though the same personnel was present.  Shannahan at P. 42, L. 21-25.

Grassi did not experience any problems obtaining information from AGSi during the audit. McGann at P. 42, L. 7-12, and P. 43 L. 2-3.  Grassi stated that AGSi cooperated throughout the audit and that the audit was considered relatively small and uncomplicated. McGann at P. 42, L. 7-12, and P. 43 L. 2-3; Shannahan at P. 42-43.  Nevertheless, the audit took several months to complete.  McGann at P. 42, L. 7-12, and P. 43 L. 2-3; Shannahan at P. 42-43; DiPasquale at P. 71, L. 3-5. P. 91, L. 18-19.  Grassi's audit staff worked on-site at AGSi on a daily basis for this audit.  Linda at P. 21, L. 10 and 16.  Normally for an audit of this size, a few days to a few weeks are required at most.  Linda at P. 59,  L. 2-10.  All the while, AGSi was being charged an hourly rate for these duplicative and inadequate services. Shannahan at P. 42, L. 21-25.

Grassi's performance of its services deviated greatly from their own internal audit procedures as well as from the applicable accounting standards.  Specifically, both Kevin McGann and Steven Manhaupt testified in their depositions that no engagement letter was ever executed with AGSi despite it being the policy of both Grassi and Tabb to obtain one. McGann at P. 50, L. 10-13; Manhaupt at P. 67-68; Gero at 1.

Grassi's own pre-audit assessment failed to accurately portray AGSi's audit risk. Gero at 2. In the early audit planning stages, Grassi determined there to be a maximum risk, which was reduced on the Inherit Risk and Combined Risk Assessment Form without explanation. Gero at 2. On the Inherit Risk and Combined Risk Assessment Form Grassi gave the audit a low risk assessment despite high turnover in the accounting department at the comptroller level. See Inherit Risk and Combined Risk Assessment Form, a copy of which is incorporated herein and attached as **Exhibit O.** To the contrary, the Fraud Risk Assessment form notes no turnover at the management level and under yet another analysis the turnover was noted as low. Copies of the Fraud Risk Assessment form and Control Environment form are incorporated herein and attached as **Exhibits P** and **Q**.

Grassi did not complete the General Planning Procedures and Supervision, Review and Approval forms. See; General Planning Procedures from and Supervision, Review and Approval form, copies of which are incorporated herein and attached as **Exhibits R** and **S,** respectively. See also: Manhaupt at P. 60, L. 22-25, P. 61, L. 2-7, P. 63-64; Colbert at P. 31, L. 1-19.

Grassi's carelessness in performing the audit was exemplified when audit work that Tabb already completed was performed again, for no apparent reason, after the merger of Grassi and Tabb. Shannahan at P. 42, L. 21-25. For example, Julia Li performed a materiality analysis on the work she entitled Financial Statement Materiality Worksheet For Planning Purposes on November 11, 2000. A copy of the November 11, 2000 worksheet is incorporated herein and attached as **Exhibit T.** On April 25, 2001, "Linda" a.k.a. Hongling Zhang (hereinafter "Linda") performed the same analysis on the same worksheet. A copy of

the April 25, 2001 worksheet is incorporated herein and attached as **Exhibit U.** It should be noted that both Julia Lee and Linda determined materiality to be $102,284.00.

The necessary early audit analytical review was not performed. Gero at 1. Additionally, necessary procedures were not performed with regards to cash accounts, which were within the scope of the audit and no alternative procedures were performed. Gero at 1.

AGSi had made two cash deposits with Global Crossing pursuant to their contract. The first deposit was for $30,000.00 and the second deposit was for $250,000.00. However, the audited financial statement reflected only a deposit of $250,000.00 with Global Crossing. A copy of AGSi's June 30, 2000 audited financial statement is incorporated herein and attached as **Exhibit V.**

Linda admitted that it was her duty to handle the confirmation control. Linda at P. 39, L. 10-15. Linda also stated that any amount over $102,284.00 was considered material and required confirmation. Linda at P. 31-32 and P. 36-37. The deposit clearly exceeded the materiality threshold.

As part of the audit process, Grassi was required to send independent confirmations to any vendor for which there was an asset or liability shown in the financial statements, including vender deposits, which exceeded the materiality threshold. McGann at P. 61, L. 2-4; Gero at 1. Due to AGSi's small size, Grassi instead sent independent confirmations to all venders who did business with AGSi. Shannahan at P. 44, L. 13-18.

Global Crossing did not respond to verify the existence of AGSi's deposit. McGann at P. 62, L. 10. Therefore, under Grassi's own internal procedures and pursuant to GAAS and/or GAAP, Grassi was required to perform alternative procedures to verify the deposit and liabilities relating to Global Crossing. McGann at P. 62, L. 10; Gero at 1. These

alternative procedures including viewing all of the invoices for the year and reconciling the balances to that which are recorded in AGSi's records.  See: Grassi's worksheet designated as G0888 and incorporated herein and attached as **Exhibit W**; McGann at P. 62-64.

According to the G0888 worksheet (and signified as completed by Linda's name) the alternative procedures that were to be performed included (1) the examination of unpaid invoices, receiving reports, and bills supporting the recorded balances; (2) examine other statements dated near the balance sheet date.  Reconcile statement balances to the balances recorded in the clients account; (3) vouch subsequent payment of the liability; and (4) inspect invoices from the selected center for purposes of goods and services subsequent to the balance sheet date to determine if invoices reflected the amount that was owed as of the balance sheet date.  **Exhibit W**.  However, when Global Crossing did not return the independent confirmation, no alternative procedures appear to have been performed.  Gero at 1.  Furthermore, differences noted in the accounts receivables confirmation processes were not evaluated and no conclusion was made as to the effect of these differences (Gero at 1).

Indeed, according to Grassi's own policies, when Linda signed her name to the worksheet relating to the performance of the alternative procedures, she signified that she personally performed these procedures and that they were completed.  Manhaupt at P. 55, L. 12-16.  However, "Linda" stated that she signed the sheet believing someone else had done the work.  Linda at P. 43, L. 4-9.  Additionally, Kevin McGann stated he reviewed only some of the invoices, rather than all the invoices as were required by the alternative procedures.  McGann at P. 64, L. 3-8, P. 65, L. 2-22.

Under the applicable accounting standards, Grassi had a duty to request that AGSi obtain the invoice or to issue a scope limitation and performed modifications to the audit report based upon the lack of an independent confirmation. Gero Reply at 3. Grassi did not issue any scope limitations, perform modification or request AGSi to obtain a copy of the June invoice for its review.

The June 2000 invoice from Global Crossing was significant in that it showed Global Crossing's wrongful application of the 250,000 deposit to the current usage on May 4, 2000. A copy of the June 2000 invoice is incorporated herein and attached as **Exhibit X.**

It became evident that AGSi did not receive the June 2000 invoice from Global Crossing, as the June 2000 invoice was not in AGSi's files or books. Had Grassi followed proper procedures it would have discovered that the invoice was missing. Gero at 1-4. Grassi never notified AGSi that this invoice was missing nor did it attempt to obtain a copy of this invoice. Shannahan at P. 44, L. 2-6.

Not only was this deposit not identified as depleted in the audit, Grassi certified audited financial statements and issued a tax return which represented that the deposit existed as of June 30, 2000. A copy of AGSi's June 30, 2000 tax return is incorporated herein and attached as **Exhibit Y**. Grassi further represented that the deposit still existed as of March 31, 2001 when it conducted a review of that period. A copy of AGSi's March 31, 2001 financial statement is incorporated herein and attached as **Exhibit Z**. AGSi did not learn of the non-existence of this material asset until June 5, 2002 when it attempted to use the deposit to settle a billing dispute with Global Crossing. DiPasquale at P. 49-51. Regrettably, all leverage with Global Crossing was lost. DiPasquale at P. 75-76.

Grassi attempts to misdirect blame for the missing invoice by trying to argue that the June invoice was a July expense. Such an argument bolsters AGSi's allegation that Grassi failed to follow proper accounting procedures, as the SEC, FASB, and ASCIA all require revenue to be recognized when earned. Gero at 3; Gero Reply at 3. AGSi earned the revenue prior to receiving the actual paper monthly invoice as it billed its customers from the daily billing records received electronically from Global Crossing. Holden at P. 15-16; Mallon at P. 21-22. Thus, under SEC FASB and ASCIA, such revenue would have to be recorded as a June expense. Furthermore, the June invoice was treated internally by AGSi as a June expense. Deposition of Mallon at P. 21-23. Shannahan at P. 38, L. 14-17.

Grassi never performed the closing of the books through the conclusion of the audit as had been contracted. Shannahan at P. 41, L. 13-20, P. 42, L. 1-14; Mallon P. 12, L. 17-24.

Also incorrect is the balance sheet on the June 30, 2000 tax return, while inexplicably different from the June 30, 2000 audited financial statements, which was also prepared by Grassi. Colbert at P. 42, L. 12-20; Gero at 2. The $250,000.00 recorded erroneously and an amended tax return must be filed to correct this mistake. Colbert at P. 42, L. 12-20. Even though Grassi is aware of this mistake, it has taken no actions to make such a correction.

What makes these deficiencies even more egregious is that this audit was conducted in part for the preparation of the sale of the company. Mallon at P. 25-26; McGann at P. 77, L. 13-16 and 22-25; Conigliaro at P. 33, L. 1-9. Mr. Mallon testified that he was present for conversations between the investment bankers who had been hired to sell the company and auditors from Grassi prior to the completion of the June 30, 2000 audit and tax return.

Mallon at P. 25-26.  The new owners purchased the company on August 1, 2001 with the belief that this $250,000.00 deposit existed as an asset.  DiPasquale at P. 114-115.

AGSi relied upon the results of the audit when dealing with Global Crossing to AGSi's detriment.  DiPasquale at P. 56, L. 2-10, P. 58-59.  When a dispute arose with Global Crossing, AGSi tried to utilize the deposit to pay Global Crossing only to be told by Global Crossing that the deposit did not exist.  DiPasquale at P. 30, L. 3-4; P. 44, L. 21-23; P. 50, L. 14-17.  AGSi then began withholding $250,000 from the bill until a determination could be made as to what happened to the deposit because AGSi believed Global Crossing was incorrect.  DiPasquale at  P. 57, L. 7-12.  With the relationship souring, minimum usage charges being applied, late fees accumulating, and Global Crossing's refusal to provide lower rates, AGSi agreed to pay $150,000.00 to Global Crossing and only withhold $100,000.00 pending resolution of this dispute.  Graham at P. 36-37; DiPasquale at P. 85, L. 18-24, P. 75-76, P. 88, L. 4-6.  However, the deposit dispute remains ongoing.

Furthermore, because the dispute has yet to be resolved, Global Crossing considers AGSi to be a delinquent payer – even though AGSi is current on monthly usage payments.  Graham at P. 44, L. 20-23, P. 54-55.  It is Global Crossing's policy not to reduce the rates of any entity that is considered a delinquent payer.  Graham at P. 54, L. 10-17, P. 44, L. 10-15 and 21-23.  Because of this deposit dispute, AGSi is unable to obtain reduced rates from Global Crossing.  DiPasquale at P. 77, L. 2-3 and 8-13; Graham at P. 41, L. 23-25, P. 43, L. 1, 20-22, P. 50, L. 17-20, P. 43, L. 2.  Therefore, AGSi must continue its business at old and inflated rates even though the trend over the last few years in the telecommunications industry has been to decrease these rates.  Holden at P. 37, L. 19-21.

Global Crossing has stated that any other dispute AGSi had with Global Crossing is irrelevant to the designation of AGSi as a delinquent payer. Graham at P. 58, L. 18-19. In fact, even if every dispute was paid, AGSi would still be considered a delinquent account due to the deposit dispute. Graham at P. 58, L. 9-11, 18-19. All other disputes provide for withholding of contested amounts, and therefore none of these disputes could result in AGSi obtaining a delinquent status. Graham at P. 34, L. 21-22.

Furthermore, because of this dispute AGSi's account was scrutinized at Global Crossing and Global Crossing began to charge a monthly minimum. Mallon at P. 97-98. Although Global Crossing had always had the right to charge such a fee, Global Crossing and never charged a monthly minimum to AGSi prior to this deposit dispute due to the parties good relationship. DiPasquale at Pages 75-76; Mallon at P. 97-98. It was not until AGSi disputed the application of the deposit that the relationship soured and minimum usage charge began to be applied. DiPasquale at P. 75-76; Mallon at P. 97-98. Additionally, due to the deposit dispute, Global Crossing has refused to renegotiate the minimum usage requirements to be more on par with AGSi's client base even though Global Crossing commonly renegotiates these minimums with its customers. Graham at P. 50, L. 17-21, P. 41, L. 23-25, P. 42, L. 20-22, P. 43, L. 2; DiPasquale at P. 77, L. 2-3 and 18-13.

Contrary to Grassi's contentions that AGSi moved traffic off of Global Crossing's network due to concerns regarding their bankruptcy filing, any reduction in new traffic with Global Crossing was merely done because of the high rates. Holden at P. 57, L. 1-2. AGSi did not remove any of their customers from Global Crossing's network unless that particular customer requested to be so moved. Holden at P. 59, L. 18-25.

AGSi has had several disputes with Global Crossing over the years regarding billing. However, these disputes are usually quickly resolved. Steve Graham, Carrier Sales Manager of Global Crossing pointed out that all of their customers are always disputing some portion of their bills. Graham at P. 36, L. 10. These other disputes are simply not relevant to this case as by Global Crossing's own statement, they did not affect Global Crossing's relationship with AGSi like the dispute over the deposit. Graham at P. 58, L. 16-19, P. 36, L. 15-20.

Global has also asked AGSi to replenish the deposit and has refused to apply the remaining deposit of $30,000.00 to any outstanding invoices because of the dispute over the $250,000.00 deposit. DiPasquale at P. 73, L. 1-2; P. 75, L. 14-15.

AGSi further remains open to liability for the material misstatement of their June 30, 2000 audited financial statements and tax return. Multiple parties relied upon these audited financial statements as they were created in part for the valuation of the company prior to its sale. DiPasquale at P. 115, L. 1-3. Additionally, tax penalties may apply due to the misstatements contained therein. Colbert at P. 40, L. 3-9, P. 42, L. 12-20.

Finally, AGSi has been damaged by virtue of the fact that it has paid $161,355.00 for services which were never rendered, rendered in duplicate, or rendered wholly inadequately and in violation of the parties' agreement. DiPasquale at P. 64-65, P. 115, L. 10-22.

Contrary to Grassi's allegations, the harm complained of herein occurred within a short time of the discovery of Grassi's misconduct. It was not until after June 5, 2002 that AGSi discovered the non-existence of the deposit. DiPasquale at P. 59. Since the discovery of the missing deposit on or about June 5, 2002, Global Crossing began to charge a monthly minimum fee, has refused requests to renegotiate the monthly minimum, has refused AGSi

discounted rates available to other telecommunication clients of Global Crossing and/or has refused to apply the separate cash deposit of $30,000.00 which remains at Global Crossing. DiPasquale at P. 72-73, P. 77, L. 2-4; Mallon at P. 97-98.

Quite clearly, material issues of fact remain as to whether the foregoing conduct fits the elements of the various claims alleged in AGSi's complaint.

### III.    SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure provide that a party is entitled to summary judgment only if there are no genuine issues as to any material fact. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Fed. Civ.R. 56(C) provides the criteria for granting a Motion for Summary Judgment:

> **Motion and Proceedings Thereon.** The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

Fed. Civ.R. 56(E) further provides:

> **Form of Affidavits; Further Testimony; Defense Required.** Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is

13

> a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

The U.S. Supreme Court in *Celotex v. Catrett, supra,* stated that the moving party bears the initial burden to inform the trial court of the basis for its motion and to identify those portions of the record which it believes demonstrates the absence of a genuine issue of material fact. However, the Court noted that once a party performs its initial duty, the burden shifts to the non-moving party. In this regard, the Court instructed on P. 322 to 323 of its decision:

> Plain language of Rule 56(E) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the non-moving party's case renders all other facts immaterial. The moving party is entitled to judgment as a matter of law because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

In deciding a motion for summary judgment, the trial court must employ the same standard it would use in deciding a motion for a directed verdict. *Suarez v. Dickmont Plastics Corp.* (1994), 229 Conn. 99, 105, 639 A.2d 507. In Connecticut, the direction of a verdict is only 'justified if upon the evidence a jury could not reasonably and legally have reached any other conclusion that that embodied in the verdict as rendered." *Bernardo v. Hoffman* (1929), 109 Conn. 158, 159, 145 A. 884.

When a moving party challenges the sufficiency of the nonmovant's evidence to support his claim or cause of action, the question presented is whether that evidence, when viewed in the light most favorable to the nonmovant, is capable of sustaining a verdict in his

14

favor. *United Oil Co. v. Urban Redevelopment Commission* (1969), 158 Conn. 364, 380, 260 A.2d 596.

IV.    **LAW & ARGUMENT**

A.    **GENUINE ISSUES OF FACT EXIST AS TO AGSI'S BREACH OF CONTRACT CLAIM.**

The key elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages. *Bouchard v. Sundberg* (2003), 8 Conn. App. 180, 189, 834 A.2d 744.

Every contract carries with it a covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. *Maloney v. Connecticut Orthopedics, P.C.* (1999), 47 F. Supp.2d 244, 249, citing *Habetz v. Condon* (1992), 224 Conn.231, 238, 618 A.2d 501.

It is undisputed that Grassi agreed to perform various accounting services on behalf of AGSi in accordance with the applicable accounting standards. Grassi was hired to perform an audit of AGSi's financial statements as of June 30, 2000, conduct a review of AGSi's financial statements as of March 31, 2001, prepare the June 30, 2000 year end tax return, and close out the books on a monthly basis until the conclusion of the audit.

None of the promises to perform were kept. Grassi breached the contract in multiple fashions. Accordingly, questions remain as to whether Grassi billed for services that were never rendered, rendered inaccurately or billed twice for the same service.

The audit originally began prior to the merger of the two accounting firms. Once the merger occurred, the same personnel responded to AGSi, but began the audit from scratch. AGSi was charged for all of the time and activities which occurred prior to the merger and was again charged for the same activities when Grassi unreasonably decided to reperform

15

the audit. Evidence of performing the same tasks twice can be found in Grassi's own work papers. For example, Julia Li performed a materiality analysis on the work she entitled financial statement materiality worksheet for planning purposes on November 11, 2000. On April 25, 2001, Linda performed the same analysis on the same worksheet.

Additionally, Grassi did not perform the audit of the financial statements in accordance with GAAP and/or GAAS, as applicable. When performing the audit, Grassi failed to follow the proper procedures to verify that the $250,000.00 deposit actually existed. Grassi sent an independent verification to Global Crossing which was not returned. According to GAAS/GAAP and Grassi's own policies, alternative procedures had to be performed in order to verify the existence of such deposit. These alternative procedure were never performed or were performed wholly inadequately.

Indeed, according to Grassi's own policies, when Linda signed her name to the worksheet relating to the performance of the alternative procedures, she signified that she personally performed these procedures and that they were completed. However, "Linda" stated that she signed the sheet believing someone else had done the work. Additionally, one auditor, Kevin McGann, stated he reviewed only some of the invoices, rather than all the invoices as were required by the alternative procedures.

Linda admitted that it was her duty to handle the confirmation control. Linda also stated that any amount over $102,284.00 was considered material and required confirmation. The $250,000.00 deposit clearly exceeded the materiality threshold.

According to the worksheet (and signified as completed by Linda's name) the alternative procedures that were to be performed included examining the invoices and performing a reconciliation of the invoices to AGSi's records. However it is unlikely, if not

16

impossible, for these procedures to have been performed without Grassi discovering the nonexistence of the deposit.

At the time of the audit, AGSi was unaware that they had not received an invoice for June 2000 from Global Crossing.  Had these procedures been performed, Grassi would have noted that the June 2000 invoice was neither in AGSi's accounting books nor vendor files.  As such, the missing invoice could not have been used to support such recorded balances or reconcile statement balances.  Furthermore, Grassi, if they did attempt to perform these procedures, never bothered to inform AGSi that there was an outstanding invoice which was missing or that such invoice has not been recorded in AGSi's records.

The June 2000 invoice from Global Crossing was significant in that it showed Global Crossing's wrongful application of the 250,000 deposit to the current usage on May 4, 2000.  It is unknown why a May 4 charge did not appear until the June invoice.  Regardless, the application of the $250,000 deposit on May 4, 2000 clearly occurred prior to AGSi's June 30, 2000 year end.

The June 30, 2000 tax return also remains incorrect.  The $250,000.00 was recorded erroneously and an amended tax return must be filed to correct this mistake.  Even though Grassi is aware of this mistake, it has taken no actions to make such a correction.  As such, AGSi has yet to receive an accurate tax return as they had contracted for in 2000.

Grassi also did not conduct a timely audit.  Grassi admits that this was an uncomplicated small audit.  As such, the audit should have taken only a few days to a weeks – not the several months for which AGSi was billed.  Linda at P. 59, L. 7-9. Additionally, Grassi never closed out the books as requested.

Finally, AGSi has paid of total of $161,355.00 to Grassi for the inaccurate and incomplete audit of the June 30, 2000 financial statements, the inaccurate March 31, 2001 review, the closing of the monthly records which was not performed and the preparation of the misstated tax return for June 30, 2000. AGSi was further damaged as more adequately described below.

Grassi's failure to provide an accurate tax return and to file an amended return correcting such a mistake, Grassi's failure to perform the audit and state the audited financial statements in accordance with the applicable accounting principles, Grassi's failure to close the books, and Grassi's overcharging for this incomplete and inaccurate work has damaged AGSi significantly, as is more adequately described herein.

Consequently, genuine issues of material fact remain as to whether Grassi's failures constitute a breach of Grassi's contract to perform services for AGSi and therefore, Grassi's motion for summary judgment must be denied.

**B.     A MATERIAL QUESTION OF FACT EXISTS AS TO WHETHER OR NOT THE JUNE 2000 INVOICE TO AGSI SHOULD HAVE BEEN REVIEWED AS PART OF THE JUNE 30, 2000 AUDIT AND FINANCIAL STATEMENTS AND/OR MARCH 31, 2000 REVIEW.**

Grassi incorrectly states that the June 2000 invoice was a July 2000 expense and therefore out of the scope of their audit and issuance of audited financial statements for the year end June 30, 2000 and for their review of the period of July 1, 2000 through March 31, 2001.

The June 2000 invoice was not received from Global Crossing by AGSi and therefore was not in AGSi's files or books. Grassi did not notify AGSi this invoice was missing nor did it attempt to obtain a copy of this invoice. Shannahan at P. 44, L. 2-6. The liability and other information on the June 2000 invoice is required to be recorded as a June

2000 expense, according to AGSi's internal accounting procedures, GAAP and/or GAAS and other accounting standards).  Mallon at P. 21-23; Shannahan at P. 30, L. 14-17; Gero at P. 3; Gero Reply at P. 3.

In its brief in support, Grassi incorrectly claims that the June invoice is a July expense by misinterpreting statements from Mr. Mark Thomas, the former president of Grassi, rather than relying upon the testimony of any of AGSi's accounting personnel.  Mr. Thomas states that he is not positive as to how the invoices were applied accounting-wise. Thomas at P. 19, 16-17.  In fact, Mr. Thomas stated that "…because this is a May bill there would have been a June bill that should have been reflected on this balance as June 30, 2000."  Thomas at P. 34, L. 11-13.

Grassi also ignores the testimony by the then Interim Comptroller of AGSi, Carol Shannahan and the present CFO of AGSi, Mike Mallon, who stated that a May invoice was a May expense and that therefore the June invoice was a June expense.

As Carol Shannahan of AGSI stated in her deposition that an invoice dated May 18, 2000 was treated as a May expense.  Shannahan at P. 38, L. 14-17.  Carol Shannahan was working in the accounting department at the time of the audit and was the Interim Comptroller.

Mike Mallon, the current CFO of AGSi confirmed that the practice of AGSi was to recognize invoices as an expense for the same month noted.  Specifically, Mr. Mallon stated:

Q:  Do you recognize these as invoices rendered to Alliance by Global Crossing?
A.  Yes.
Q.  The first one has a cycle date of May 18, 2000 and the invoice date is May 26 2000… when would your customers be billed for this time?
A.  Okay, the May 18 cycle, we would have built our customers from May 1 through May 31 for the daily CDR traffic coming in electronically; so there would have been an offset, we would be ahead of the actual invoice.

> Q.  In Alliances records, for which month with the cost is reflected in the invoice to Alliance from Global Crossing, for which month would that be booked?
>
> A.  May.

Deposition of Mike Mallon at P. 21-23.  Thus the June 2000 invoice should have been reviewed and included as a June expense/revenue relating to the June 30, 2000 year end audit and audited financial statements.

Additionally, material questions of fact exist as Grassi has alleged that the June Invoice was a July expense even if AGSi receives the revenue (due to daily electronic billing) prior to receiving the actual paper monthly invoice.  Although Grassi's argument clearly shows its' lack of understanding of acceptable accounting standards as the SEC, FASB, and ASCIA all require revenue to be recognized when earned, it also presents a question of material fact.

When this invoice was obtained as part of the deposit dispute with Global Crossing, it showed that the deposit had been applied on May 4, 2000.  Therefore, even if the June 2000 invoice was a July expense, *which it clearly was not*, this application of the deposit had occurred prior to the June 30, 2000 year end and was required to be recorded as such.

While the June 30, 2000 tax return, audit and audited financial statement preparation should have discovered the depletion of this deposit, Grassi absolutely should have caught their mistake during their March 31, 2001 review of AGSi.

Therefore, clearly questions of fact remain regarding Grassi's actions concerning the Global Crossing deposit.  However, it is clear that this deposit and its application were clearly within the scope of Grassi's work and therefore Grassi's request for summary judgment must fail.

**C.**      **GENERAL MATERIAL ISSUES OF FACT REMAIN AS TO NEGLIGENCE CLAIM.**

In order to establish its claim of negligence, AGSi must show that Defendant breached a duty to AGSi which caused damage to AGSi. *Coste v. Riverside Motors, Inc.* (1991), 24 Conn.App.109, 112, 585 A.2d 1263, 1265.

Grassi had the duty to use reasonable care toward AGSi. Grassi breached this duty by (1) failing to adequately train and supervise its staff; (2) failing to detect that it was billing AGSi for services that were never performed, inadequately perform and/or billing for duplicate services; (3) failing to conduct an accurate audit of AGSi's financial statements; (4) failing to prepare an accurate tax return; (5) failing to follow GAAP and GAAS; (6) Failing to discover and/or correct its errors after Grassi knew or should have known of the errors; (7) failing to timely complete the audit; (8) dialing to perform alternative procedures to verify amounts when no independent confirmation was returned; and/or (9) failing to verify the existence of the deposit with Global Crossing.

The specifics of Grassi's negligent conduct is discussed at length herein and therefore only one example will be examined here. Grassi was required pursuant to applicable accounting standards and the parties' agreement to perform its work in accordance with GAAS and/or GAAP as the case may require. Therefore, when auditing the June 30, 2000 financial statements, Grassi was required to independently verify the existence of AGSi's cash deposit with Global Crossing. Grassi sent out an independent confirmation which was not returned by Global Crossing. Under the applicable standards, Grassi was then to perform a reconciliation of the receivables, liabilities and deposit by examining the monthly invoices from Global Crossing to AGSi.

Grassi represented that it had correctly performed such procedures, and further represented that the deposit existed as of June 30, 2000 and March 31, 2001. Grassi never notified AGSi that the June invoice was not in their files or that no payment appeared to have been made to Global Crossing in June or that the June invoice amounts had not been recorded in AGSi's records. It appears as though Grassi never examined the invoices as required, as even a cursory examination would have revealed that the June invoice was missing. Under the applicable accounting standards, Grassi had a duty to request that AGSi obtain the invoice or Grassi was required to issue a scope limitation to the audit report based upon the lack of an independent confirmation. Grassi did not issue any scope limitations, perform modification or request AGSi to obtain a copy of the June invoice for its review.

As a result of Grassi's negligent conduct, AGSi suffered significant damages as are more adequately described herein. Genuine issues of material fact remain as to whether Grassi's collective conduct constituted negligence and therefore Grassi's motion for summary judgment must be denied.

## D.   QUESTIONS OF FACT REMAIN REGARDING AGSI'S CLAIM FOR NEGLIGENT MISREPRESENTATION

AGSi will be able to establish that Grassi made a false representation as a statement of fact, (2) that such statement was made for the guidance of AGSi; (3) that Grassi failed to exercise reasonable care in obtaining or communicating the information; and (4) AGSi reasonably relied upon the representation to its detriment. *Thompson v. Bridgeport Hospital* (2003), unreported, Conn. Super. No. CV980352686S, 2003 WL 294465 (Conn. Super.), a copy of which is attached as **Exhibit AA.**

A claim for negligent misrepresentation may be based upon a defendant's failure to speak when he has a duty to do so. *Id.*

22

Grassi represented that the audit, audited financial statements and the tax return for the June 30, 2000 year and were complete and accurate. Grassi further represented by virtue of the audit financial statements that a $250,000 deposit existed with Global Crossing.

Grassi failed to exercise reasonable care in making these statements as it did not follow its own procedures or those procedures which are standard in its profession. It appears Grassi merely took a short cut rather than following the proper procedures in obtaining an independent confirmation, viewing all invoices and reconciliation the amounts or otherwise verifying the existence of this deposit. Additionally, Grassi never told AGSi of its failure to perform these functions even after confronted by AGSi when AGSi learned that Global Crossing did not believe that the deposit existed.

AGSi used these representations as guidance when dealing with Global Crossing to its detriment. When a dispute arose with Global Crossing, AGSi tried to make payment with the deposit only to be told by Global Crossing that it did not exist. AGSi then began withholding $250,000 from the bill because it believed Global Crossing was mistaken about the deposit. Such a dispute deteriorated the parties' relationship. Furthermore, because the dispute has yet to be resolved, AGSi is considered a delinquent payer – even though AGSI is current on usage payments. It is Global Crossing's policy not to reduce the rates of any entity that is considered a delinquent payer. Because of this deposit dispute, AGSi is unable to obtain reduced rates from Global Crossing. Instead AGSi must continue its business at old and inflated rates, even though the trend in the telecommunications industry has been to decrease such rates.

Furthermore, because of this dispute AGSi's account was scrutinized at Global Crossing and Global Crossing began to charge a monthly minimum. Although Global

Crossing had always had the right to charge such a fee, Global Crossing had never once charged AGSi a monthly minimum prior to this deposit dispute.

According to the Connecticut Supreme Court, the governing rules of a negligent misrepresentation claim are set forth similarly to that contained in Section 522 Restatement (Second) of Torts (1977):

> One who, in the course of his business, profession, or employment … supplies false information for the guidance of others in their business transactions, is subject to liabilities of pecuniary loss caused to them by their justifiable reliance upon the information if he fails to exercise reasonable care or competence in obtaining or communicating that information.

*Craine v. Trinity College* (2002), 259 Conn. 625 at 660-661, citing Section 522 Restatement (Second) of Torts (1977).  It is clear that Grassi did not exercise reasonable care or competence in obtaining or communicating information regarding this deposit, as it did not follow its own internal procedures nor did it followed generally accepted procedures in its profession, namely GAAS and GAAP.

The Connecticut Supreme Court has held that:

> Even an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth.

*Richard v. A. Waldman & Sons, Inc*. (1967), 155 Conn. 343, 346, 232 A.2d 307; *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School* (1987), 202 Conn. 206, 217, 520 A.2d 217.  Here, Grassi clearly had the means of knowing, ought to have known,  and had at a duty to know by virtue of the relationship of the parties, that this deposit did not exist. Grassi merely had to follow the proper procedures to look at the invoices or otherwise independently confirm the existence of this deposit in order to know the truth as to the

deposit's existence.  Instead of following the required procedures, Grassi merely copied the amount from AGSi's records and recorded it on the audited financial statements.

Furthermore, Grassi had a duty to notify AGSi if it wasn't able to verify the deposit's existence.  Had the auditors reviewed the invoices, it would've become apparent that the June invoice was not in the records or in the accounting system and efforts could have been made to obtain a duplicate for their review.

The Connecticut Supreme Court has held that a "remedy on the contract is independent of a remedy for negligent misrepresentation."  *Williams Ford, Inc. v. The Hartford Courant Company* (1995), 232 Conn. 559, 579, 657 A.2d 212.  Moreover, whether or not evidence supports a claim for negligent misrepresentation is a question of fact.  *Jester v. Fischer* (2001), 65 Conn. App. 349, 358, 783 A.2d 28; *Thompson* at 3.  Therefore, Defendant's motion for summary judgment must be denied as material questions of fact remain as to AGSi's negligent misrepresentation claim.

**E.   MATERIAL QUESTIONS OF FACT REMAIN AS TO AGSI'S FRAUD CLAIM.**

The essential elements of a fraud claim are (1) a false representation was made as a statement of fact; (2) the statement was known to be untrue by the party making it; (3) the statement was made to induce another party to act upon it; and (4) the other party did so act upon that false representation to his injury.  *Barbara Weisman, Trustee v. Kaspar* (1995), 233 Conn. 531, 539-540, 661 A.2d 530; *Billington v. Billington* (1991), 220 Conn. 212, 217, 595 A.2d 1377; *Kiduff v. Adams, Inc.* (1991), 219 Conn. 314, 329, 593 A.2d 478; *Maturo v. Gerard* (1985), 196 Conn. 584, 587, 494 A.2d 1199.

False statements that are made recklessly without knowing or caring whether they are true or false will support an action for fraud or deceit.  *Bobbin v. Sail the Sounds, LLC*

(September 12, 2003), *unreported*, Connecticut Superior Court Case No. CV020563884S, 2003 WL 22206799 (Conn. Super.), a copy of which is attached as **Exhibit BB.** Accordingly, the scienter or intent to deceive element of a fraud claim can be satisfied by a showing of recklessness. *Id.*

Grassi acted intentionally and/or recklessly when it refused to follow proper procedures, both internally and as required by GAAS and GAAP, in order to verify the existence of the deposit. Had Grassi merely performed the alternative procedures, it would have been apparent that the June 2000 invoice from Global Crossing was not present. This fact alone should have put Grassi on notice that the deposit may not exist and that the assets and liabilities relating to Global Crossing may be incorrect.

Furthermore, had Grassi merely notified AGSi of the missing invoice, AGSi could have obtained a copy of the invoice from Global Crossing and this error could have averted. By not verifying the existence of the deposit or performing alternative procedures and/or by not informing AGSi of the missing invoice, Grassi acted intentionally and recklessly when it provided AGSi with a tax return and audited financial statements and represented that they were correct and complete and that the deposit existed in the amounts noted therein.

Additionally, Grassi committed fraud when it charged AGSi for duplicative services, services that were never performed, and/or services that were intentionally performed contrary to the parties' agreement.

As described below, AGSi acted to its detriment upon the belief that this deposit did exist, that the bills were correct and that the tax return and audited financial statements were correct. As such, material questions of fact exist as to the extent of AGSi's damages caused

by Grassi's fraudulent actions.  Therefore, Grassi's motion for summary judgment must be denied.

**F.**    **QUESTIONS OF FACT REMAIN AS TO AGSI'S  CLAIM FOR VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT**

To prevail on a Connecticut Unfair Trade Practices Act ("CUTPA") claim, AGSI must establish that the defendant engaged in a prohibited act which proximately caused an injury to AGSI.  *Abrahams v. Young and Rebicam, Inc.* (1997), 240 Conn.300, 306, 692 A.2d 709, 712.

In determining whether a practice violates CUTPA any one of three criteria must be met: (1) The practice (whether or not previously determined to be unlawful), offends public policy as such policy has been established by statutes, common law or otherwise (i.e. it is within the penumbra of some common law, statute or other established concept of fairness); (2) the action is immoral, unethical, oppressive or unscrupulous; or (3) such an act causes substantial injury to consumers competitors or other persons.  *Janusauskas v. Fichman* (2003), 264 Conn. 796, 808, 826 A.2d 1066.  A practice may violate CUTPA if only one criteria is met or if all three are met to a lesser degree.  McLaughlin Ford, Inc. v. Ford Motor Co. (1984), 192 Conn.558, 473 A.2d 1185.

The Connecticut Supreme Court has stated "with regard to the requisite causal element, it is axiomatic that proximate cause is an actual cause that is a substantial factor in the resulting harm." *Id.*

The question to be asked in determining whether or not proximate cause exists is "whether the harm which occurred was of the same general nature as the foreseeable risk

27

created by the defendant's act." *Id.* The issue of causation is generally reserved for the trier of fact. *Id.*

Only allegations of unfair, unconscionable, or deceptive methods, acts or practices in the conduct of the entrepreneurial, commercial or business aspects of accounting may be brought under CUTPA. *Advest Group v. Arthur Anderson LLP* (July 28, 1998), *unreported*, Connecticut Superior Court Case No. CV970571417, 1998 WL 457697 (Conn. Super.), a copy of which is attached as **Exhibit CC**; *ShareAmerica, Inc. v. Ernst & Young* (July 2, 1999), *unreported,* Connecticut Superior Court Case No. X02CV930150132S, 1999 WL 545417 (Conn. Super.), a copy of which is attached as **Exhibit DD**. Professional negligence or malpractice does not fall under CUTPA. *Haynes v. Yale-New Haven Hospital* (1997), 243 Conn. 17, 34, 699 A.2d 964.

An example of the entrepreneurial commercial or business aspects of an accounting business includes billing practices. *Janusauskas* at 808. Here, AGSi was over billed as it was billed for services that were never performed, performed in duplicate and/or performed inaccurately.

Additionally, while negligent departures from the standard of care of accountants does not constitute an unfair trade practice, other activities of these professionals can constitute an unfair trade practice. In *Dudrow v. Ernst & Young, infra,* the Court held that allegations of a faulty audit and the preparation of incorrect financial statements constituted a claim under CUTPA and further stated:

> While such conduct of course may also be a departure from the standard of care, it would be difficult to see why intentional misconduct would not be held to constitute an entrepreneurial trade practice since it would constitute a stark departure from the standards understood to be embodied in the work of professional services, that is, a commitment to adhere

> to standards instituted for conduct within the professions. It does not seem logical, for example, they use of a professional role to commit a fraud would not be actionable under CUTPA, since such a perversion of professional standards would be such a departure as to render the activities merely entrepreneurial practice rather than professional performance.

*Dudrow v. Ernst & Young* (September 14, 1999), *unreported,* Connecticut Superior Court Case No. X01CV980144211, 1999 WL 786343 (Conn. Super.), a copy of which is attached as **Exhibit EE.**

Here, Grassi acted intentionally and recklessly by purposely choosing not to perform any independent verification and/or alternative procedures relating to the deposit even though the deposit was clearly material pursuant to their own calculations. AGSi has also stated claims of fraud and misrepresentation – all of which actions have been held under Connecticut law to be such stark departures from the standard of care that renders these actions subject to CUTPA as entrepreneurial practices.

In a substantially similar case, where an accountant represented financial statements were accurate when they were not, the Connecticut Superior Court held that such allegations "are sufficient to implicate the commercial or entrepreneurial aspects of accounting". *Facchini v. Miller* (January 31, 2000), *unreported*, Connecticut Superior Court Case No. CV990587686S, 2000 WL 175580 (Conn. Super.), a copy of which is attached as **Exhibit FF.**

AGSi's CUTPA claim is also based on fraud and misrepresentation due to Grassi's representations (1) that the deposit existed as stated by the June 30, 2000 tax return, June 30, 2000 audited financial statements, and March 31, 2001 (2) that all of the material amounts within the scope of the audit had been verified in accordance with the applicable standards,

as has been more adequately described herein and (3) that the fees for Grassi's services were for work that was actually and adequately performed.

A CUTPA claim based upon misrepresentation includes a broader range of conduct that the common law action for misrepresentation, as CUTPA violations do not require actual knowledge of the falsity of the statement or any reliance thereon. *L.G. Defelice, Inc. v. Fireman's Insurance Co*. (1998), 41 F. Supp.2d 153, 166. An innocent misrepresentation is sufficient to state a claim under CUTPA. *Id.* Furthermore, a failure to disclose can also be deceptive under CUTPA where there is a duty to make such a disclosure. *Normand Josef Enterprises, Inc. v. Connecticut National Bank* (1994), 230 Conn. 486, 523, 646 A.2d 1289.

Material questions of fact also remain regarding whether Grassi was aware of the sale of AGSi and sought to profit from such sale by knowingly or recklessly inflating AGSi's audited financial statements.   Mr. Mallon stated that he recalls conversations between the auditors and the investment bankers who were hired to sell the company prior to the conclusion of the audit and preparation of the tax return.

As Grassi has misrepresented that the audited financial statements and tax returns were complete and accurate and performed with the appropriate standard of care, that a $250,000.00 deposit existed with Global Crossing and had been verified, and as Grassi has committed overbilling, and billing for services that were not render or rendered inadequately, AGSI has clearly stated a claim under CUTPA according to Connecticut law. As such, Defendant's motion for summary judgment must be denied.

### G.    SIGNIFICANT FACTUAL ISSUES EXIST REGARDING THE PROMISSORY ESTOPPEL CLAIM.

The doctrine of promissory estoppel is derived from the Restatement of Contracts § 90, which provides in relevant part:  "A promise which the promisor should reasonably

expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." 1 Restatement (Second), Contracts § 90, p.242 (1981). See, also, *Pavliscak v. Bridgeport Hosp.* (1998), 48 Conn.App. 580, 711 A.2d 747.

For a claim of estoppel, a party must prove two elements: (1) the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and (2) the other party must change its position in reliance on those facts, thereby incurring some injury. *Lawson v. Aetna Life Ins. Co.* (Conn.Super. Dec. 30, 1998), *unreported*, No. CV 940464989S, 1998 WL 929645, a copy of which is attached as **Exhibit GG;** *Chotkowski v. State*, 240 Conn. 246, 268, 690 A.2d 368 (1997).

Grassi conducted an audit and prepared audited financial statements for the year end June 30, 2000, performed a March 31, 2001 review and prepared a tax return for the year end of June 30, 2000, during all of which Grassi represented that a $250,000 deposit existed with Global Crossing. These representations induced AGSi to believe that this $250,000 deposit did in fact exist.

AGSi acted upon its belief that such a deposit existed when attempting to resolve a dispute that arose between Global Crossing and AGSi. Because of AGSi's reliance on Grassi's representation that such a deposit existed, AGSi has been damaged as described below. Material questions of fact remain as to whether Grassi's actions were calculated to be relied upon by AGSi and therefore, Grassi's motion for summary judgment must fail.

### H.    MATERIAL QUESTIONS OF FACT REMAIN AS TO THE CONVERSION CLAIM.

Generally, "[c]onversion is an unauthorized assumption of exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights." *Epstein v. Automatic Enterprises* (1986), 6 Conn.App. 484, 488, 506 A.2d 158; *Falker v. Samperi* (1983), 190 Conn. 412, 461 A.2d 681.

To establish a prima facie case of the second class of conversion, a plaintiff must prove: (1) the property given to the defendant belonged to the plaintiff, (2) the defendant deprived the plaintiff of the property for an indefinite period of time, (3) the defendant's conduct was unauthorized and (4) the defendant's conduct harmed the plaintiff." *Miller v. Guimaraes* (2003), 78 Conn.App. 760, 829 A.2d 422.

In this action, Grassi has wrongfully asserted control or exercised dominion of monies belonging to AGSi by issuing invoices and accepting payment for work that it never performed or performed in violation of the agreed upon procedures, i.e., performance in accordance with GAAP and/or GAAS, as applicable.  AGSi had paid this money to Grassi in a good-faith belief that Grassi was performing the work in accordance with the applicable standards.  Grassi was not authorized to charge for work that was not performed or to charge or perform work that was duplicative or for work that was not in accordance with the applicable standards.  Although such a demand is not required under Connecticut law in such a situation, when these issues were discovered, AGSi requested a refund of what was paid as the audit, review, tax return and audited financial statements are wholly inadequate and must be restated. *Luciani v. Stop & Shop Co., Inc.* (1988), 15 Conn.App. 407, 544 A.2d 1238.  Additionally AGSi's records were not closed on a monthly basis as had been agreed

by the parties. Grassi has refused to return these monies thereby harming AGSi, as is more adequately described below.

In the case *sub judice*, Plaintiff unreasonably relies on *Anglo-Iberia Underwriting Mgmt. Co. v. Lodderhose* (2002), 224 F.Supp.2d 679, which states **in *dicta*, and not as part of its holding** as Plaintiff claims, "'not performing as agreed' . . . is not a proper basis for a conversion claim". However the Court goes on to qualify this statement by stating that the plaintiff was not the proper owner of the goods at the time of the alleged conversion and therefore the plaintiff could not establish a claim for conversion. *Id. Anglo-Iberia Underwriting Mgmt. Co.* clearly is not applicable in this instance. As established above, AGSi is the proper party and can show a claim for conversion.

Here, Grassi is well aware of the deficiencies of their work on behalf of AGSi and are aware that the audited financial statements and tax return will have to be restated. Grassi, however, has refused to return any of the money it wrongfully holds, including the monies received due to its overbilling, billing for services never performed or performed in duplicate and/or performed so inadequately that AGSi will have to pay an accountant to reperform such work and restate the June 30, 2000 financial statements and tax return. Such wrongful withholding of AGSi's monies has significantly damaged AGSi, as described below. Therefore, Grassi's motion for summary judgment must be denied.

## I.   SIGNIFICANT FACTUAL QUESTIONS REMAIN AS TO AGSI'S UNJUST ENRICHMENT CLAIM.

Unjust enrichment is a doctrine based on the postulate that it is contrary to equity and fairness for a defendant to retain a benefit at the expense of the plaintiff. *Gagne v. Vaccaro* (2001), 255 Conn. 390, 401, 766 A.2d 416.

The doctrine's three basic requirements are that:  (1) the defendant has benefited, (2) the defendant unjustly failed to pay the plaintiff for the benefits, and (3) the failure of the payment was to the plaintiff's detriment.  *Id.* at 409, 766 A.2d 416.  See also, *Ayotte Bros. Constr. Co., supra*; *Bolmer v. Kocet*, 6 Conn.App. 595, 612-13, 507 A.2d 129 (1986).

Unjust enrichment applies whenever justice requires compensation to be given for property or services rendered under a contract, and a remedy is not available by an action on the contract,  *Gagne v. Vaccaro* (2001), 255 Conn. 390, 401, 766 A.2d 416.  See also, *Ayotte Brothers Const. Co., supra*; 5 S. Williston, Contracts (Rev.Ed.) § 1479. Should the breach of contract remedy not be available as a matter of law, then, by correlation, Plaintiff is able to recover for each of those claims under an unjust enrichment theory.

Plaintiff realleges all of the allegations made under its breach of contract theory, as well as under each of its other claims, as have been more adequately described in detail herein.

Grassi benefited from each of these actions in that it did not have to expend much energy to perform this audit and was able to profit greatly therefrom.  Additionally, it is believed that Grassi wanted to show that AGSi had as much assets as possible as the company was being placed for sale and Grassi would presumably be paid from the profits of that sale.  By redoing various aspects of the audit without cause, by failing to follow correct standards and perform necessary procedures (such as the alternative procedures to determine the existence of the deposit), and by failing to perform necessary work or correct such failures, Grassi was able to profit greatly without performing the necessary work.  Grassi ultimately charged AGSi $161,355.00 for this improper and materially inaccurate accounting work which will have to be restated.

34

Even though Grassi is aware of their own failures, of the double billing, and of its billing for work that was not necessary, not performed, or performed inadequately and inaccurately, Grassi has retained all benefits therefrom.  Grassi has not returned the amounts charged for this audit nor has it undertaken any attempt to correct these material mistakes.

Due to Grassi's actions, AGSi has been significantly damaged, as has been more adequately described below.  As material facts remain relating to AGSi's unjust enrichment claim, Grassi's motion for summary judgment must be denied.

**J.    GENUINE ISSUES OF MATERIAL FACT REMAIN AS TO WHETHER AGSI WAS DAMAGED DUE TO GRASSI'S NEGLIGENCE AND REPRESENTATIONS.**

AGSi relied upon the results of the audit when dealing with Global Crossing to AGSi's detriment.  When a dispute arose with Global Crossing, AGSi tried to utilize the deposit to pay Global Crossing only to be told by Global Crossing that the deposit did not exist.  AGSi then began withholding $250,000 from the bill because it believed Global Crossing was mistaken about the deposit.   Such a dispute deteriorated the parties relationship.  Consequently there remains an issue of material fact as to whether the loss of bargaining power damaged AGSi in its relationship with Global Crossing.

Furthermore, because the dispute has yet to be resolved, Global Crossing considers AGSi to be a delinquent payer – even though AGSi is current on monthly usage payments. It is Global Crossing's policy not to reduce the rates of any entity that is considered a delinquent payer.  Because of this deposit dispute, AGSi is unable to obtain reduced rates from Global Crossing.  Therefore AGSi must continue its business at old and inflated rates, even though the trend over the last few years in the telecommunications industry has been to decrease these rates.

Furthermore, because of this dispute AGSi's account was scrutinized at Global Crossing and Global Crossing began to charge a monthly minimum.  Although Global Crossing had always had the right to charge such a fee, Global Crossing and never charged a monthly minimum to AGSi prior to this deposit dispute.

Contrary to Grassi's contentions that AGSi moved traffic off of Global Crossing's network due to concerns regarding their bankruptcy filing, any reduction in new traffic with Global Crossing was merely done because of the high rates.  AGSi did not remove any of their customers from Global Crossing's network unless that particular customer requested to be so moved.

AGSi has had several disputes with Global Crossing over the years regarding billing.  Contrary to Grassi's allegations, these disputes were quickly resolved and did not affect the parties relationship or AGSi's damages in this matter.  As Steve Graham, Carrier Sales Manager of Global Crossing pointed out, all customers are always disputing some portion of their bills.

These other disputes are simply not relevant to this case as by Global Crossing's own statement, they did not affect Global Crossing's relationship with AGSi like the dispute over the deposit.  The disputes noted by Grassi include a resolved dispute that arose when Global Crossing moved a delinquent paying client off of AGSi's account without AGSi's consent.  Under the terms of AGSi's contract with that client, Lextel, AGSi had the right to take over the client's customers to recoup what was owed to it by Lextel.  When the traffic had been moved, AGSi no longer could recoup their loss.  AGSi consulted with Global Crossing and a settlement has previously been reached on this matter.

The other issue noted by Grassi is equally irrelevant. AGSi hired a firm to review the invoices from its venders to discover inaccuracies. Several incorrect billing items were discovered relating to Global Crossing, including charges for clients which did not belong to AGSi, overbilling, and late fees on disputed amounts (which was contrary to the parties' contract). Again, almost all of these disputes have previously been resolved. Currently, only a dispute remains as to whether a portion of the traffic for which AGSi was billed belonged to another carrier. This dispute is currently being investigated by Global Crossing.

On the other hand, AGSi originally withheld $250,000.00 in payments to Global Crossing until a determination could be made as to what happened to the deposit. With the relationship souring, minimum usage charges being applied, late fees accumulating, and Global Crossing's refusal to provide lower rates, AGSi agreed to pay $150,000.00 to Global Crossing and only withhold $100,000.00 pending resolution of this dispute. However, the deposit dispute remains ongoing. Additionally, Global Crossing has labeled AGSi as a delinquent payer due to the deposit dispute making AGSi ineligible for any favorable rate reductions.

Global has also asked AGSi to replenish the deposit and has refused to apply the remaining deposit of $30,000.00 to any outstanding invoices because of the dispute over the $250,000.00 deposit, which remain open items.

AGSi also remains open to liability for the material misstatement of their June 30, 2000 audited financial statements and tax return. Multiple parties relied upon these audited financial statements as they were created in part for the valuation of the company prior to its sale. Additionally, tax penalties may apply due to the misstatements contained therein.

Finally, AGSi has been damaged by virtue of the fact that it has paid $161,355.00 for services which were never rendered or rendered twice or rendered wholly inadequately and in violation of the parties' agreement.

**K.    THE AFOREMENTIONED DAMAGES WERE PROXIMATELY CAUSED BY GRASSI'S NEGLIGENCE AND MISREPRESENTATIONS NOTED HEREIN.**

Each of the noted damages were proximately caused by Grassi's actions and misrepresentations.

In order for legal causation to exist, actual cause or cause in fact, as well as proximate cause must be present. *Coste* at 113, 1265. Actual cause occurs when the particular injury would not have occurred in the precise way that it did occur without the defendant's conduct. *Id.* Proximate cause is defined as "an actual cause that is a substantial factor in the resulting harm" *Coste* at 114, 1265-1266. In order to be a substantial factor, the harm that occurred must be of the same general nature as the foreseeable risk created by the defendant's negligence. *Coste* at 114, 1266. The question of proximate cause is reserved for the trier of fact. *Id.*

All of AGSi's damages arose due to Grassi's wrongful conduct and misrepresentations. Each of the damages were clearly foreseeable. Specifically, AGSi suffered damages of (1) additional costs for minimum usage charges to Global Crossing, (2) inability to receive discounted rates from Global Crossing, (3) a rating of a delinquent payer by Global Crossing, (4) income tax liability, (5) liability to third parties who may have relied upon the audited financial statements and/or tax return, (6) liability to the purchasers of the company who relied on the audited financial statements and tax return in valuating the company, (7) potential SEC/FCC and/or other governmental liability for misstated financial

statements, (8) the deterioration of the relationship between Global Crossing and AGSi and (9) AGSi suffered damages in the amount of $ 161,355.00 for payment of services from Grassi which were not performed, performed twice or performed wholly inadequately and contrary to the parties' agreement.

It was foreseeable that AGSi would rely upon the existence of the assets as verified by the audit. It is further foreseeable that a dispute would arise between Global Crossing and AGSi due to AGSi's reliance on the audited financial statements showing that the $250,000.00 deposit existed with Global Crossing when it did not in fact exist. It is also foreseeable that others would rely on these audited financial statements, as Grassi was aware that AGSi was being sold. Finally, it is foreseeable that the June 30, 2000 audit, the March 31, 2001 review, and preparation of the June 30, 2000 tax return, when performed contrary to the applicable accounting standards would result in inaccuracies and material misstatements.

Although Global Crossing had the right to apply minimum usage charges for several years, Global Crossing did not do so due to the parties' good relationship. It was not until AGSi disputed the application of the deposit that the relationship soured and minimum usage charge began to be applied. Additionally, due to the deposit dispute, Global Crossing has refused to renegotiate the minimum usage requirements to be more on par with AGSi's client base even though Global Crossing commonly renegotiates these minimums with its customers.

Mr. Graham noted that it is Global Crossing's policy not to grant more favorable rates to those customers who have a delinquent status and AGSi is considered to be delinquent due to the deposit dispute.

Furthermore, as all other disputes provide for withholding of contested amounts, none of these disputes could result in AGSi obtaining a delinquent status.  In fact, even if every dispute was paid, according to Global Crossing AGSi would still be considered a delinquent account due to the deposit dispute.

Contrary to Grassi's allegations, the harm complained of herein occurred within a short time of the discovery of Grassi's misconduct.  It was not until after June 5, 2002 that AGSi discovered the non-existence of the deposit.  Since the discovery of the missing deposit on or about June 5, 2002, Global Crossing began to charge a monthly minimum fee, has refused requests to renegotiate the monthly minimum, has refused AGSi discounted rates available to other telecommunication clients of Global Crossing and/or has refused to apply the separate cash deposit of $30,000.00 which remains at Global Crossing.

As material issues of fact remain and, as causation is a question of fact for a jury, Grassi's Motion for Summary Judgment must be denied.

**V.**      **CONCLUSION**

As questions of material fact remain, this Honorable Court must deny Defendant's Motion for Summary Judgment.

Respectfully submitted,

**MINTZ, LEVIN, COHN, GLOVSKY AND POPEO, P.C.**


By: /s/ Pamela Chambers
    **Pamela Chambers, Esq. (21105)**
    Mintz, Levin, Cohn, Ferris,
     Glovsky and Popeo, P.C.
    Connecticut Financial Center
    157 Church Street
    New Haven, Connecticut 06510
    (203) 777-8200 phone
    (203) 777-7111 fax


**Of Counsel:**

**RITZLER, COUGHLIN
  & SWANSINGER, LTD.**

John Swansinger, Esq.
Drue Marie Skaryd, Esq.
1001 lakeside Avenue
1550 North Point Tower
Cleveland, Ohio 44114
(216) 241-8333 phone
(216) 241-5890 fax

## PROOF OF SERVICE

A copy of the foregoing Brief in Opposition to Plaintiff's Motion for Summary Judgment has been forwarded to the following by electronic mail and regular U.S. Mail on this 26th day of March 2004:

Robert K. Ciulla, Esq. (Ct 04262)
Ciulla & Donofrio, LLP
127 Washington Ave.
P.O. Box 219
North Haven, CT 06473
(203) 234-0379

and

John Eickmeyer, Esq. (Ct 24317)
Vedder Price Kaufman & Kammholz
805 Third Ave.
New York, New York 10022
(212) 407-7799

**MINTZ, LEVIN, COHN, GLOVSKY AND POPEO, P.C.**

By: /s/ Pamela Chambers
 **Pamela Chambers, Esq. (21105)**

42