UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

--------------------------------------------------------------

ALLIANCE GROUP SERVICES, INC.,

                Plaintiff,

      -against-

GRASSI & CO., CERTIFIED PUBLIC
ACCOUNTANTS, P.C.,

                Defendant.

--------------------------------------------------------------

Civil Action No. 3:02CV02080 (WWE)

# REPLY MEMORANDUM IN SUPPORT OF
# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

        ROBERT K. CIULLA (ct-04262)
        Rciulla@cd-llp.com
        Ciulla & Donofrio, LLP
        127 Washington Avenue
        P.O. Box 219
        North Haven, CT 06473
        Tel:  (203) 239-9828
        Fax:  (203) 234-0379

        JOHN H. EICKEMEYER (ct-24317)
        jeickemeyer@vedderprice.com
        Vedder, Price, Kaufman & Kammholz, P.C.
        805 Third Avenue
        New York, New York  10022
        Tel:  (212) 407-7700
        Fax:  (212) 407-7799

        *Attorneys for Defendant Grassi & Co.,*
        *Certified Public Accountants, P.C.*

**PRELIMINARY STATEMENT**

Defendant Grassi & Company, CPAs, P.C. ("Grassi") submits this reply memorandum in further support of its motion for summary judgment. In order to defeat Grassi's motion for summary judgment, plaintiff Alliance Group Services, Inc. ("Alliance") was required to present admissible evidence demonstrating the existence of a genuine issue of material fact. *Leak v. United Technologies Corp.*, 81 F. Supp. 373, 377 (D.Conn. 1999). However, Alliance has presented only speculation and distortions of deposition testimony that fail effectively to rebut Grassi's showing that, as a matter of law, there is no causal link between Grassi's allegedly wrongful conduct and the amounts Alliance was charged by Global Crossing ("Global") under their contract. Moreover, Alliance has failed to overcome Grassi's showing that Alliance's claims are subject to dismissal as a matter of law. Accordingly, Grassi's motion for summary judgment should be granted in all respects.

**POINT I**

**ALLIANCE HAS FAILED TO PRESENT EVIDENCE OF A GENUINE FACT ISSUE REGARDING THE ABSENCE OF THE REQUISITE ELEMENT OF CAUSATION**

Alliance has failed to present evidence of any triable fact issue regarding the absence of any causal link between Grassi's allegedly wrongful conduct and the amounts that Global charged to Alliance, which represent approximately 90 percent of Alliance's claimed damages.[1] The amounts for which Alliance seeks recovery fall into two categories: (1) minimum usage charges specified in the agreement, and (2) reduced rates that Alliance claims it would have obtained had Grassi discovered Global's application of the deposit during its audit. But as demonstrated below, Alliance has not shown the existence of a fact issue as to either category.

---

[1] Alliance's extensive discussion of Grassi's alleged negligence is irrelevant to this discussion, which assumes, solely for the sake of argument on this point, that Grassi was negligent.

A. **<u>Enforcement Of The Minimum Usage Charge.</u>**

Alliance's effort to establish proximate cause as to the enforcement of the minimum usage charge relies entirely on speculation and distortion of the record. For example, Alliance baldly states that "because of [the deposit] dispute [Alliance's] account was scrutinized at Global Crossing and Global Crossing began to charge a monthly minimum." (Opp. Mem. at 36) However, Global account executive Steven Graham testified that "it is always Global Crossing's policy to put shortfalls onto someone's invoice when they are not meeting their minimums and that it is a manual process and that it does get overlooked." (Graham Dep. at 46-47) Graham continued that he believed there was no relationship between the deposit issue and the enforcement of the minimums. (Graham Dep. at 47, quoted at p.17 of Grassi's main memo) Thus, Alliance presents no evidence supporting its hypothesis of a causal link and the person in the best position to know – Global's account executive – says that there was none.

Alliance also states without support that it reduced its usage of Global's network because of the higher rates it was allegedly being charged, which it in turn attributes to the deposit dispute. (Opp. Mem. at 36) But Alliance's own CFO testified to the contrary:

> Q. Did [the volume of business with Global] change at some subsequent point?
>
> A. Yes.
>
> Q. And how did it change?
>
> A. Diminished.
>
> Q. Why did it diminish?
>
> A. Concerns about Global Crossing's financial position, they were filing bankruptcy.
>
> *     *     *     *     *

2

> Q. Was it the case that whenever you had a choice in the first few months of 2002 you switched traffic away from Global Crossing to other vendors?
>
> A. I would say that's correct.

(Mallon Dep. at 33-35) Alliance's reduction of its Global usage thus undisputedly began months before the discovery of the application of the deposit in June 2002. Moreover, Alliance's contention that it did not remove customers from Global's network unless that customer requested a transfer (Opp. Mem. at 36) is also unsupported by any testimony and is contradicted by the foregoing testimony that Alliance made such a switch whenever it could, even prior to discovery of the application of the deposit. Alliance's position is further contradicted by Exhibit Q to the Eickemeyer Dec., which shows a drop in the amount of Global traffic, and so of the amounts billed by Global, in the first half of 2002.

Although Alliance contends that the enforcement of the minimums "occurred within a short time of the discovery" in June 2002 that the deposit had been applied two years earlier (Opp. Mem. at 12), the first minimum shortfall charge did not appear on Global's invoices to Alliance until nine months later, in April 2003. Alliance's contention that the minimums were enforced solely due to the deposit dispute is further undercut by Global's decision to stop enforcing the minimum a few months later, with the deposit issue unresolved. Moreover, not only has Alliance not paid any of the minimum usage charges, but Graham testified that these charges may be forgiven as part of a subsequent renegotiation of the Global-Alliance relationship. (Graham Dep. at 58-59)[2]

---

[2] Not only may this non-incurred "damage" not be recovered, but Alliance's speculation that it may yet be called upon to pay tax penalties or to restate financial statements (Opp. Mem. at 33) also provides no basis for the imposition of liability on Grassi. Indeed, if a restatement were going to be required, it would have been done by now. Moreover, since the effect of any non-detection of the invoice reflecting the application would have been to overstate Alliance's income, it is highly unlikely that Alliance would owe any additional tax or penalties. The other elements of supposed damages listed at pp. 38-39 of the Opp. Mem. are equally specious because (1) as a private

Alliance thus has offered no admissible evidence from which it could be inferred that the minimum usage provision would not have been enforced "but for" Grassi's alleged failure to discover the deposit had been applied. Alliance also provides no basis for its contention that enforcement of the minimum was a foreseeable result of an audit error by Grassi. Specifically, Alliance has not even addressed the Connecticut Supreme Court's teaching in *Abrahams v. Young and Rubicam, Inc.*, 240 Conn. 300, 692 A.2d 709 (1997), that a mere assertion, such as appears at p. 38 of the Opp. Mem., that a particular supposed harm was foreseeable is insufficient. Even if one were to accept Alliance's unsupported assertion that the deposit issue is related to Global's charges, any "poisoning" of the relationship is not the result of a failure to discover that the deposit was applied but rather of the application itself. In short, Alliance blames the messenger – Grassi – for not delivering the news fast enough when it is the news itself, namely, Global's application of the deposit, that led Alliance to withhold payments from Global and in turn led Global supposedly to consider Alliance "delinquent." Since Alliance has failed to demonstrate any triable fact issue as to the lack of causation with respect to enforcement of the contractual minimums, Grassi is entitled to summary judgment dismissing that portion of Alliance's claim.

**B.     Denial Of More Favorable Rates.**

Alliance's efforts to establish a fact issue as to a causal link between Grassi's alleged negligence and Global's refusal to grant more favorable rates are also founded on speculation and distortions of the record. For example, while emphasizing the deposit issue, Alliance says that its other billing disputes with Global were typical and quickly resolved. (Opp. Mem. at 36)

---

company Alliance does not make SEC filings, (2) any liability to Alliance's purchasers would fall on the sellers not on Alliance itself, and (3) Alliance fails to identify any other party who might have relied on the audited financial statement.

But one such dispute, involving Global's transfer of a delinquent Alliance customer, Lextel, away from Alliance, persisted for over 18 months. This dispute led Alliance to withhold $280,000 otherwise due to Global, and was the subject of almost constant communication between the parties. (Mallon Dep. at 38-42) Alliance also concluded that it had been overbilled by Global. (*Id.*) As a result, contrary to Alliance's assertion that it was entitled to withhold disputed amounts (Opp. Mem. at 40), by June 2002, Alliance had a past due balance with Global of approximately $480,000. (Mallon Dep. at 55-56; Eickemeyer Dec., Exh. P)

Moreover, Alliance's characterization of Graham's testimony – namely, that other ongoing disputes between Global and Alliance did not affect the relationship between them as the deposit dispute did (Opp. Mem. at 12) – is simply wrong. In one of the cited passages (Graham Dep., at 58, ll. 16-19), Graham testified that such disputes *were* a factor and had more of an impact on renegotiation of the minimums than on Global's willingness to grant reduced rates. In the other (Graham Dep. at 36, ll. 15-20), Graham testified that the parties had a dispute over whether certain usage showed on a Global invoice was in fact Alliance usage, without drawing any conclusions as to the effect of that dispute on the relationship.[3] (Copies of these portions of Graham's deposition transcript are attached as Exhibit A to the accompanying Eickemeyer Reply Declaration.) Graham never said the other disputes did not affect the relationship; on the contrary, he implied that they did.

As with enforcement of the minimums, Alliance not only fails to produce any facts from which "but for" causation could be inferred, it fails even to address Grassi's showing that its causation argument impermissibly rests on conjecture and that Global's denial of rate reductions

---

[3] Coincidentally, the amount of that dispute is $100,000, which is the same amount being withheld by Alliance as a result of the dispute over whether Global acted improperly in applying the deposit to an amount that Alliance admits it legitimately owed. The two $100,000 items, though, are separate and distinct.

was not a foreseeable result of a Grassi audit error, even if such an error occurred. Once again, Alliance fails to address the analysis mandated by the Connecticut Supreme Court in *Abrahams*, which rejected the premise relied on by Alliance, *i.e.*, because harm occurred after an event, it must have been caused by the event. Even if "but for" causation could be found with respect to the denial of rate reductions – which it cannot – Alliance fails to establish that this was a foreseeable result of an audit error, just as it fails with enforcement of the contractual minimums. Presumably, if Grassi had detected the application of the deposit at an earlier date, Alliance would have had the same reaction, and the same consequences would have ensued, just at a different time. Alliance also fails to address cases such as *Parkins v. United States*, 834 F.Supp. 569 (D. Conn. 1993), in which attenuated theories of causation such as those offered by Alliance were rejected as a matter of law.

As demonstrated in Grassi's moving papers, causation cannot be premised on conjecture and summary judgment cannot be evaded by speculation. Since Alliance has offered only conjecture and distortions to support its causation theory, Grassi is entitled to summary judgment dismissing Alliance's claims at least to the extent they seek recovery of the still-unpaid monthly minimum charges and the denied rate reductions.

## POINT II

### ALLIANCE FAILS TO ESTABLISH THE EXISTENCE OF A FACT ISSUE AS TO THE PROPER PERFORMANCE OF THE AUDIT BY GRASSI

Alliance fails to raise a triable fact issue regarding its three claims – for breach of contract (Count I), negligence (Count II) and negligent misrepresentation (Count IV) – that are based on Grassi's alleged failure to discover the application of the deposit while performing its audit. While Alliance contends that Grassi improperly failed to examine the company's invoices to determine whether the deposit existed (Opp. Mem. at 21-22), it ignores the evidence in the

record that such an examination was made. (*See* "Search for Unrecorded Liabilities" workpaper, annexed as Exhibit B to the Eickemeyer Reply Dec.)

Alliance also has no effective response to Grassi's showing that under the accounting methods then used by Alliance, the payables reflected on the missing June 18, 2000 invoice would have been matched to revenue billed after June 30, 2000, and so would not have been applied toward the financial statements for the year ending that date. (Grassi Mem. at 27-30) While Alliance's current CFO, Michael Mallon, testified that Alliance does not now currently account for its revenues and expenses in this manner (Mallon Dep. at 21-23),[4] he was not employed by Alliance in the summer of 2000 and so cannot testify about Alliance's accounting methods at that time. Alliance also mis-cites the testimony of its interim comptroller, Carolyn Shannahan, to support classification of the June 26, 2000 invoice as a June expense. (Opp. Mem. at 9) In fact, Shannahan testified regarding the May invoice and said she believed it would be a May expense but could not tell without checking. (Shannahan Dep. at 38-39, Eickemeyer Reply Dec. Exh. D) Mark Thomas, who was then president of Alliance in the summer of 2000 and so was familiar with its accounting methods at that time, has testified that the June 18, 2000 invoice would have been treated as a July 2000 expense since that is when it would have been billed to Alliance's customers. (Thomas Dep. at 37-38) This testimony by Thomas stands uncontradicted.

While Alliance repeatedly attempts to raise spurious issues by asserting that Grassi's audit did not comply with professional standards (*see*, *e.g.*, Opp. Mem. at 4-7, 19-20), it fails to present any competent evidence to contradict the testimony of Thomas and of Kevin McGann that the association of the June 2000 invoice with post-June 30 revenue was entirely consistent

---

[4] This excerpt from Mallon's deposition transcript is contained in Exhibit C to the Eickemeyer Reply Dec. Also, though Alliance points to testimony by both Holden and Mallon regarding daily electronic records received from Global (Opp. Mem. at 9), neither of them testified that such daily records were in use in 2000, when the events in question took place.

7

with the accounting methods then used by Alliance. Accordingly, Alliance has failed to raise a genuine material fact issue regarding the adequacy of the Grassi audit and Grassi is entitled to summary judgment dismissing Counts I, II and IV of the Complaint.

## POINT III

### ALLIANCE FAILS TO DEMONSTRATE THE LEGAL VIABILITY OF ANY OF ITS REMAINING CLAIMS

Alliance fails even to address many of the issues raised by Grassi that compel the conclusion that Alliance's remaining claims are all legally infirm and must be dismissed. For example, Alliance attempts to sustain its unjust enrichment claim by speculating without support that Grassi hoped to benefit from a sale of Alliance. (Opp. Mem. at 34) But Alliance fails to address the threshold issue requiring dismissal, namely, that Connecticut does not permit an unjust enrichment claim where there is a contract between the parties. *Gagne v. Vaccaro*, 255 Conn. 390, 401, 766 A.2d 416, 424 (2001). (*See* Grassi main memo at 31) Since Alliance certainly does not dispute that it had a contractual engagement with Grassi, dismissal of the unjust enrichment claim (Count III) is required. Similarly, in its effort to salvage its "promissory estoppel" claim (Opp. Mem. at 30-31), Alliance fails even to address Grassi's showing (Grassi main memo at 35) that there is no such separate cause of action under Connecticut law. Dismissal of that purported claim (Count VII) is therefore also required.

Alliance seeks to sustain its fraud claim (Count V) by conclusorily asserting that Grassi recklessly or intentionally failed to adhere to professional standards, citing, *inter alia*, the supposed failure to perform alternative procedures. (Opp. Mem. at 25-27) But Alliance ignores the evidence that Grassi did undertake alternative procedures to determine whether year-end invoices were accounted for. (Eickemeyer Reply Dec., Exh. B) Moreover, Alliance cites no *admissible evidence*, as opposed to unsupported conjecture, from which it could be inferred that

8

Grassi acted recklessly or intentionally. The only inference permitted by the record is that any audit error (which Grassi denies) was unintentional, a conclusion buttressed by McGann's testimony (McGann Dep. at 73-75) that he understood Alliance's accounting methodology would place the June 2000 invoice outside the June 30, 2000 financial statement since it would be associated with July 2000 revenue. As there is thus no evidence to support an inference that Grassi acted with the requisite scienter, Alliance's fraud claim must be dismissed.

Alliance's attempt to sustain its claim (Count VI) under the Connecticut Unfair Trade Practices Act (CUTPA) relies on a Superior Court's intimation in *Dudrow v. Ernst & Young*, 1999 WL 786343 (Conn. Super. September 14, 1999), that an intentional deviation from professional standards could support a CUTPA claim. (Opp. Mem. at 28-29) However, this aspect of *Dudrow* was expressly disapproved by the Connecticut Supreme Court in *Suffield Development Associates Limited Partnership v. National Loan Investors, L.P.*, 260 Conn. 766, 782-84, 802 A.2d 44, 53-54 (2002), which dismissed a CUTPA claim against an attorney, on the ground that both negligent *and* intentional malpractice were outside CUTPA's scope. The Supreme Court's *Suffield* holding compels dismissal of Alliance's CUTPA claim. Also, as discussed above, there is no evidence from which intentional misconduct by Grassi could be inferred.

Finally, Alliance argues that its conversion claim (Count VIII) can survive because the Court's statement in *Anglo-Iberia Underwriting Mgmt. Co. v. Lodderhose*, 224 F.Supp.2d 679, 689-90 (S.D.N.Y. 2002), that "not performing as agreed . . . is not a proper basis for a conversion claim" is mere *dicta*. (Opp. Mem. at 32-33) In fact, the Court squarely established this bar to plaintiff's claim and went on to note that in any event the claim would fail because the property in question did not belong to plaintiff. The latter alternative basis for the result in no way

9

detracts from the vitality of the Court's rejection of attempts, such as here, to transform a contract claim into a conversion claim. As demonstrated at pp. 36-37 of Grassi's main memo, Alliance's claim based on allegedly inadequate services cannot properly be squeezed into the conversion framework and Alliance has presented no authority to the contrary. The conversion claim should therefore be dismissed.

## CONCLUSION

For all the foregoing reasons, Grassi's motion for summary judgment should be granted.

Dated: April 8, 2004								Respectfully submitted,

										THE DEFENDANT-
										GRASSI & CO.,
										CERTIFIED PUBLIC ACCOUNTANTS, P.C.


By_____			By_____
　　JOHN H. EICKEMEYER (ct-24317)			　　ROBERT K. CIULLA (ct-04262)
　　jeickemeyer@vedderprice.com				　　Rciulla@cd-llp.com
　　Vedder, Price, Kaufman &				　　Ciulla & Donofrio, LLP
　　　Kammholz, P.C.					　　127 Washington Avenue
　　805 Third Avenue					　　P.O. Box 219
　　New York, New York  10022				　　North Haven, Connecticut  06473
　　Tel:  (212) 407-7700					　　Tel:  (203) 239-9828
　　Fax: (212) 407-7799					　　Fax: (203) 234-0379

# TABLE OF AUTHORITIES

Page

**CASES**

*Abrahams v. Young and Rubicam, Inc.*, 240 Conn. 300, 692 A.2d 709 (1997)..............................4

*Anglo-Iberia Underwriting Mgmt. Co. v. Lodderhose*, 224 F.Supp.2d 679 (S.D.N.Y. 2002) .......9

*Dudrow v. Ernst & Young*, 1999 WL 786343 (Conn. Super. September 14, 1999).......................9

*Gagne v. Vaccaro*, 255 Conn. 390, 766 A.2d 416 (2001) ...............................................................8

*Leak v. United Technologies Corp.*, 81 F. Supp. 373 (D.Conn. 1999)...........................................1

*Parkins v. United States*, 834 F.Supp. 569 (D. Conn. 1993) ..........................................................6

*Suffield Development Associates Limited Partnership v. National Loan Investors, L.P.*,
260 Conn. 766, 802 A.2d 44 (2002) ................................................................................................9

## TABLE OF CONTENTS

                                                                                       **Page**

PRELIMINARY STATEMENT ................................................................................................ 1

POINT I       ALLIANCE HAS FAILED TO PRESENT EVIDENCE OF A GENUINE FACT ISSUE REGARDING THE ABSENCE OF THE REQUISITE ELEMENT OF CAUSATION ............................................................................. 1

        A.     Enforcement Of The Minimum Usage Charge ....................................... 2

        B.     Denial Of More Favorable Rates ............................................................. 5

POINT II      ALLIANCE FAILS TO ESTABLISH THE EXISTENCE OF A FACT ISSUE AS TO THE PROPER PERFORMANCE OF THE AUDIT BY GRASSI .................................................................................................................. 6

POINT III     ALLIANCE FAILS TO DEMONSTRATE THE LEGAL VIABILITY OF ANY OF ITS REMAINING CLAIMS ................................................................... 8

CONCLUSION ............................................................................................................................ 10