## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

*******************************************

| | |
|---|---|
| * | |
| ALLIANCE GROUP SERVICES, INC., | * Case No. 3:02CV02080(EBB) |
| * | |
| * | |
| Plaintiff | * |
| v. | * |
| * | |
| * April19, 2004 | |
| GRASSI & CO., CERTIFIED PUBLIC | * |
| ACCOUNTANTS, P.C. | * |
| * | |
| Defendant. | * |
| * | |
| * | |

*******************************************

### PLAINTIFF ALLIANCE GROUP SERVICE INC.'S MOTION FOR LEAVE TO SUBMIT SUR REPLY TO DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Now comes the Plaintiff, Alliance Group Services, Inc. ("AGSi" or "Plaintiff"), by and through its undersigned counsel, and respectfully requests that this Honorable Court allow it to submit a Sur Reply to Defendant's Reply in Support of Defendant's Motion for Summary Judgment. The reason for such a request is the misrepresentation of facts and law contained in Defendant's Reply. Namely, Defendant states several times that certain of Grassi's statements are not being disputed even though these same statements have been contradicted by AGSi and are clearly in dispute! Furthermore, Grassi misrepresents the content of deposition testimony. As genuine issues of material fact remain, and reasonable minds can come to differing conclusions, Summary Judgment is inappropriate in this case. Plaintiff's proposed Sur Reply is incorporated herein and attached hereto as Exhibit A, for the convenience of the Court.

Respectfully submitted,

**MINTZ, LEVIN, COHN, GLOVSKY AND POPEO, P.C.**

By: _/s/ Pamela Chambers_____
    **Pamela Chambers, Esq. (21105)**
    Mintz, Levin, Cohn, Ferris,
     Glovsky and Popeo, P.C.
    Connecticut Financial Center
    157 Church Street
    New Haven, Connecticut 06510
    (203) 777-8200 phone
    (203) 777-7111 fax

**Of Counsel:**

**RITZLER, COUGHLIN
  & SWANSINGER, LTD.**

John Swansinger, Esq.
Drue Marie Skaryd, Esq.
1001 lakeside Avenue
1550 North Point Tower
Cleveland, Ohio 44114
(216) 241-8333 phone
(216) 241-5890 fax

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
*******************************************
                                        *
ALLIANCE GROUP SERVICES, INC.,          *    Case No. 3:02CV02080(WWE)
                                        *
                                        *
                          Plaintiff     *
         v.                             *
                                        *
                                        *    April 19, 2004
GRASSI & CO., CERTIFIED PUBLIC          *
ACCOUNTANTS, P.C.                       *
                                        *
                       Defendant.       *
                                        *
                                        *
*******************************************
```

### PLAINTIFF ALLIANCE GROUP SERVICE INC.'S SUR REPLY TO DEFENDANT'S REPLY MEMORANDUM

**Respectfully submitted,**

**MINTZ, LEVIN, COHN, GLOVSKY AND POPEO, P.C.**

By: _/s/ Pamela Chambers_____

**Pamela Chambers, Esq. (21105)**
Connecticut Financial Center
157 Church Street
New Haven, Connecticut 06510
(203) 777-8200 phone
(203) 777-7111 fax

**Of Counsel:**

**RITZLER, COUGHLIN**
  **& SWANSINGER, LTD.**

John Swansinger, Esq.
Drue Marie Skaryd, Esq.
1001 lakeside Avenue
1550 North Point Tower
Cleveland, Ohio 44114
(216) 241-8333 phone
(216) 241-5890 fax

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..........................................................................1

LAW AND ARGUMENT ...............................................................................1

    A.   **A MATERIAL QUESTION OF FACT REMAINS AS TO WHETHER OR NOT GRASSI PERFORMED A PROPER AUDIT.** .....1

    B.   **AGSI HAS ESTABLISHED CAUSATION AND DAMAGES DUE TO DEFENDANT'S ACTIONS IN THIS MATTER.** ...............................3

    C.   **AGSI HAS ESTABLISHED THAT SIGNIFICANT FACTUAL QUESTIONS REMAIN AND THEREFORE SUMMARY JUDGMENT IS INNAPPROPRIATE IN THIS MATTER.** ....................8

CONCLUSION...........................................................................................10

# TABLE OF AUTHORITIES

**CASES**                                                                 **Page**

*Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 322 ............................................................1

*Hayes v Yale-New Haven Hospital* (1997), 243 Conn. 17, 34-38, 699 A.2d 964 ................9

*Dudrow v. Ernst & Young* (September 14, 1999), *unreported,* Connecticut
    Superior Court Case No. X01CV980144211, 1999 WL 786343 (Conn.
    Super.)..........................................................................................................................9

*Suffield Development Associates Limited Partnership v. National Loan Investors,
    LP* (2002), 260 Conn. 766, 802 A.2d 44 ....................................................................9

# I.  PRELIMINARY STATEMENT

The Federal Rules of Civil Procedure provide that a party is entitled to summary judgment **only** if there are no genuine issues as to any material fact; *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 322.  Grassi  has failed to show that there are no genuine issues of fact remaining in this matter.

AGSi has established in its Brief in Opposition to Defendant's Motion for Summary Judgment genuine issues of material fact, which, when viewed in the light most favorable to AGSi, are capable of sustaining a verdict in favor of AGSi.  AGSi's Brief in Opposition is hereby incorporated by reference.[1]  As such, in this Sur Reply, AGSi is merely responding to clear misstatements of fact and law committed by Grassi in its overzealous attempt to avoid liability for its intentionally substandard performance.

# II.    LAW AND ARGUMENT

## A. MATERIAL QUESTIONS REMAIN AS TO WHETHER GRASSI PROPERLY VERIFIED THE EXISTANCE AND AMOUNT OF THE DEPOSIT.

AGSi has stated that Grassi failed to examine the Global Crossing invoices to determine the existence of the deposit.  Grassi claims it made such an examination of this invoice. Ironically, it is uncontested that the June 2000 invoice was not contained in AGSi's records.  If such an invoice was not present, how did Grassi inspect it?  Furthermore, had Grassi inspected it,

---

[1] All of the documents and deposition transcripts noted herein are annexed as the noted exhibits to the accompanying Declaration of John Swansinger ("Swansinger"), and all such documents and deposition transcripts are hereby incorporated herein by reference.  A copy of such declaration is incorporated herein and attached as **Exhibit 1** to AGSI's Brief in Opposition to Grassi's Motion for Summary Judgment.

Grassi would have seen that the deposit did not exist, as the application of said deposit was noted on the June 2000 invoice.

Grassi claims it performed alternative verification procedures. According to Grassi, it was its policy for the person who performed the alternative procedures to initial the applicable worksheet after they had had personally performed the procedures. Manhaupt at Page 55, Lines 12-16. However, Linda admits she did not perform the task and merely initialed it because she thought someone else performed it. Linda at Page 43, Lines 4-9.

Contrary to Grassi's assertion, AGSi has clearly shown evidence that the information contained on the June 2000 invoice should have been included in the audit. Not only did two accounting professionals for AGSi make this statement, but AGSi's expert CPA has also provided an expert opinion as to this fact.

Grassi further misinterprets when such invoices were recorded by AGSi. Grassi's position was <u>clearly contradicted</u> by both the Comptroller at the time of the invoice at issue and the current CFO of AGSi. Mike Mallon, the current CFO of AGSi confirmed that the practice of AGSi was to recognize invoices as an expense for the same month noted. Specifically, Mr. Mallon stated:

> Q. The first one has a cycle date of May 18, 2000 and the invoice date is May 26 2000… when would your customers be billed for this time?
> A. Okay, the May 18 cycle, we would have billed our customers from May 1 through May 31 for the daily CDR traffic coming in electronically; so there would have been an offset, we would be ahead of the actual invoice.
> Q. In Alliances records, for which month with the cost is reflected in the invoice to Alliance from Global Crossing, for which month would that be booked?
> A. May.

Deposition of Mike Mallon at P. 21-23. Grassi claims that Mr. Mallon is not qualified to determine when such amounts would have been billed as he was not working at AGSi in June 2000. However, Mr. Mallon is a CPA and was instrumental in performing the monthly closings

that Grassi had failed to do and therefore has intimate knowledge of the billing from this time frame. Furthermore, Ms. Shannahan noted that once a bill was deemed an expense for a certain month, than all subsequent months would be treated consistently. Shannahan at 22. Mr. Mallon has additional first hand knowledge of the consistent treatment of these invoices in all subsequent months.

Contrary to Grassi's statements AGSi has alleged numerous other actions for which Grassi remains liable. For example, Grassi does not even address the fact that the deposit was applied on May 4, 2000. Therefore, even if the June 2000 invoice was a July expense, *which it clearly was not*, this application of the deposit had occurred prior to the June 30, 2000 year end. Furthermore, the deposit was listed as being an asset <u>throughout the entire fiscal period</u> ending June 30, 2000 and was required to be reviewed and confirmed as part of this audit.

Therefore, clearly questions of fact remain regarding Grassi's actions relating to the Global Crossing deposit. However, it is clear that this deposit and its application were clearly within the scope of Grassi's work. Therefore Grassi's request for summary judgment must fail.

**B. AGSI HAS ESTABLISHED CAUSATION AND DAMAGES DUE TO DEFENDANT'S TORTIOUS ACTIONS IN THIS MATTER.**

Grassi incorrectly states that AGSi is only claiming damages for minimum usage charges and the lack of reduced rates. AGSi is also claiming damages for (1) the wholly inadequate services billed by Grassi; (2) income tax liability; (3) liability to third parties who have relied on these audited financial statements to their detriment; (4) liability to the purchasers of the company who relied on the audited financial statements when valuating the company; (5) the deterioration of AGSi's relationship with Global Crossing; (6) damages pertaining to obtaining the rating of delinquent payer by Global Crossing; and (7) the amount of the additional damages AGSi will

sustain in hiring an accounting firm to reaudit, restate and refile the work allegedly performed by Grassi with the proper taxing authorities.

Global Crossing notified AGSi that the deposit was missing and AGSI, in reliance on Grassi's representations, took a firm stand that such deposit was present and accounted and that any misplacement of the deposit was done inaccurately by Global Crossing. By relying on Grassi's statement and taking such a firm stand, the parties came to an impasse and their favorable relationship drastically declined. Due to this dispute and while the relationship was drastically declining, Global began for the first time ever to demand monthly minimum fees.

A clear causal link exists between Grassi's wrongful conduct and the damages sustained by AGSi in this matter. It was foreseeable that AGSi would rely upon the existence of the assets as verified by the audit. It is further foreseeable that a dispute would arise between Global Crossing and AGSi due to AGSi's reliance on the audited financial statements showing that the $250,000.00 deposit existed with Global Crossing when it did not in fact exist. It is also foreseeable that others would rely on these audited financial statements, as Grassi was aware that AGSi was being sold. Finally, it is foreseeable that the June 30, 2000 audit, the March 31, 2001 review, and preparation of the June 30, 2000 tax return, when performed contrary to the applicable accounting standards would result in inaccuracies and material misstatements, thus necessitating the amendment and restatement thereof.

Because the dispute has yet to be resolved, Global Crossing considers AGSi to be a delinquent payer – even though AGSi is current on monthly usage payments. Graham at Page 44, Lines 10-23. It is Global Crossing's policy not to reduce the rates of any entity that is considered a delinquent payer. Because of this deposit dispute, AGSi is unable to obtain reduced rates which are available to Global's other customers.

Because the parties' relationship drastically deteriorated due to this dispute, Global began charging a monthly minimum fee for the first time ever in the parties' relationship. AGSI continues to be damaged as Global has also asked AGSi to replenish the deposit and has refused to apply the remaining deposit of $30,000.00 to any outstanding invoices due to this dispute.

AGSi also remains open to liability for the material misstatement of their June 30, 2000 audited financial statements and tax return. Multiple parties relied upon these audited financial statements as they were created in part for the valuation of the company prior to its sale. Additionally, tax penalties may apply due to the misstatements contained therein.

Finally, AGSi has been damaged by its payment of $161,355.00 for services which were never rendered, rendered twice, and/or rendered wholly inadequately in violation of the parties' agreement. AGSi will now have to pay these fees a second time for another firm to amend and restate the improper work performed by Grassi.

Grassi inaccurately and without any logic states that refusal to establish more favorable rates consists of speculation and is not causally related. Global Crossing stated that such rate reductions were denied due to the deposit issue. Graham at Page 44, Lines 7-23. In fact, neither AGSi nor Global Crossing dispute that discounted rates are not being offered to AGSi due to the deposit dispute. Graham at Pages 54-55.

Grassi attempts to confuse issues by drawing attention to Lextel, which both Global and AGSi have testified was resolved **prior** to the deposit dispute. Graham at Page 23, Lines 3-4. Page 35, Line 9. The deposit issue was discovered after a settlement was reached with Global Crossing on the Lextel issue when AGSi requested to apply its deposit toward such settlement. Graham at 23-24. Even Global stated that all other billing disputes were typical and were quickly resolved. Graham at P. 26, Line 10.

Grassi also inaccurately alludes that AGSi did not have a right to withhold disputed amounts on other matters-a right clearly stated in AGSi's contract with Global Crossing and uncontested by Global Crossing. Graham at Page 34, Lines 21-22. As AGSi had an uncontested right to withhold these amounts for other disputes, such a withholding did not contribute to any decreased relations between the parties.

Had Grassi discovered that the deposit had been previously applied when performing its audit, AGSi would not have insisted upon its existence when settling an unrelated dispute approximately two years later. Without such a dispute, AGSI would have continued not to be subject to minimum usage fees and would have received a reduction in rates, as was the trend in the industry. Additionally, AGSi would be facing liability toward foreseeable third parties who used such representations in the purchase of AGSi. Finally, AGSi would not have outstanding tax liability for material misstatements in its return or have to pay for the correction of same.

Mr. Graham stated that Global considered AGSi to be delinquent due to the deposit issue and that it was Global's policy not to reduce rates to any delinquent entity. Graham at Pages 54-55. Again, at best, Grassi merely shows that there are material questions of fact remaining.

Grassi claims that it should not be held liable for any minimum usage charges because Global alluded that they may possibly consider rescinding such charges in the future depending on whether a settlement of the deposit issue occurs and on what terms. Such a statement is so illusory that it can only be held to be speculative. What Grassi fails to note is that AGSi has attempted to settle this dispute for over a year to no avail. Global Crossing has not rescinded these charges and such charges have remained pending on AGSi's account. Furthermore, while Global has agreed not to place such charges on AGSi's current usage invoices on an on-going basis, Global Crossing has retained the right to demand payment of these minimum usage fees

for all months in which the deposit issue remains in dispute. Therefore, any possibility of rescission in the future is so remote and speculative that it cannot absolve Grassi of its liability for such damages.

Grassi further misstates that it was undisputed that AGSI purposely switched traffic away from Global Crossing due to its Bankruptcy. Those involved with traffic decisions at AGSi stated that there was no such purposeful reduction. In fact, Stuart Holden, the chief information officer who worked directly with the provisioning (or trafficking) of clientele to certain carriers, when asked if Global Crossing's bankruptcy caused AGSi to switch traffic away from Global Crossing, stated that:

> I don't know if [the bankruptcy] had any impact…I would not expect [customers to be switched to other carriers] would have happened….Whenever you touch a customer you incur costs. You put doubt in the mind of that customer and depending on where the customer is in the country they would probably get a letter from their local phone company explaining that their carrier has changed and would they like to switch to the local carrier's long distance services. Holden at Page 24.

Grassi states that it has established that AGSi removed customers because the invoice from Global diminished. However, such decrease in costs could be due to a variety of reasons independent of a transferring away of customers by AGSI. Specifically, such a decrease could be due to the AGSi's customers making fewer calls, a decrease in new traffic available to place with Global Crossing, AGSi's clients terminating their business with AGSi, AGSi's clients requesting to be removed from Global Crossing's network, technology issues, etc.

Grassi is also inaccurate when it claims there was no testimony in support of the fact that AGSi did not remove clients from Global Crossing's network unless that particular client made such a request. The following exchange took place at Mr. Holden's deposition:

> Q: Do you know whether during 2002 existing traffic was directed by Alliance away from Global Crossing to other carriers?

7

> A.  I am not aware of that, but would not expect it to be done because as we discussed earlier, when we touch a customer it triggers a letter saying that you have been moved and it triggers charges anything from $5.00-$10.00 that someone has to pay.  So you don't want to touch it.  Existing customers you leave where they are, but if a reseller expressed a preference to change their carrier priority then the way new orders are handled would be affected.

Holden at Page 59.  Clearly, AGSi has established that it did not switch customers off of Global Crossing's network due to their bankruptcy and that material questions of fact exist as to the imposition of the minimum usage fines.

### C.  AGSI HAS ESTABLISHED SIGNIFICANT FACTUAL QUESTIONS REMAIN AND THEREFORE SUMMARY JUDGMENT IS INNAPPROPRIATE.

Grassi has misspoken when it stated that AGSI had produced no evidence to show that Grassi acted intentionally or recklessly with regard to the fraud claim.  Clearly, Grassi was reckless in failing to perform the alternative procedures.  As has been discussed above, Linda signed the worksheet in violation of company policy even though she acknowledged that she did not perform these procedures.  Kevin McGann admits that he viewed only some on the required invoices.  Furthermore, it is undisputed that the June 2000 invoice was not located in AGSi's records and therefore it would have been impossible for anyone to have reviewed it as Grassi claims to have done. Clearly, genuine questions of material fact remain as to whether or not Grassi performed the alternative procedures.

Additionally, Mike Mallon testified that he was present for many conversations between Grassi and the investment bankers regarding the sale of the company.  The straying from such applicable professional standards and the failure to confirm assets of AGSi amounts to reckless behavior.  When one also considers the additional fact that the company was for sale and that there were foreseeable third parties who would be relying on said audited financial statements, Grassi's behavior was clearly beyond reckless – it was intentional.  It is believed that Grassi was

to be paid out of the proceeds of the sale and therefore had an interest in the company selling quickly and for adequate capital.

Grassi also generally states that it cannot be held liable under a CUTPA claim. However, Grassi has failed to address how it cannot be held liable for its fraudulent billing practices. It is clear that an accounting firm maybe held liable under CUTPA for its billing practices. *Janusauskas* at 808; *Suffield* at 782; *Hayes v Yale-New Haven Hospital*, 243 Conn. 17, 34-38, 699 A.2d 964. Here, AGSi was over billed as it was billed for services that were never performed, performed in duplicate and/or intentionally performed in violation of the applicable standards.

In *Dudrow v. Ernst & Young, infra,* the Court held that allegations of a faulty audit and the preparation of incorrect financial statements constituted a claim under CUTPA because the intentional misconduct of that accountant was such a stark departure from the professional standards. *Dudrow v. Ernst & Young* (September 14, 1999), *unreported,* Connecticut Superior Court Case No. X01CV980144211, 1999 WL 786343 (Conn. Super.), a copy of which is attached to AGSI's Brief in Opposition as **Exhibit EE.**

Grassi further misstates that *Dudrow* was rejected when referencing *Suffield Development Associates Limited Partnership v. National Loan Investors, LP,* 260 Conn. 766, 802 A.2d 44. In *Suffield* an attorney obtained an execution for more than the amount contained in the stipulated judgment. The *Suffield* Court held that obtaining an execution of judgment was "the heart of any attorney's representation of a client" and therefore not an entrepreneurial aspect of the practice of law. *Id.* at 781. In holding that *Dudrow* was not applicable to that case, the *Suffield* Court stated that an attorney's intentional actions, if subject to CUTPA, would prevent the attorney from robustly representing his or her client and would "compromise an attorney's duty of loyalty to

his or her client".  The *Suffield* Court's main concern was that an attorney would be prevented from taking aggressive actions if they were afraid of CUTPA liability, and by not taking such actions they would violate their duty to zealously represent their client.  *Id* at 783-784.  These same concerns are not present when evaluating the intentional actions of an accounting firm.

Here, Grassi acted intentionally and recklessly by purposely choosing not to perform any independent verification and/or alternative procedures relating to the deposit even though the deposit was clearly material pursuant to their own calculations.  AGSi has also stated claims of fraud and misrepresentation – all of which actions have been held under Connecticut law to be such stark departures from the standard of care that renders these actions subject to CUTPA as entrepreneurial practices.  Material questions of fact also remain regarding whether Grassi was aware of the sale of AGSi and sought to profit from such sale by knowingly or recklessly inflating AGSi's audited financial statements.

As to all of AGSi's other claims, AGSI defers to the arguments and evidence contained in its Brief in Opposition to Grassi's Motion for Summary Judgment, which is incorporated herein by reference.

## IV.    CONCLUSION

Genuine issues of material fact remain in this case as to a myriad of matters.  Indeed, the expert reports demonstrate the vast difference in opinion as to whether Grassi performed in accordance with acceptable audit standards. AGSi stands by the previous arguments and evidence contained in its Brief in Opposition to Grassi's Motion for Summary Judgment.  As genuine issues of material fact remain, this Honorable Court must deny Defendant's Motion for Summary Judgment.

Respectfully submitted,

**MINTZ, LEVIN, COHN, GLOVSKY AND POPEO, P.C.**


By: */s/ Pamela Chambers*_____
      **Pamela Chambers, Esq. (21105)**
      Mintz, Levin, Cohn, Ferris,
       Glovsky and Popeo, P.C.
      Connecticut Financial Center
      157 Church Street
      New Haven, Connecticut 06510
      (203) 777-8200 phone
      (203) 777-7111 fax


**Of Counsel:**

**RITZLER, COUGHLIN
  & SWANSINGER, LTD.**

John Swansinger, Esq.
Drue Marie Skaryd, Esq.
1001 lakeside Avenue
1550 North Point Tower
Cleveland, Ohio 44114
(216) 241-8333 phone
(216) 241-5890 fax

11

### PROOF OF SERVICE

A copy of the foregoing Brief in Opposition to Plaintiff's Motion for Summary Judgment has been forwarded to the following by electronic mail and regular U.S. Mail on this 19th day of April 2004:

Robert K. Ciulla, Esq. (Ct 04262)
Ciulla & Donofrio, LLP
127 Washington Ave.
P.O. Box 219
North Haven, CT 06473
(203) 234-0379

and

John Eickmeyer, Esq. (Ct 24317)
Vedder Price Kaufman & Kammholz
805 Third Ave.
New York, New York 10022
(212) 407-7799

**MINTZ, LEVIN, COHN, GLOVSKY AND POPEO, P.C.**

By: _/s/ Pamela Chambers_____
**Pamela Chambers, Esq. (21105)**

12

NHN 24036v1