UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
------------------------------X
ALLIANCE GROUP SERVICES, Inc.,:
            Plaintiff,    :    CIVIL NO.
                          :
        v.                :
                          :    3:02CV02080 (EBB)
GRASSI & CO., CERTIFIED PUBLIC:
ACCOUNTANTS, P.C.,        :
            Defendants.   :
------------------------------X
```

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### Introduction

The underlying motion for summary judgment was filed by the Defendant, Grassi & Co. ("Grassi"). Alliance Group Services ("AGSi" or "Alliance") engaged the accounting firm of Tabb, Conigliaro & McGann ("TCM") during the late spring or early summer of 2000 to perform an audit for the fiscal year ended June 30, 2000. TCM[1] was also to prepare the June 30, 2000 year end tax return, close Alliance's account books on a monthly basis from June 30, 2000 until the close of the audit, and perform a review ending March 30, 2001. During the course of negotiations between Alliance and one of its vendors, Global Crossing ("Global"), Alliance discovered that an asset it believed existed did not, in fact, exist. Alliance claims that Grassi should have discovered, during the course of the June 30, 2000 audit, that

_____

[1] TCM merged with Grassi during the events at issue in the Complaint. The court refers to the merged entity as "Grassi" throughout.

this asset no longer existed, and Grassi's failure entitles
Alliance to the relief sought in the Complaint.

### Factual Background

Alliance is "a network service provider for AT&T and other
first-tier telecommunications carriers to other telephone
companies." Def.'s 56(a)1 Statement ¶ 1.  Alliance provides
access to long distance networks to other carriers, who then sell
the access to their customers.  Alliance hired TCM to provide
certain financial and tax services.  Def.'s 56(a)1 Statement ¶ 3;
Shannahan Dep. at 43.  Namely, TCM was to prepare a tax return
for the year ended June 30, 2000, conduct an audit of Alliance's
financials for that year, perform a review of the period ending
March 30, 2001, and close out Alliance's books on a monthly basis
until the close of the audit.

On January 31, 2000, Alliance placed a $30,000 deposit with
Global, a business from which Alliance would purchase long
distance access.  In April 2000, Alliance and Global entered an
agreement.  Alliance then placed a second deposit with Global,
this time for $250,000.  Alliance received invoices on a monthly
basis from Global that reflected the level of Alliance's usage
each month.  However, rather than retain the $250,000 deposit,
Global immediately applied it to Alliance's then-outstanding
balance.  Def.'s 56(a)1 Statement ¶¶ 8, 9.  This action was
reflected on a June 26, 2000 invoice from Global to Alliance.

2

Id. at ¶ 10.  That invoice was either never received by Alliance or, if it was received, was never entered into Alliance's accounting system.  Id.  This missing invoice and the deposit-related information contained therein are at the center of the parties' dispute.

Around the beginning of January 2001, after the audit had already begun,[2] TCM merged with Defendant Grassi.  Though the audit lasted several months and was conducted primarily on-site at Alliance, Grassi never discovered the missing invoice or Global's application of the $250,000 deposit.  Alliance became aware of the status of the deposit in June 2002, when a billing dispute arose between Alliance and Global, and Alliance attempted to use the deposit to satisfy an outstanding balance.  Global notified Alliance that the deposit had already been applied in May of 2000.  Id. at ¶ 20.  Alliance disputed Global's assertion that the deposit no longer existed, relying, Plaintiff claims, on the financial statements provided by Grassi.  Global and Alliance continued to dispute this issue, along with other issues, and their relationship degenerated.

Alliance blames Grassi for the deterioration of its relationship with Global claiming that it relied on Grassi's prepared financial statements indicating the continued existence

---

[2] TCM's audit of Alliance's financials began in the fall of 2000.

3

of the $250,000 deposit.  Alliance allegedly believed that, if
the deposit truly had been depleted, Grassi would have, and
should have, so discovered during the course of the June 30, 2000
audit, and, therefore, Global must have made a mistake.  This
disagreement persisted until Global provided a copy of the June
26, 2000 invoice indicating the $250,000 deposit had, indeed,
been applied to an outstanding Alliance balance in May of 2000.
Id.  While Alliance believes that Global's premature application
of the deposit was improper, it also blames Grassi for the
breakdown of the relationship between Alliance and Global.
Plaintiff claims that the terms of the agreement between Alliance
and Grassi, and the prevailing professional standards in the
accounting industry, required Grassi to perform certain
procedures that it failed adequately to perform and that, had
Grassi performed these functions satisfactorily, it would have
discovered that the deposit had been applied by Global.
Accordingly, Grassi's financial statements would not have
contained the relevant misstatements, and the relationship
between Alliance and Global would not have deteriorated.

    At issue here is whether Grassi was required, by industry
standards or the parties' agreement, to perform its services in
accordance with generally accepted accounting principles ("GAAP")
and generally accepted auditing standards ("GAAS"), and, if so,
whether those standards, or Grassi's own audit procedures, were

followed during the course of the June 30, 2000 audit.  McGann
Dep. at 62-65; Gero Report at 1.  Defendant admits only that it
agreed to perform in accordance "with applicable law and
prevailing professional standards."  Answer ¶¶ 8-9.  Plaintiff
contends that GAAS and GAAP also required Grassi to account for
the expenses as they were incurred, i.e., invoices received by
Alliance in January were to be treated as January expenses.
Defendant, on the other hand, claims that the accounting methods
used by Alliance at the time of the audit required the expense
activity reflected on the June 26, 2000 invoice to be tied to the
resulting income received by Alliance from its customers in July.
Accordingly, Defendant claims, the expenses on the June 26, 2000
invoice should have been classified as July expenses, since the
resulting income would have been received in July.  Since,
Defendant claims, July expenses are outside the scope of the June
30, 2000 audit, the June 26, 2000 invoice should not have been
included.

In 2002, Alliance reduced its volume of business with
Global.  Plaintiff claims it did this because of the souring
business relationship with Global, while Defendant asserts that
the reduction occurred because Alliance had concerns about
Global's financial condition.  Defendant also claims that
Alliance became involved in a dispute with Global regarding
Global's transfer of an Alliance customer from Alliance's network

to that of another network service provider.  Alliance also
claims that Grassi billed Alliance for work it never performed,
performed twice, and/or performed inadequately.

In or about April 2003, Global began to enforce, pursuant to
a clause in its agreement with Alliance, minimum monthly usage
charges for those months that Alliance's usage fell below a
predetermined minimum threshold.  Def.'s 56(a)1 Statement ¶ 25.
Alliance claims that Global only began applying these charges
because the business relationship soured, and that Grassi is
responsible.  Further, Alliance claims that Grassi is responsible
for Global's refusal to renegotiate the rates it was charging
Alliance ("lost discount" damages).  Global has a policy of
refusing to renegotiate rates with a customer whose account is
overdue.  Because of these disputes, Plaintiff has been
withholding various amounts owed to Global.

Alliance claims that Grassi's conduct constitutes a breach
of contract (Count One), negligence (Count Two), unjust
enrichment (Count Three), negligent misrepresentation (Count
Four), fraud (Count Five), violations of the Connecticut Unfair
Trade Practices Act ("CUTPA") (Count Six), promissory estoppel
(Count Seven), and conversion (Count Eight).

Defendant filed a motion for summary judgment on all counts.
Defendant also claims, in the event that the negligence and
breach of contract claims survive this motion, there is a lack of

causation with respect to the minimum usage and lost discount damages claimed by the Plaintiff.

## Discussion

I.   **Standard of Review**

A.    **Summary Judgment - Fed.R.Civ.P. 56**

Summary judgment may not be granted unless the Court determines that there is no genuine issue of material fact to be tried and that the moving party is entitled to judgment as a matter of law. Dobrich v. Gen. Dynamics Corp., Electric Boat Div., 40 F.Supp.2d 90, 93 (D. Conn. 1999).  Upon the filing of a motion for summary judgment, "the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  The burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  Id.  See also  Anderson v. Liberty Lobby, 477 U.S. 242, 256 (1986)(plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which

7

he has the burden of proof at trial, then summary judgment is appropriate. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). If the plaintiff fails to provide any proof of a necessary element of the its case, then there can be no genuine issue as to any material fact. <u>Id.</u> A complete failure to provide proof of an essential element renders all other facts immaterial. <u>Id.</u>; <u>see also</u> <u>Goenaga v. March of Dimes Birth Defects Found.</u>, 51 F.3d 14, 18 (2d Cir. 1995)(finding movant's burden satisfied if it can point to an absence of evidence to support an essential element of nonmoving party's claim).

**II.  <u>Standard of Review As Applied</u>**

> **A.  Breach of Contract, Negligence, and Negligent Misrepresentation (Counts One, Two, and Four).**

Plaintiff's claims for breach of contract, negligence and negligent misrepresentation are based, primarily, on Grassi's failure to detect the application of the $250,000 deposit by Global to Alliance's outstanding balance. Alliance claims that, according to the parties' agreement and the applicable professional standards, Grassi was required to adhere to GAAP and GAAS during its performance of the June 30, 2000 audit. Plaintiff believes that GAAP and GAAS required Grassi to implement certain alternative procedures that would have led to the discovery of Global's deposit application. Grassi, Plaintiff claims, did not adequately perform these alternative procedures, and this failure constituted a breach of contract and negligence,

8

and led to negligent misrepresentations by the Defendant.

To state a claim for breach of contract, the plaintiff must show (1) the formation of an agreement, (2) performance by one party, (3) a breach of the agreement by the other party, and (4) damages. Boucher v. Sundberg, 80 Conn. App. 180, 189 (2003). To state a claim of negligence, plaintiff must show the existence of (1) a duty, (2) a breach of that duty, (3) causation, and (4) actual damages. Silano v. Cumberland Farms, Inc., 85 Conn. App. 450, 453 (2004). Finally, an action for negligent misrepresentation requires a plaintiff to prove that (1) defendant supplied false information in the course of business, (2) defendant supplied such information for the guidance of plaintiff in its business, (3) plaintiff justifiably relied upon the information, (4) the false information caused pecuniary loss to plaintiff, and (5) defendant failed to exercise reasonable care or competence in communicating or obtaining the information. Williams Ford, Inc. v. Hartford Courant Co., 232 Conn. 559, 575 (1995).

Neither party disputes that an agreement between Alliance and Grassi existed, see Pl.'s 56(a)2 Statement ¶ 4, and that Alliance paid the full amount it was billed for services rendered by Grassi. Grassi also had a duty to exercise reasonable care in the performance of its services.

Alliance, however, asserts that Grassi did not conduct its

9

audit in accordance with GAAS, did not prepare Alliance's financial statements in accordance with GAAP, billed Alliance for services that were not rendered or were inadequately rendered, and allowed its employees to perform services without providing the proper training and/or supervision to its staff. Gero Report 1-4; Shannahan Dep. at 42. Plaintiff claims that the agreement and industry standards required Defendant to conform its audit to GAAS and GAAP and that Defendant's failure to do so constituted a breach of contract, negligence, and negligent misrepresentation.

Specifically, the parties dispute whether Grassi, having sent an independent verification to Global Crossing which was not returned, was then required to implement certain alternative procedures in order to confirm the status of the $250,000 deposit. If Grassi was so required, the parties dispute whether or not Grassi properly performed these alternative procedures. Gero Report 1-4; Zhang Dep. 43-46; Kappel Report 13, ¶ 7. Grassi claims, with respect to the Global account, that it performed adequately such alternative procedures as the examination of unpaid invoices, reports and bills, and the verification of bill payments. McGann Dep. 62-65. Alliance claims that, if these procedures were properly performed, Grassi would have discovered the missing June 26, 2000 invoice reflecting the application of the $250,000 deposit by Global to Alliance's then outstanding balance.

10

The parties also dispute which accounting and auditing methods – Alliance's, Grassi's, GAAP/GAAS, etc. – Grassi was required to follow pursuant to their agreement and the applicable professional standards. Whether or not Grassi was required to conform to GAAP and GAAS, and did so conform, is essential to the determination of whether or not Grassi breached its agreement and/or acted negligently. Citing deposition transcripts and expert reports, both parties disagree about which standards were applicable and whether or not they were followed.

Further, Defendant claims that the relevant missing invoice should not have been included in the June 30, 2000 audit, in which case it cannot be held responsible for its nondiscovery of that invoice and the information contained therein. Plaintiff disputes this, claiming that the expenses Alliance incurred from Global should be recorded in the month they are incurred. Pl.'s 56(a)2 Statement of Disputed Material Facts ¶ 1; Gero Report 1-4; Mallon Dep. 21-23.

Accordingly, Defendant's motion for summary judgment is denied as to Counts One, Two, and Four.

**B.    Damages**

The agreement between Alliance and Global contains a provision that requires Alliance to pay a minimum monthly charge of $250,000 or 75 percent of the previous month's usage, whichever is greater. If Alliance's monthly usage fell below

11

this minimum threshold, it would be required to pay the difference (minimum usage charges). Alliance's usage fell below the minimum threshold during the deposit dispute with Global, and it claims that Grassi is responsible for the reduction and the subsequent additional charges imposed on Alliance by Global. Further, while the renegotiation of applicable rates is common in this industry, Global has a policy of refusing to renegotiate its rates with its customers whose accounts are delinquent (lost discounts). Plaintiff withheld $250,000 in funds, among other amounts, it owed to Global because it believed Global was mistaken about the status of the deposit. Thus, Alliance was classified as delinquent and lost the opportunity to negotiate more favorable rates with Global. Grassi claims that its failure to recognize the deposit application, even if negligent, was not the actual or proximate cause of Plaintiff's minimum usage or lost discount damages. Rather, it claims Plaintiff would have merely disputed the deposit application earlier, had Grassi discovered it, and the resulting minimum usage and lost discount damages would have occurred regardless of any error by Grassi.

Cause in fact is established "if the plaintiff's injury would not have occurred 'but for' the defendant's conduct...." Stewart v. Federated Dept. Stores, Inc., 234 Conn. 597, 605 (1995), citing W. Prosser & W. Keeton, Torts § 41, p. 266 (5th ed. 1984). "Conversely, if the plaintiff's injury would have

12

occurred regardless of the defendant's conduct, then the
defendant's conduct was not a cause in fact of the plaintiff's
injury." Id.

This court will assume, for the purposes of this analysis,
that Grassi was negligent in the performance of its obligations
to Alliance.  Alliance relied on the statements provided by
Grassi as accurate statements of Alliance's financial condition.
When Global raised the deposit issue, and Global's deposit-
related information contradicted the information in the financial
statements prepared by Grassi, Alliance disputed Global.  Global
had not enforced the "minimum usage" penalties prior to this
dispute, but began applying them thereafter.  Thus, Alliance
claims, Grassi's negligence was the cause of the dispute between
Global and Alliance, and the result of the dispute was that
Global applied minimum usage charges to Alliance's account that
it would not otherwise have applied.  Grassi, on the other hand,
claims that Global would have applied these charges regardless of
Grassi's negligence.  Graham Dep. 45-47.  Grassi claims that
Global's application (or misapplication) of the deposit was the
true cause for the dispute - not any delay in the discovery of
the application caused by Grassi, and that any resulting charges
applied by Global in response to the dispute were caused by
Global's alleged misapplication of the deposit, not Grassi's non-
discovery of the misapplication.  Further, Grassi claims that

13

Alliance was involved in other billing disputes with Global that led to Alliance's decision to reduce its usage level with Global, allowing its usage level to drop below the agreed upon minimum threshold.

As Defendant points out, even if a trier of fact finds that Grassi's negligence was the cause in fact of the minimum usage and lost discount damages claimed by the Plaintiff, Alliance must also show that these damages were proximately caused by Grassi's negligence. That is, the minimum usage and lost discount damages must have been a foreseeable result of Grassi's negligence. The Connecticut Supreme Court has defined proximate, or legal, cause as "an actual cause that is a substantial factor in the resulting harm...." Stewart, 234 Conn. at 606 (internal citations omitted). "The question of proximate causation generally belongs to the trier of fact because causation is essentially a factual issue." Stewart, 234 Conn. at 611. "It becomes a conclusion of law only when the mind of a fair and reasonable [person] could reach only one conclusion; if there is room for a reasonable disagreement the question is one to be determined by the trier as a matter of fact." Id.

According to the Defendant, the foreseeable risks of its alleged negligence include the possibility that Alliance's net worth would be overstated on its balance sheet, that there will be future discoveries that certain assets no longer exist, or

14

that a third party would be misled as to the actual value of Alliance.  Defendant's list is a narrow one.  Certainly, as Plaintiff suggests, it is conceivable that a client for which Grassi prepared a financial statement would rely on that statement in its discussions with vendors.  If the financial statement is inaccurate, it could lead to a dispute with the vendor.

While at first glance the Plaintiff's claimed damages appear somewhat attenuated, this Court concludes that there may be room for reasonable disagreement.  Therefore, the issues of causation, both factual and legal, are left for the trier of fact to determine.  Defendant's motion for summary judgment as to the minimum usage and lost discount damages is hereby denied.

### C.  Unjust Enrichment (Count Three)

To state a claim of unjust enrichment, a plaintiff must show (1) defendant was benefitted, (2) defendant unjustly failed to pay plaintiff for the benefits, and (3) the failure to pay was to plaintiff's detriment.  Gagne v. Vaccaro, 255 Conn. 390, 409 (2001).  Additionally, lack of a remedy under the contract is a precondition for recovery based on unjust enrichment.  "Proof of a contract enforceable at law precludes the equitable remedy of unjust enrichment."  Feng v. Dart Hill Realty, Inc., 26 Conn. App. 380, 383 (1992); Polverari v. Peatt, 29 Conn. App. 191, 199 (1992); A&C Corp. v. Pernaselci, 2 Conn. App. 264, 265 (1984)

15

("Finding no contract, the court applied the doctrine of unjust enrichment."). "The quasi-contractual remedy of unjust enrichment is only available when no express contractual obligation exists." Gidatex v. Campaniello Imports, Ltd., 49 F.Supp.2d 298, 301 n.4 (S.D.N.Y. 1999). "Where...there is an enforceable express or implied in fact contract that regulates the relations of the party...or that part of their relations about which issues have arisen, there is no room for quasi contract." Harris v. Shea, 2002 Conn. Super. LEXIS 4142, *7 (Conn. Super. Ct. Dec. 24, 2002), citing 1-1 Corbin on Contracts § 1.20 (Rev. Ed.). "Therefore, the doctrine of unjust enrichment is not applicable in this case." Id.

In Polverari, the trial court's award of damages for unjust enrichment was upheld by the Connecticut Appellate Court because neither of the two underlying agreements between the parties created any obligations. Polverari, 29 Conn. App. at 199. Therefore, the damage award for unjust enrichment was not inconsistent with the agreements.

Here, neither party denies that there was a valid and enforceable agreement between Alliance and Grassi which obligated each party to perform. In fact, Alliance is seeking the return, by way of its breach of contract claim, of all or a portion of the fees it paid to Defendant pursuant to that agreement. In its unjust enrichment claim, Plaintiff, again, seeks damages for

16

Grassi's nonperformance or inadequate performance of the services rendered by the Defendant.  The purpose of the unjust enrichment doctrine is to supply a remedy where no remedy exists under the contract, not to provide two bites at the apple.  If Grassi failed adequately to perform the services for which it accepted payment pursuant to the parties' agreement, Alliance can pursue a remedy through its breach of contract and negligence claims.

Defendant's motion for summary judgment as to Count Three is granted.

### D.    **Fraud (Count Five)**

To prove fraud, Plaintiff must show that a false representation was made, the statement was known to be untrue by the party making it, the statement was made to induce another party to act upon it, and the other party did so act to his injury.  <u>Weisman v. Kaspar</u>, 233 Conn. 531, 539-40 (1995).  A "promise to do an act in the future coupled with a present intent not to fulfill it is a false representation."  <u>Flaherty v. Shettino</u>, 136 Conn. 222, 226 (1949).  Scienter is an essential element in a claim of fraud.  <u>In re Baby Girl B.</u>, 1992 WL 66688, at *3 (Conn. Super. Ct. March 24, 1991).  "[A] defendant must *know* what he or she represents as true is not true.  A reckless allegation will not suffice."  <u>Bobbin v. Sail The Sounds, LLC</u>, No. CV020563884S, 2003 WL 22206799, at *5 (Conn. Super. Ct. Sept. 12, 2003) (emphasis in original).

17

Plaintiff, on the other hand, puts forth the proposition that "the scienter or intent to deceive element of a fraud claim can be satisfied by a showing of recklessness."  Pl.'s Opp'n at 26.  This, however, is not the law in Connecticut.[3]  <u>Bobbin</u>, 2003 WL 22206799, at *5.  "[F]raud requires an allegation of intent or scienter rather than recklessness...."  <u>Kashetta v. Robertucci</u>, No. 32 05 64, 1995 WL 645985, at *3 (Conn. Super. Ct. Oct. 26, 1995).

Here, the Plaintiff alleges that the Defendant made certain representations that it performed various services for the Plaintiff pursuant to GAAP and/or GAAS, that its work was accurate, and that it would bill the Plaintiff accurately according to the work that was performed.  <u>See</u> Pl.'s Compl. ¶ 50. While Plaintiff sets forth some evidence that certain services performed by the Defendant might not have conformed to the terms of the agreement or the applicable standard of care, there is no evidence that the Defendant intentionally misled Plaintiff, or that it knew any representations it made were false at the time

---

[3] In its analysis of the law of fraud as it exists in other states, the <u>Bobbin</u> court noted that, elsewhere, "'a defendant is liable in a tort action of fraud or deceit only if the defendant knows that a representation is false or is recklessly indifferent in the sense that the defendant knows that he or she lacks knowledge as to its truth or falsity.'  But even if this were to be viewed as the rule in [Connecticut], <u>which it is not</u>, the allegations of this complaint do not satisfy it." <u>Bobbin</u>, 2003 WL 22206799, at *5 (emphasis added), quoting 37 Am.Jr. 2d *Fraud and Deceit* § 120, p. 153.

they were made.  Plaintiff's evidence does not show anything more
than potential negligence or a breach of contract.

Therefore, because there is no evidence of the Defendant's
intent to provide a false representation to the Plaintiff,
summary judgment as to the fraud claim in Count Five is hereby
granted.

### E.    CUTPA (Count Six)

Mere negligence in the provision of professional services is
not actionable under the Connecticut Unfair Trade Practices Act
("CUTPA").  Haynes v. Yale-New Haven Hospital, 243 Conn. 17, 34
(1997).  The entrepreneurial, or business, practices of a
professional services organization may, however, give rise to
CUTPA liability.  Beverly Hills Concepts, Inc. v. Schatz &
Schatz, Ribicoff & Kotkin, 247 Conn. 48, 79 (1998).  For example,
in Park v. Kramer, 2004 WL 303898, at *1-*2 (Conn. Super. Ct.
Jan. 27, 2004), the court found that the billing practices of a
law firm fell into the "entrepreneurial" exception to CUTPA
immunity, and sufficiently provided a basis for a CUTPA claim.
Citing Suffield Dev. Assoc. LP v. Nat'l Loan Investors LP, 260
Conn. 766 (2002), the Park court stated that, since the case
before it centered on the "collection of fees between attorney
and client," it was "a matter of billing which involves the
entrepreneurial aspect of the practice of law and is therefore
within the reach of CUTPA."  Park, 2004 WL 303898, at *1.

Because the issue concerned "a bill for services already rendered," the court found the CUTPA claim did not address issues of professional services. Id. The CUTPA claim survived.

In Suffield, *supra*, the Connecticut Supreme Court affirmed the lower court's dismissal of a CUTPA claim where the conduct complained of involved an attempt by an attorney to collect a judgment in an amount that exceeded that which was owed to his client. Suffield, 260 Conn. at 781-82. The attorney, however, was not collecting a bill, but rather he was performing a service for his client. The court stated "[t]he 'entrepreneurial' exception is just that, a specific exception from CUTPA immunity for a well-defined set of activities - advertising and bill collection, for example." Id. CUTPA immunity for professional services also applies to the accounting profession. ShareAmerica, Inc. v. Ernst & Young, 1999 WL 545417, at *8-*9 (Conn. Super. Ct. July 2, 1999); Advest Group, Inc. v. Arthur Andersen, LLP, 1998 WL 457697, *8 (Conn. Super. Ct. July 28, 1998) (dismissing CUTPA claim against accounting firm where plaintiffs were "merely attempting to restate their claim for accounting malpractice"). The Suffield court also rejected the proposition that intentional misconduct was sufficient to remove a professional's conduct from the CUTPA exemption for

20

professional services.[4]

In its complaint, Plaintiff alleges Defendant billed for services that were never performed, were performed twice, or that it knew were performed inadequately, and misrepresented the accuracy of its work. Compl. ¶ 59. Alliance's CUTPA claims which are based on Grassi's alleged over-billing, double-billing, or any other type of unfair billing-related business practices survive the underlying summary judgment motion. To the extent, however, that the CUTPA claims are based on Grassi's alleged professional misconduct, either intentional or negligent, Grassi's motion for summary judgment as to Count Six is granted.

**F.    Promissory Estoppel (Count Seven)**

Plaintiff's promissory estoppel claim fails because there is an enforceable agreement between Alliance and Grassi. "Under the law of contract, a promise is generally not enforceable unless it is supported by consideration." <u>D'Ulisse-Cupo v. Bd. of Dirs. of N.D.H.S.</u>, 202 Conn. 206, 213 (1987). However, the doctrine of promissory estoppel can sometimes provide a remedy where the

---

[4] "The plaintiff attempts to draw a distinction between the present case and the cases previously set forth by emphasizing that the amended complaint in the present case alleges intentional misconduct. In support of this distinction, the plaintiff relies on <u>Dudrow v. Ernst & Young</u>, 1999 WL 786343 (Conn. Super. Ct. Sept. 14, 1999), in which the trial court reasoned that 'intentional misconduct ... [must] constitute an entrepreneurial trade practice since it would constitute a stark departure from the standards understood to be embodied in the work of professional services ....' <u>We are unpersuaded by this reasoning</u>." <u>Suffield</u>, 260 Conn. at 782 (emphasis added).

underlying agreement is unenforceable.  "Generally, promissory

estoppel lies where there is no written contract or where the

contract cannot be enforced."  Sav. Bank of Rockville v. Wielgos,

No. CV970065409, 2001 WL 835411, at *5 (Conn. Super. Ct. June 27,

2001), citing Lark v. Post Newsweek Stations Conn., No.

CV940705326, 1995 WL 491290 (Conn. Super. Ct. Aug. 9, 1995); see

also Kleinberg v. Radian Group, Inc., 2002 WL 31422884, at *9

(S.D.N.Y Oct. 29, 2002), Foxley v. Sotheby's Inc., 893 F.Supp.

1224, 1234 (S.D.N.Y. 1995), Wood v. Sempra Energy Trading Corp.,

No. 03CV986, 2005 WL 465423, at *11, (D. Conn. Feb. 22, 2005).

"A party does not have a cause of action for promissory estoppel

where an existing contract ... is alleged and appears to be

enforceable."  Lark, 1995 WL 491290, at *3.  "Promissory estoppel

provides an alternative that allows enforcement of a promise even

without the usual indicia of conventional bargained for

consideration."  Pavliscak v. Bridgeport Hosp., 48 Conn. App.

580, 592 n.5 (1998).  "Promissory estoppel, therefore, is not a

separate cause of action available to plaintiffs, but rather

serves to allow enforcement of an otherwise validly formed

contractual commitment that lacks traditional consideration."

Id.

Here, neither party disputes that an agreement between

Alliance and Grassi exists.  Pl.'s 56(a)2 Statement ¶¶ 3-4;

Def.'s 56(a)1 Statement ¶¶ 3-4.  In fact, in its promissory

estoppel claim, the Plaintiff refers to the underlying contract between Alliance and Grassi, alleging that Grassi agreed to perform in accordance with GAAP and GAAS.  Compl. ¶ 65.  The doctrine of promissory estoppel dictates that a promise is binding "if injustice can be avoided *only* by enforcement of the promise."  Restatement (Second) of Contracts § 90 (1973) (emphasis added); see Glazer v. Dress Barn, 274 Conn. 33, 88-89 (2005) (holding a jury may consider in the alternative claims for breach of contract and promissory estoppel when there is an issue of whether the agreement may be too indefinite to allow for contract formation.).

Alliance has made no claim that the underlying agreement is unenforceable.  Alliance can redress any harm it suffered due to any failure of Grassi to conform to the underlying agreement by maintaining its breach of contract and other claims.  The promissory estoppel claim is superfluous and inappropriate where the underlying relationship is controlled by an undisputedly enforceable agreement.

Therefore, Defendant's motion for summary judgment as to Count Seven is granted.

### G.  Conversion (Count Eight)

The Plaintiff's conversion claim is predicated on its belief that Defendant accepted payment for work it was required to perform, pursuant to the agreement between the two parties,

despite its failure adequately to perform its obligations.
Defendant contends that Plaintiff may not simply reassert its
breach of contract and negligence claims under the guise of
conversion. Since there does not appear to be any Connecticut
case law directly addressing this issue, and because the standard
for conversion claims in Connecticut and New York are similar,[5]
this Court will look to the New York courts to see how this issue
is treated in that jurisdiction.

"[A] claim of conversion cannot be predicated on a mere
breach of contract." <u>Fraser v. Doubleday & Co., Inc.</u>, 587
F.Supp. 1284, 1288 (S.D.N.Y. 1984). "An action for conversion
cannot be validly maintained where damages are merely being
sought for breach of contact." <u>Id.</u> Failing to perform as agreed
is not the proper basis for a conversion claim. <u>See</u> <u>Anglo-Iberia</u>
<u>Underwriting Management Co. v. Lodderhose</u>, 224 F.Supp.2d 679, 689
(S.D.N.Y. 2002). "Payment for services inadequately rendered

---

[5] In order to state a cause of action for conversion under
New York law, "a plaintiff must establish legal ownership of a
specific identifiable piece of property and the defendant's
exercise of domination over or interference with the property in
defiance of the plaintiff's rights." <u>Anglo-Iberia Underwriting</u>
<u>Mgmt. Co. v. Lodderhose</u>, 224 F.Supp.2d 679, 689 (S.D.N.Y. 2002).
In Connecticut, generally, "conversion is an unauthorized
assumption and exercise of the right of ownership over goods
belonging to another, to the exclusion of the owner's rights...."
<u>Miller v. Guimaraes</u>, 78 Conn. App. 760, 778 (2003) (Upholding
plaintiff's verdict on conversion claim where an agreement
existed, but the agreement was entered into under false
pretenses.).

sounds in breach of contract."  <u>Id.</u>  Where "plaintiffs have
merely repeated ... their breach of contract claims and called
them conversions," the conversion claims must fail.  <u>Fraser</u>, 587
F.Supp. at 1288 (internal quotation marks omitted).  A decision
to dismiss the conversion claims "will in no way prevent
plaintiff's [sic] from recovering damages for alleged wrongdoing
asserted in the conversion cause of action, for, as noted, these
claims may be fully pursued under plaintiff's breach of contract
theory."  <u>Id.</u>  "[W]here the contractual relationship of the
parties defines the rights of each, the breach of that contract
does not result in a wrong which is separately actionale (sic)."
<u>Wexselblatt v. Bank of Boston Int'l</u>, 666 F.Supp. 513, 517
(S.D.N.Y. 1987).

    In <u>Fraser</u>, the plaintiffs brought an action against their
book publisher alleging breach of contract, fraud,
discrimination, and conversion.  <u>Fraser</u>, 587 F.Supp. at 1286-87.
The parties had an agreement whereby defendants agreed to publish
and sell an autobiography of one of the plaintiffs, to be co-
authored by the other plaintiff.  <u>Id.</u> at 1286.  A dispute between
the plaintiffs and defendant arose over plaintiffs' belief that
the defendant did not use its best efforts to promote the book.
In their attempt to make out a conversion claim, plaintiffs
alleged the defendants "breached several other clauses of the
publishing agreement and thereby converted monies due plaintiff

to its own use." Id.  The court found that the publishing
agreement controlled the parties' relationship and that
plaintiffs were merely repeating their allegations that the
defendants breached the agreement.  The conversion claim was
dismissed.  Id. at 1288.

In Anglo-Iberia, the plaintiffs, a reinsurance underwriter
and a reinsurance intermediary, entered into an agreement with
the defendants – a reinsurance broker, the broker's owner, and
the broker's employees – whereby the plaintiffs would remit to
the defendants brokerage fees and premiums in return for
defendants' services.  Anglo-Iberia, 224 F.Supp.2d at 683.
Defendants were required to obtain the corporate, financial, and
governmental documents necessary to register a company called
Astek, also a party to the underlying agreement, as an
international reinsurer in several designated countries.  Id.
The relationship subsequently deteriorated, and plaintiffs
brought a lawsuit against defendants.  The complaint included
claims of fraud, negligent misrepresentation, conversion, and
breach of contract in connection with the defendants' negotiation
of the underlying international reinsurance contract.  The court
found that, with respect to plaintiffs' claims that the
defendants did not perform as agreed - i.e., that they failed to
provide the required documents - plaintiffs had not provided the
proper basis for a conversion claim.  Id. at 689.  The court

26

explained, "conversion concerns the unlawful exercise of control over or interference with another's property.  Payment for services inadequately rendered sounds in breach of contract."  Id.

Finally, in Wexselblatt, plaintiffs sued a bank that held a joint account in the names of the two plaintiffs, Alberto and Fanny Wexselblatt, and another relative, Eduardo Wexselblatt. 666 F.Supp. at 514-15.  After plaintiffs learned that Eduardo had been stealing from them, they requested the bank establish a new account in only their names using two-thirds of the funds in the original joint account.  Id. at 515.  After the bank requested the cooperation of all three parties to the joint account, it ultimately effectuated a transfer, at Eduardo's request, of $145,000 from the joint account to a Swiss bank account in Eduardo's name only.  Id.  This left a balance in the amount of $4,300, which was subsequently depleted after Eduardo signed and cashed a check in that amount.  Id.  The court found that "a plaintiff may not maintain an action for conversion where, as in this case, 'damages are merely being sought for breach of contract.'" Id. at 517, citing Fraser v. Doubleday & Co., 587 F.Supp. 1284, 1288 (S.D.N.Y. 1984).  There was a signature card agreement which controlled the relationship between the Wexselblatt's and the bank.  Id. at 516.  The breach of contract claim survived summary judgment because there were genuine issues

27

of material fact regarding the bank's delay in processing the plaintiff's original request, but the conversion claim was dismissed. <u>Id.</u> at 517.

Here, Plaintiff and Defendant do not dispute that they entered into an agreement. Plaintiff claims that Grassi converted Plaintiff's property by "accepting payment for work that it never performed." Compl. ¶¶ 72-75. A cause of action for the return of payments Plaintiff made to Defendant pursuant to their agreement sounds in breach of contract and/or negligence, not conversion.

Defendant's motion for summary judgment as to Count Eight is hereby granted.

**<u>Conclusion</u>**

For the foregoing reasons, defendants' motion for summary judgment [Doc. No. 21] is hereby GRANTED as to Counts Three, Five, Seven, and Eight, GRANTED in part as to Count Six, and DENIED as to Counts One, Two, and Four.

So Ordered,

_____
Ellen Bree Burns
Senior U.S. District Judge

Dated at New Haven, Connecticut on this ____ day of November, 2005.